UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>The Diocese of Duluth,<br><br>Debtor.<br>Bankruptcy Case No. 15-50792 | **AFFIDAVIT OF THE VERY REVEREND FATHER JAMES B. BISSONETTE REGARDING STRUCTURE AND PRE-FILING HISTORY OF DEBTOR AND IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS** |

STATE OF MINNESOTA )
                                    ) ss.
COUNTY OF ST. LOUIS )

Father James B Bissonette, being duly sworn, deposes and states:

1.  My name is Father James B. Bissonette. I am the Vicar General for the Diocese of Duluth (the "Diocese" or "Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case. I have served as the Vicar General since February 24, 2010 and also Pastor of St. James Church, Duluth since 7/23/2008. Prior to my appointment as Vicar General, I served as Diocesan Administrator from 12/4/2008-12/14/2009, as Vicar General from 8/27/2007-12/4/2008, as Diocesan Chancellor as well as pastor of St. Rose Church, Proctor and St. Philip Church, Saginaw; as Judicial Vicar and Presiding Judge in the Marriage Tribunal as well as Pastor of Immaculate Conception Church, Cromwell; as Pastor of St. Francis Church, Carlton; a member of the Priest Personnel Board; as pastor of St. Mary Church, Marble and St. Joseph Church, Taconite; as Director of Vocations to the Priesthood and Associate Pastor of Blessed Sacrament Church, Hibbing. I am familiar with the history, structure and mission of the Diocese. I am also generally familiar with the Diocese's day-to-day operations, business affairs and records.

2.  I make this Affidavit based upon my personal knowledge of the facts set forth herein, upon information supplied to me by others associated with the Diocese, upon my review of relevant documents or upon my opinion based on my experience and knowledge of the Diocese's operations,

financial condition and present financial outlook. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Diocese to submit this Affidavit.

3. On the date hereof (the "Petition Date"), the Diocese caused its attorneys to file a voluntary petition for Chapter 11 bankruptcy relief under Title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Diocese continues to operate its business and manage its properties as debtor in possession.

4. To enable the Diocese to minimize the adverse effects of the commencement of this Chapter 11 case on its operations, the Diocese has requested various types of relief in "first day" motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, facilitating a smooth transition in this Chapter 11 case, maintaining employee compensation, maintaining the goodwill and morale of priests, lay employees and others who rely on the programs and services provided by the Diocese, and preserving and maximizing the property available to satisfy the Diocese's creditors. All of the First Day Motions are vital to the Debtor's reorganization efforts, and expedited approval of the First Day Motions is important to the Debtor's success in this Chapter 11 case.

5. This Affidavit provides background on the Diocese's organization and operations relevant to this Chapter 11 case, and further provides factual information relevant to and in support of the First Day Motions.

**A.    Canon Law**

6. The Church and every Catholic entity, including the Diocese, is subject to Church law also called Canon Law. Canon Law was originally codified in 1917 and subsequently amended in 1983. As used herein, the term "Church" means the universal Catholic Church seated in the Vatican and headed by Pope Francis. My references to Canon Law are taken from The Code of Canon Law

<u>Latin-Endish Edition</u>, <u>New English Translation</u>, prepared under the auspices of the Canon Law Society of America (Washington D.C. Canon Law Society of America, 1999). The term "canon" means law. It is abbreviated here "c." in the singular and "cc." in the plural.

    7.    Canon Law recognizes the existence of rights and obligations of physical, moral, and juridic persons (c. 113 §2). A juridic person is a legal entity established by competent authority or by the law itself, and is classified as either public or private. The Diocese and every parish are separate public juridic persons (cc. 373, 515 §3). The Church claims the innate right to acquire, retain, administer, and alienate property and temporal goods independently from civil power (c. 1254 §1). Juridic persons in the Church are capable of acquiring, retaining, administering, and alienating temporal goods, in accordance with the requirements of Canon Law (c. 1255). The administration of property belonging to a juridic person pertains to its administrator, such as the diocesan bishop over the property of a diocese, and the pastor over the property of a parish (cc. 393, 532). All property acquired, retained, administered or alienated by a public juridic person is governed by the provisions of Canon Law and the statutes of the juridic person (c. 1257). Among other things, property held by a public juridic person is required to be managed by that person with diligence and care. Property held by a juridic person must be used for the purposes of the Church, including the organization of divine worship, the care and support of the clergy and other ministers, and the works of the apostolate and of charity (c.1254§2).

    8.    Canon Law also distinguishes between clerics and lay persons. As set forth in Canon 207, "By divine institution, there are among the Christian faithful in the Church sacred ministers who in law are also called clerics; the other members of the Christian faithful are called lay persons" (c. 207). The Church believes that the ordination of an individual as a deacon, priest, or bishop effects a fundamental (or "ontological") change in the essence and condition of the individual.

9. Clerics and lay persons have distinct rights and obligations. Canon Law is clear that the rights of a cleric include a right to support from the bishop or superior with responsibility for, and authority over, the cleric. As set forth in Canon 281:

> § 1. Since clerics dedicate themselves to ecclesiastical ministry, they deserve remuneration which is consistent with their condition, taking into account the nature of their function and the conditions of places and times, and by which they can provide for the necessities of their life as well as for the equitable payment of those whose services they need.
>
> § 2. Provision must also be made so that they possess that social assistance which provides for their needs suitably if they suffer from illness, incapacity, or old age.

10. The Church is entitled to regulate the exercise of the priesthood through the grant or removal of "faculties." A priest who has abandoned or has been permanently removed from ecclesial ministry loses the right to remuneration (essentially, wages or salary) under paragraph one of Canon 281. However, the priest will remain entitled to "social assistance" under paragraph two of Canon 281. The term "incapacity," as used in Canon 281, is not limited to physical, emotional or mental disability. In fact, Canon 1350 states that "Unless it concerns dismissal from the clerical state, when penalties are imposed on a cleric, provision must always [be] made so that he does not lack those things necessary for his decent support" (c. 1350 § 1). In other words, if a priest has not been dismissed from the clerical state, even if a serious penalty has been imposed or his faculties severely restricted, Canon 1350 makes clear that the bishop has a duty to assure that provision is made that he have what is needed for decent support.

11. As suggested above, it is possible for a priest to be dismissed from the clerical state. Even in that circumstance, "In the best manner possible . . . the [bishop] is to take care to provide for a person dismissed from the clerical state who is truly in need because of the penalty" (c. 1350 §2).

12. The foregoing should not be construed to suggest that the canonical obligations summarized above give rise in all cases to a "claim" for civil law purposes. However, it is important to emphasize that the responsible bishop is duty bound to honor the requirements of Canon Law, including

-4-

the provisions summarized above, and that a breach may expose the bishop or the diocese to canonical penalties.

**B.     Corporate Structure**

13.     As indicated above, the Diocese is structured and operates in accordance with Canon Law and is a juridic person under Canon Law.

14.     The Diocese was originally established by the Vatican in 1889. The Diocese is organized as a religious Diocesan Corporation under Minnesota Statutes Section 315.16. The "Diocese" or "Debtor" refers to the Corporation, and for purposes of this Affidavit, the terms of the secular legal embodiment of the juridic person of the Diocese under Canon Law.

15.     The Diocese serves a geographical area consisting of 10 northern Minnesota counties, including Aitkin, Carlton, Cass, Cook, Crow Wing, Itasca, Koochiching, Lake, Pine and St. Louis counties (the "Region"). There are 74 parishes and approximately 53,000 Catholic individuals in the Region. These individuals and parishes are served by approximately 75 priests and 58 deacons. The Diocese currently employs approximately 34 individuals, which includes clergy and laity.[1]

16.     As set forth in its Articles of Incorporation, the Diocese's general purpose is to manage the temporal affairs of the Church in the Region, and to promote spiritual, educational and other interests of the Church in the Region, including charitable, benevolent, and missionary work.

17.     The goal of the work of the Diocese as set forth in our mission statement, is: "… to be of service to one another in the name of Jesus our Lord…Our mission is to proclaim the Kingdom of God, the Good News of Jesus Christ…"

---

[1] In Canon Law, anyone not ordained a deacon, priest or bishop is a layperson or "laity." In this legal sense, women in a religious order (sisters) and men in a religious order (brothers) are laity.
In the documents of the Second Vatican Council, however, the laity are those who are neither ordained nor members of a religious order. That Vatican II sense is the one usually intended in most discussions of laypeople and their role in the Church.

18. Along with the 74 parishes, there are 11 Catholic schools in the Region, educating Pre-K to 8th graders (collectively, the "Schools"), with a total enrollment of over 1,498 students. Various other Catholic-based social and community service organizations operate in the Region, including four Catholic nursing homes and two Catholic hospitals. As indicated above, parishes, the Schools, and other separately incorporated Catholic entities within the Diocese's Region are not under the fiscal or operating control of the Diocese.

19. Catholic organizations located within the Region provide financial assistance to those in need. Through various forms of social outreach, these independent Catholic organizations help those in urgent need. Diocesan programs serve and provide advocacy and support for families and the unborn, the poor, the handicapped, persons with AIDS, the divorced and separated, people in prison, refugees, and others with special needs. The Catholic Church is the largest nongovernmental provider of social services in the United States.

20. The Bishop of the Diocese is the Most Reverend Paul D. Sirba. According to Canon Law, the Bishop is a teacher of the truths of the faith, a priest who sanctifies through sacred worship, and shepherd who exercises governance. As Vicar General, I serve at Bishop Sirba's side and assist him in governance of the Diocese.

21. The Diocese maintains a number of departments, including Finance and Facilities (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Catholic Schools (responsibilities include leadership development and ensuring Catholic identity in schools), Development and Stewardship (responsibilities include parish development efforts and programs to support a culture of stewardship), Marriage and Family Life (responsibilities include marriage preparation, family programs, and efforts to promote the dignity of life from conception to death), Continuing Formation of Clergy (responsibilities include clergy formation, planning and leadership development support),

Communications (responsibilities include the *Northern Cross,* diocesan websites, social media and other communications), the departments of Youth and Young Adult Ministry as well as Evangelization and Catechesis (responsibilities include out-reach in teaching and forming young disciples in the faith), Social Apostolate (responsibilities include leadership in the areas of social concern and providing support to those in desperate situations), Indian Ministry (directors responsibilities include representing the diocese at various church, civic and tribal functions and serves as the voice that brings Indian concerns to the attention of the Bishop), Vocations (responsibilities include recruitment, education and formation of seminarians and candidates for permanent diaconate), Safe Environment (responsibilities include establishing 'safe environment' programs, working with parents, civil authorities, clergy, parish staffs, educators, and community organizations to provide education and training for children, youth, parents, ministers, educators and others about ways to make and maintain a safe environment for children)

## C. Budget And Revenue

22. As a religious organization, the Diocese has no significant, ongoing for-profit business activities or business income. Gross revenue for the fiscal year ending on June 30, 2015 was approximately $3,643,231. The Diocese's revenue primarily derives from donations and parish assessments.

## D. Non-Debtor Parish Corporations

23. As I understand it, there have been a number of Chapter 11 bankruptcy cases filed by other dioceses in the United States. Several of these cases, including the bankruptcy cases in Spokane, Washington; Tucson, Arizona; Portland, Oregon; San Diego, California; and Fairbanks, Alaska; were filed by dioceses operating under a "corporation sole" structure. In those cases, the individual parishes existed under civil law as unincorporated associations as a part of the diocese civil corporation.

24. The Diocese does not operate under the corporation sole model. Parish property located in the Region is held by 74 separate parish corporations (each a "Parish Corporation" and collectively, the

"Parish Corporations"), each of which has been organized and exists under Section 315.15 of the Minnesota Statutes. Each Parish Corporation in the Region owns the separate property used in the operation of the parish, normally including the church itself, administrative offices, and, in most cases, a rectory that serves as the pastor's (priest's) residence.

25. These Parish Corporations are subject to the requirements and possess the rights, powers, and privileges of a religious corporation. Each Parish Corporation maintains its own tax identification number and each corporation owns and manages its own property and assets, and has responsibility for their own corporate actions. The Parish Corporations are not debtors in this Chapter 11 Case and have not otherwise sought bankruptcy relief.

26. In addition to the civil distinction referenced above, under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

E. **Other Non-Debtor Catholic Entities**

27. The Diocese is one of a number of separate entities created to promote the mission of the Church in the Region. These other entities include the Seminarian Endowment Fund, Human Life and Development Fund, Catholic Religious Education Endowment Fund. Each of these entities (each a "Non-Debtor Catholic Entity" and, collectively, the "Non-Debtor Catholic Entities") is incorporated as a separate non-profit corporation under Chapter 317(A ) or § 315.16 of the Minnesota Statutes.

28. In terms of secular legal structure, the above-listed entities have no corporate relationship with the Diocese. As with the Parish Religious Corporations, these Non-Debtor Catholic Entities have separate tax identification numbers, own their own property and are responsible for their individual corporate actions.

**F.     Funds of Other Organizations Held by the Diocese as Agent**

29.    National Collections Programs.    The Parish religious corporations throughout the Diocese of Duluth participate in various worldwide charitable programs and make monetary contributions in response to requests for financial support for those programs.  The Diocese coordinates the solicitation of donations from the parish religious corporations and donations from the parish religious corporations for those programs are electronically remitted to an account specifically created by the Diocese for the exclusive receipt of those funds (i.e., Wells Fargo # xxxxxx4495).  After all parishes have remitted their donations, the Diocese forwards the funds to the national office of the organization sponsoring the program, and that organization distributes the funds in compliance with the donor's restrictions.  The Diocese has no ownership interest in those funds and requests that the National Collections Programs be allowed to continue.

30.    Missionary Cooperative.  Similarly, the Diocese of Duluth coordinates a program with the parish religious corporations within the diocese whereby catholic missionaries are invited to fundraise in the parishes for their missionary ministry.   This Missionary Cooperative Program is required by canon law and the Diocese acts as an intermediary.   The parish religious corporations collect the funds for the missionary and forward them to the Diocese where they are deposited into the diocesan general operating account (i.e., Wells Fargo # xxxx7569).  After all participating parishes have remitted their funds, the Diocese forwards the total collected to the appropriate missionary order.  Even though the funds are deposited in the general operating account, the Diocese has no ownership interest in the funds.  The Diocese requests that this Program be allowed to continue and the various missionaries allowed to receive their funds.

31.    Diocesan Benefit Programs.    The Diocese of Duluth and all parish religious corporations within the diocesan territory participate in certain centralized employee benefits programs such as dental, medical and retirement.    The Diocese and each parish corporation electronically transfers

funds each month to a Diocese of Duluth Benefits Agency account (i.e., Wells Fargo xxxxxx7604) set up specifically and exclusively for this program. Benefit providers are then paid out of this segregated account to maintain insurance coverages and retirement benefits. If this program is not allowed to continue, employees at the parishes and at the Diocese will lose medical/dental coverage and funding for their retirement. The Diocesan Benefits Program includes both employee funds by means of payroll deductions and employer contributions. The Diocese does not own the funds in this Program. The Diocese requests that the deposit and remittance activity out of this segregated account be allowed to continue.

**G.    The Clergy Sexual Abuse Crisis And The Diocese's Historical Response**

32.    Over the last several decades, some clergy members in the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of sexual abuse. This conduct runs contrary to the teaching and traditions of the Church. The Diocese has worked for more than two decades to meet the needs of alleged victims without filing for Chapter 11 reorganization. Since the 1990s, the Diocese has directed substantial resources towards providing financial, psychological, pastoral and spiritual support to victims.

33.    In 1992, the Diocese issued a written Sexual Misconduct Policy to protect minors from clergy abuse, and in that same year held workshops for priests and Church personnel on ministry-related sexual misconduct. Included in the implementation of the policy was the establishment of the Sexual Misconduct Investigation Committee (SMIC), a panel of primarily laypersons to advise the bishop on matters related to clergy misconduct.

34.    In 2003, the Sexual Misconduct Policy was updated to be in compliance with the publication of the Charter for the Protection of Children and Young People (the "Charter") from the United States Conference of Catholic Bishops (USCCB). At that time, the name of SMIC was changed to

the Diocesan Review Board (DRB). Victim Advocates were also named and their contact information placed in the *Northern Cross* and on the Diocesan website.

35. Also in 2003, background checks were required for clergy, employees and volunteers in the Diocese. In 2005, an online training program provided through the Boy Scouts of America was implemented. The program could be described as "an awareness session which better equips adults to protect children in the world around them." Online training has evolved with the adoption of a program from Catholic Mutual called *Safe Haven* and continues to be required of all clergy, Catholic school and parish employees, as well as all volunteers who have regular or unsupervised interaction with children under the age of 18.

36. In 2005, the Diocese established the Department of Safe Environment whose primary job is the implementation of the Charter and to ensure the completion of background checks, safe environment training for clergy, Diocesan and parish employees and volunteers working with minor children, and an age-appropriate, Church-approved personal safety instruction for minors in Schools, Faith Formation Programs and Youth Ministry Programs called *Circle of Grace*. The department also completes annual compliance audits under the terms of the Charter.

**H.** **The Diocese's New Policies Aimed At Preventing Sexual Abuse In The Church**

37. In connection with this effort, the Diocese has voluntarily released the names, assignment histories, and current status of clergy members against whom "credible claims" of sexual abuse of a minor had been submitted as part of the John Jay Study. This is not an exacting standard. Rather, a "credible claim" as defined by the study is one that is "not implausible". An allegation was considered "implausible" only if it <u>could not possibly have happened</u> under the given circumstances.

Case 15-50792   Doc 8   Filed 12/07/15   Entered 12/07/15 16:52:32   Desc Main
              Document      Page 12 of 16

38.     To date, the Diocese has publicly disclosed thirty four (34) priests with credible claims of sexual abuse of a minor.[2] Of these men, fifteen (15) are priests of the Diocese of Duluth, thirteen (13) are order priests and six (6) are from other dioceses. Nine (9) of those priests name are the subject of civil litigation, ie. a Notice of Claim or Lawsuit. For each individual against whom a credible claim has been made, including priests from other dioceses and religious orders, the Diocese has disclosed certain background and biographical information, including the following: (i) his year of birth and year of ordination; (ii) whether he is alive or deceased; (iii) if deceased, the year of his death; (iv) his prior assignments; (v) the date of his permanent removal from ministry; and (vi) for those who are alive, their present status with the Church (i.e. retire, removed from ministry or dismissed from the clerical state) and the city and state in which they reside on the Diocesan website.

39.     These disclosures are ongoing. If a claim is determined to be credible, whether from the review of clergy files by outside experts or otherwise, the Diocese will share this information with the public by adding the name of the clergy member to the disclosure section of its website. The Diocese believes that disclosure is critically important if it is to do all that it can to keep children safe, help victims of abuse heal, and regain the trust and confidence of our communities.

40.     In December 2012, the Diocese implemented diocesan-wide processes to ensure that any report of sexual abuse of a minor is promptly reported to law enforcement. In the event any such claim is not manifestly false or frivolous, the accused clergy member will also be placed on a leave of absence pending an investigation of the claim by police and the Diocese. During the leave of absence, the accused clergy will not engage in any public ministry. The threshold for placing an accused clergy member on leave is a decidedly low one. Any accusation that is not, on its face, blatantly and demonstrably false will

---

[2] Most of these incidents of sexual abuse of a minor occurred between the mid-1950s and the mid-1980s, and many of these men have been previously identified in media reports. All of these men have been permanently removed from ministry, and most of them have been out of ministry for a decade or more. Twenty Three (23) of these men are deceased. Diocesan leaders are not aware of any men with substantiated claims of sexual abuse of a minor against them who are currently in public ministry in the Diocese.

initiate the leave of absence process. If, upon investigation, the claim against the accused clergy member is determined credible then this finding initiates a canonical process in order to resolve the claim. As required by Church law, no priest who is found to have sexually abused a minor can ever return to public ministry. Through this process the Diocese continues to be committed to outreach through services that address victims' emotional, psychological and spiritual well-being, such as counseling and spiritual direction. Victims are invited to talk with the bishop if and when they wish to do so as part of their healing process. The bishop is committed to meeting with victims of sexual abuse in order to hear about their experiences and concerns, and to provide solidarity and support.

**I.      Doe 30 Judgment**

41.    In February, 2014, plaintiff Doe 30 filed a lawsuit in Ramsey County District Court against the Diocese of Duluth, the Oblates of Mary Immaculate (OMI), and the Diocese of New Ulm. The suit alleged that the three entities should be held liable under various theories of negligence and nuisance, for the actions of OMI priest Vincent Fitzgerald. The plaintiff's claim was based on Fitzgerald's sexual abuse of him in 1978, while plaintiff was a parishioner of New Ulm parish.

42.    OMI reached a settlement with Doe 30, and the Diocese of New Ulm's motion for summary judgment was granted in August, 2015, dismissing all claims made against them.

43.    On October 19, 2015, trial commenced on Doe 30's remaining claims against the Diocese of Duluth. The Diocese did not dispute that Doe 30 had been sexually abused by Fitzgerald, but maintained that it had no knowledge that Fitzgerald had or would abuse children.

44.    The jury returned a verdict in Doe 30's favor in the amount of $8,166,000. It found that the Diocese of Duluth had negligently supervised and negligently retained Fitzgerald, and attributed 60% of Doe 30's damages to that negligence. The jury found that OMI's negligent supervision and retention of Fitzgerald was the direct cause of 40% of Doe 30's damages.

45.     Judgment was accordingly entered on November 5, 2015, against the Diocese in the amount of $4,899,600. That judgment was stayed for thirty days, pursuant to court rule, and will be effective on December 7, 2015.

**J.      Necessity For Commencement Of This Chapter 11 Case**

46.     In May 2013, Minnesota enacted the Minnesota Child Victims' Act, Minn. Stat. § 541.073 (the "CVA"), which altered, expanded, and in some circumstances eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse. The CVA allows victims who were sexually abused when they were younger than 18 years old to bring a civil lawsuit for damages arising from the abuse, regardless of how long ago the abuse occurred. The CVA also provides a three-year window, during which victims whose claims would have been time barred by the previous statute of limitations, may bring civil suits against alleged abusers and the Diocese. This window will not expire until May 25, 2016.

47.     The CVA has opened the door to a significant number of additional civil claims against the Diocese relating to clergy misconduct spanning a time period of more than half of a century.

48.     The Diocese, however, remains subject to 18 pending civil actions (six (6) lawsuits and twelve (12) notices of claim). The next trial scheduled to begin in August 2016.

49.     The Diocese has insurance coverage available for some, but not all, of the amounts sought by the claimants in the CVA cases pending against it. In certain instances, the insurance coverage is also subject to certain coverage disputes. The Diocese is defending each of the cases in civil court, but had also attempted to resolve the Doe 30 case several times through mediation.

50.     The Diocese is concerned that with the very large judgment in the Doe 30 case, the Diocese would be left with insufficient assets to fairly compensate other claimants and creditors and would result in a disproportionate allocation of the limited funds available to the Diocese.

51. In addition, although the Diocese is current on its vendor obligations, it faces other financial issues in addition to claims involving allegations of clergy sexual abuse, including, for example, an underfunding obligation under its pension plans and potential claims of parishes.

**K.     Goals of This Chapter 11 Case**

52. The combined circumstances of the civil claims against the Diocese, considered in their totality, make clear that reorganization is the only way to fairly and equitably fulfill the Diocese's obligations to all victims. The Diocese did not seek Chapter 11 relief to shirk any responsibility regarding sexual misconduct by clergy or any mistakes made by the Diocese's administration. The Diocese is not attempting to deny victims their day in court or hide the truth. Rather, the Diocese has been and continues to be committed to pursuing the truth, addressing the wrongs perpetrated against children and other parishioners, and fairly compensating victims.

53. The Diocese is entering into this Chapter 11 Case with three paramount goals in mind, as follows:

- The Diocese's primary goal is to compensate, as fairly and equitably as possible, all victims with unresolved claims, including those with claims presently pending against the Diocese and those who, with great courage, will come forward as a result of this Chapter 11 case. The Diocese hopes to accelerate healing and resolution with victims while making efficient and responsible use of Diocesan resources.

- The Diocese must continue its essential ministries and functions associated with its mission. The plan of reorganization will provide a feasible operational structure for the Diocese to allow it to continue its ministry in the community and provide the worship, outreach, education, service, and charity that constitutes the critical work of the Church in this Diocese. The importance of this work cannot be overstated.

- This Chapter 11 case will enable the Diocese to use available funds and resources to compensate all victims with unresolved claims in a single process managed and overseen by the Bankruptcy Court to ensure that all are treated equitably. In addition, this Chapter 11 case will allow the Diocese to move forward on stable financial ground so that it may focus on its Gospel mission and serve the people who depend on the Church.

54. Throughout this Chapter 11 case, the Diocese will continue its outreach to victims and others affected by the tragedy of sexual abuse. The Diocese will also continue to implement and build upon the good work of our Diocesan leadership and staff.

55. The circumstances described above make it clear that reorganization under Chapter 11 of the Bankruptcy Code is the best and only way for the Diocese to fairly and equitably fulfill its obligations to victims, creditors, and other parties in interest, and represents the only method by which the Diocese may maintain its worship, outreach, educational and charitable services to the community.

56. Finally, I wish to emphasize the need to move this reorganization case forward as quickly as possible. I am aware of the enormous professional and other fees that have been incurred in other diocesan bankruptcy cases across the United States. The Diocese has limited resources and limited financial means and must rely on the support of its parishioners to sustain its existence and to promote a spiritual, religious and charitable mission. The Diocese will use all best efforts to communicate with the faithful and the other parties who rely on the continued existence and operation of the Diocese. Although I am hopeful that the faithful will continue to fund the ongoing work and ministries of the Diocese for the benefit of the faithful and the community, the risk to this work and the ministries of the Diocese can only increase if the Diocese is unable to achieve a prompt resolution of the case.

To that end, for the reasons stated herein and in each of the First Day Motions filed concurrently herewith, I respectfully request that the Court grant each of the First Day Motions in their entirety and award the Diocese such other and further relief as is just and proper.

_Fr. James B. Bissonette_
The Very Reverend James B. Bissonette

Subscribed and sworn to before me this
6TH day of DECEMBER, 2015

_Robert J. Zallar_
Notary Public

ROBERT J. ZALLAR
Notary Public-Minnesota
My Commission Expires Jan 31, 2020