## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:

Diocese of Duluth,

          Debtor-in-Possession.

Case No.: 15-50792

Chapter 11

---

### NOTICE OF HEARING AND MOTION PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN THE DIOCESE, THE PARISHES AND LIBERTY MUTUAL INSURANCE COMPANY

---

TO:    The parties specified in Local Rule 9013-3(a)(2) and the parties identified on the attached service list.

    1.    The above-captioned debtor moves the Court for the relief requested below and gives notice of a hearing.

    2.    The Court will hold a hearing on the Motion at **10:30 a.m. on Thursday, March 7, 2019**, before the Honorable Robert J. Kressel in Courtroom 8 West at the United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.

    3.    Any response to this Motion must be filed and served no later than **[day], [date], 2019**, which is five (5) days before the time set for the hearing (including Saturdays, Sundays, and holidays). **UNLESS A RESPONSE OPPOSING THIS MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

    4.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rule 1070-1. This is a core proceeding.

5.      The petition commencing the Diocese's chapter 11 case was filed on December 7, 2015. The case is now pending in this Court.

6.      This Motion arises under section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). This Motion is filed under Fed. R. Bankr. P. 9019 and Local Rules 2002-1, 9013-1 and 9013-2. The Diocese requests an order: (i) approving the Settlement Agreement, Release, and Policy Buyback (the "Settlement Agreement") between the Diocese, the Parishes named therein (the "Parishes"), Liberty Mutual Insurance Company ("Liberty Mutual"); and (ii) granting such other relief as is just and proper.

## GENERAL BACKGROUND

7.      On December 7, 2015, the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Diocese has continued to manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors has been appointed in this case.

8.      General information about the Diocese's business and the events leading up to the Petition Date can be found in the Affidavit of the Very Reverend Father James B. Bissonette [Docket No. 8].

## BACKGROUND SPECIFIC TO MOTION

9.      Over the last several decades, some clergy members in the Diocese have violated the sacred trust placed in them by children, their families and the Diocese by committing acts of sexual abuse. The Diocese filed its chapter 11 bankruptcy case in an effort to compensate, as fairly and equitable as possible, all survivors of such abuse.

10.    The Diocese purchased historical insurance policies that it believes will provide some of the dollar amounts necessary to compensate the survivors.  To determine the extent and applicability of the available coverage, the Diocese initiated an adversary proceeding (the "Coverage Litigation") seeking declaratory judgment against its various insurance carriers, including Liberty Mutual. [Minn. Bankr. Case No. 16-05012].   The Coverage Litigation is now pending in the United States District Court before the Honorable Donovan Frank as Case No. 17-cv-03254.

11.    Liberty Mutual is a corporation organized under the laws of Massachusetts. Liberty Mutual operates in the state of Minnesota and the Diocese maintains that Liberty Mutual is responsible for certain insurance policies issued to the Diocese ("Policies") providing coverage to the Diocese and the Parishes for certain time frames during which survivors allege abuse.

12.    The Diocese and the Parishes maintain that the Policies require Liberty Mutual to pay, on behalf of the Diocese, all sums that the Diocese became legally obligated to pay as a result of bodily injury, as long as any part of the injury took place during the policy period.  They also maintain that the Policies require Liberty Mutual to pay all defense costs and expenses, including attorneys' fees, incurred by the Diocese and the Parishes in the investigation and defense of the underlying actions and claims alleged by the victims.

13.    The Diocese and the Parishes maintain that they timely notified Liberty Mutual of the underlying actions and claims and have fulfilled their duties and conditions under the Policies.  As a result, the Diocese and the Parishes maintain that they are entitled to all benefits provided by the Policies.

14.     To resolve the alleged obligations of Liberty Mutual under the Policies, the Diocese, the Parishes and Liberty Mutual have conferred and have entered into the Settlement Agreement.  The Settlement Agreement is attached as **Exhibit A.**  The debtor has advised the Official Committee of Unsecured Creditors (the "Committee") of the terms of the Settlement Agreement and provided a copy of the Settlement Agreement to the Committee.

15.     The material provisions of the Settlement Agreement are as follows (capitalized terms used herein have the same meaning assigned to them in the Settlement Agreement):

- The Diocese shall sell, convey, transfer and assign any and all interest it may have in the Policies to Liberty Mutual;
- Liberty Mutual and the Parishes shall exchange global releases for all Claims, except as otherwise provided in the Settlement Agreement;
- The Parties shall exchange global releases for any and all Tort Claims, including Unknown Tort Claims;
- A Channeling Injunction and a Supplemental Injunction shall be in the Diocese's Plan of Reorganization;
- Liberty Mutual will deliver a Settlement Amount in the amount of $[6,500,000.00], which amount shall be paid to the Diocese for the benefit of Tort Claimants, but not claimants with Unknown Tort Claims;
- The settlement is contingent and conditioned on the confirmation of a consensual Plan of Reorganization agreed to by all Parties.

16.     The Diocese has determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the dispute with Liberty Mutual.

17.     The Diocese has conferred with the Parishes and believes the terms of the Settlement Agreement to be acceptable to the Parishes.   A fully executed Settlement Agreement will be filed prior to the hearing on this Motion.

18.    Pursuant to Local Rule 9013-2(a), this Motion is verified and is accompanied by the Declaration of James Murray, coverage counsel for the Diocese, a Memorandum, Proposed Order and Proof of Service.

19.    Pursuant to Local Rule 9013-2(c), the Diocese gives notice that it may, if necessary, call Father James B. Bissonette, the Vicar General of the Diocese, and James Murray, outside coverage counsel for the Diocese, to testify regarding the facts set forth in this Motion.

WHEREFORE, the Diocese respectfully requests that the Court enter an order: (i) approving the Settlement Agreement, Release, and Policy Buyback between the Diocese, Liberty Mutual and the Parishes; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: this 5th day of February, 2019

**ELSAESSER ANDERSON**

/s/ Bruce A. Anderson
Bruce A. Anderson (admitted *pro hac vice*)
J. Ford Elsaesser (admitted *pro hac vice*)
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Phone: 208-263-8517
brucea@eaidaho.com
ford@eaidaho.com

-and-

**GRAY PLANT MOOTY MOOTY &
BENNETT, P.A.**

/s/ Phillip L. Kunkel
Phillip L. Kunkel (#058981)
1010 West St. Germain
Suite 500
St. Cloud, MN 56301
Phone: 320-202-5335
phillip.kunkel@gpmlaw.com

*Attorneys for the Diocese of Duluth*

**<u>VERIFICATION</u>**

I, Father James B. Bissonette, the Vicar General of the Diocese of Duluth, based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Date:  2|5|2019                    Signed:  _Reverend   James B. Bissonette_

**EXHIBIT A**

**(Settlement Agreement)**

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("Agreement") is hereby made by, between and among the Diocese Parties, the Parish Parties, and the Liberty Mutual Parties.[1/]

## RECITALS

**WHEREAS**, numerous individuals have asserted certain Tort Claims against the Diocese and Parishes;

**WHEREAS**, through a corporate transaction between The Ohio Casualty Insurance Company and Great American Insurance Company, Liberty Mutual is responsible for certain insurance policies issued to the Diocese Parties and the Parish Parties;

**WHEREAS**, certain disputes among the Diocese Parties, Parish Parties, and the Liberty Mutual Parties have arisen and/or may arise in the future concerning the Liberty Mutual Parties' position regarding the nature and scope of its responsibilities, if any, to provide coverage to the Diocese Parties or Parish Parties under the Policies including in connection with Tort Claims (the "Coverage Disputes"), including those disputes at issue in the proceedings, captioned *Diocese of Duluth v. Liberty Mutual Group, et al.,* Adv. Pro. 16-0512, which was pending in the United States Bankruptcy Court for the District of Minnesota, and *Diocese of Duluth v. Liberty Mutual Insurance Company, et al.*, Case No. 17-cv-03254 DWF-LIB, pending in the United States District Court for the District of Minnesota (collectively, the "Coverage Suit");

**WHEREAS**, the Diocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (Case No. 15-50792) (the "Reorganization Case") on December 7, 2015  (the "Petition Date");

**WHEREAS**, the Diocese Parties, the Parish Parties, and the Liberty Mutual Parties, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Disputes, Tort Claims, and all other disputes between and among them;

**WHEREAS**, through this Agreement, the Diocese Parties and Parish Parties intend to provide the Liberty Mutual Parties with the broadest possible release of all Tort Claims, including all Unknown Tort Claims, that occurred, or may have arisen, prior to the effective date of the Plan, which Plan shall include a Channeling Injunction and a settling insurer Supplemental Injunction that protects the Diocese Parties, the Parish Parties, and the Liberty Mutual Parties from and against any past, present or future Tort Claims and Related Insurance Claims arising prior to the effective date of the Plan;

**WHEREAS**, through this Agreement, the Diocese Parties, Parish Parties, and the Liberty Mutual Parties also wish to effect a sale of the Policies pursuant to 11 U.S.C. § 363 and to provide the Liberty Mutual Parties with the broadest possible release and buyback with respect to

---

[1/]      Capitalized terms not defined herein, including in Section 1 hereof, shall have the meanings given to them in the Bankruptcy Code.

the Policies, resulting in the Liberty Mutual Parties having, except as otherwise provided herein, no obligations now, or in the future, under the Policies;

**NOW, THEREFORE**, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the Bankruptcy Court and any other court in which the Reorganization Case may be pending or that has jurisdiction over the Reorganization Case, the Parties hereby agree as follows:

1. **DEFINITIONS**

1.1.   As used in this Agreement, the following terms shall have the following meanings. Capitalized terms and terms in quotations shall have the meaning ascribed to them herein. Unless otherwise indicated, references to "Sections" are references to Sections of this Agreement.

1.1.1.   "Abuse" means (i) any actual or alleged sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in Minnesota Statutes § 541.073(1); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; or (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, intimidation, or misconduct.

1.1.2.   "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, and any amendments thereto applicable to this case.

1.1.3.   "Bankruptcy Court" means the United States Bankruptcy Court for the District of Minnesota.

1.1.4.   "Bankruptcy Orders" means collectively, the Approval Order and the Plan Confirmation Order.

1.1.5.   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Bankruptcy Court, as applicable to the Reorganization Case.

1.1.6.   "Channeled Claim(s)" means any Tort Claim or any other Claim against any of the Protected Parties, the Liberty Mutual Parties, or any Person qualifying as an insured under any Policy that, directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, any Related Insurance Claim, any Medicare Claim, and any Claim covered by the Channeling and Supplemental Injunctions under the Plan.

1.1.7.   "Claim" means any past, present, or future claim, demand, action, request, cause of action, suit, proceeding, or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by, or on behalf of, any Person, whether seeking

damages (including compensatory, punitive, or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.8. "Committee" means the Official Committee of Unsecured Creditors appointed in the Reorganization Case, pursuant to an Order of the Bankruptcy Court entered on December 28, 2015.

1.1.9. "Diocese" means the Diocese of Duluth and its estate (pursuant to section 541 of the Bankruptcy Code).

1.1.10. "Diocese Parties" means, collectively, the Diocese and: (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies of the Diocese; (ii) any and all named insured Person, insured Person, additional insured Person, or other Person claiming coverage under the Policies, including any and all past and present parishes of or in the Diocese (as applicable) and every Protected Person (as defined in the Policies); (iii) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies; (iv) each of the foregoing Persons' respective predecessors, successors, and assigns; and (v) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iv), in their capacity as such.  Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Diocese or subject to its control.   An individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Diocese Party with respect to that Tort Claim.  No religious order is a Diocese Party.

1.1.11. "Effective Date" means the date on which all conditions precedent to this Agreement are satisfied.

1.1.12. "Extra-Contractual Claim" means any Claim against any of the Liberty Mutual Parties based, in whole or in part, on allegations that any of the Liberty Mutual Parties acted in bad faith or in breach of any express or implied duty, obligation, or covenant, contractual, statutory or otherwise, including any Claim on account of alleged bad faith; failure to act in good faith; violation of any express or implied duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of any of the Liberty Mutual Parties of any type for which the claimant seeks relief other than coverage or benefits under a policy of insurance.  Extra-Contractual Claims include: (i) any Claim that, directly or indirectly, arises out of, relates to, or is in connection with, any of the Liberty Mutual Parties' handling of any Claim or any request for insurance coverage, including any request for coverage for any Claim, including any Tort Claim; (ii) any Claim that, directly or indirectly, arises out of, relates to, or is in connection with, the

3

Policies and any contractual duties arising therefrom, including any contractual duty to defend the Diocese Parties or Parish Parties against any Tort Claims; and (iii) the conduct of the Parties with respect to the negotiation of this Agreement and the Plan.

1.1.13. "Final Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such an appeal or review has been taken, (i) it has been resolved and no longer remains pending, or (ii) an appeal or review has been taken timely but such order has not been stayed and the Parties have mutually agreed in writing that the order from which such appeal or review is taken should be deemed to be a Final Order within the meaning of this Agreement.

1.1.14. "Great American Insurance Company" means the Great American Insurance Company and each of its past, present and future parents, subsidiaries, affiliates, and divisions; each of its respective past, present, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies; each of its respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and each of its respective predecessors, successors, assignors, and assigns, whether known or unknown.

1.1.15. "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

1.1.16. "Liberty Mutual" means Liberty Mutual Insurance Company.

1.1.17. "Liberty Mutual Parties" means the Liberty Mutual Insurance Company and each of its past, present and future parents, subsidiaries, affiliates, and divisions; each of its respective past, present, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, and acquired companies; each of its respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and each of its respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons, including without limitation, Great American Insurance Company,  acting on behalf of, by, through or in concert with them, including those Persons who issued, or allegedly issued, the Policies listed on Exhibit A attached to this Agreement.

1.1.18. "Parish" means all parishes listed on Exhibit B.

1.1.19. "Parish Parties" means the Parishes and (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies of the Parishes; (ii) any and all named insured Person, insured Person, additional insured

Person, or any other Person claiming coverage under the Policies, including every Protected Person (as defined in the Policies); (iii) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies; (iv) each of the foregoing Persons' respective predecessors, successors, and assigns; and (v) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iv), in their capacity as such.  Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Parishes or subject to their control.   An individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Parish Party with respect to that Tort Claim.

1.1.20. "Parties" means the Diocese Parties, the Liberty Mutual Parties and the Parish Parties, and "Party" refers to them individually.

1.1.21. "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity or organization, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision, or any agency or instrumentality thereof, and any other individual or entity within the definition of (i) "person" in section 101(41) of the Bankruptcy Code; or (ii) "entity" in section 101(15) of the Bankruptcy Code.

1.1.22. "Plan" refers to the Diocese's chapter 11 plan of reorganization and any amendment thereto, as approved and confirmed by Final Order of the Bankruptcy Court, and that is consistent with the Agreement, and containing such language and provisions as are acceptable to Liberty Mutual in its sole discretion.

1.1.23. "Policies" means any and all insurance policies, whether known or unknown, existing, missing, or allegedly in existence, that were issued or allegedly issued by any of the Liberty Mutual Parties to the Diocese Parties or the Parish Parties on or before the Bankruptcy Plan Effective Date, and allegedly insure or otherwise provide insurance coverage for the Diocese Parties or the Parish Parties with respect to Tort Claims, and including all secondary evidence alleged to support the existence and terms of the Policies.  Policies shall include, but not be limited to: (i) policies issued to the Diocese Parties or Parish Parties for which Liberty Mutual has either accepted responsibility, or for which Liberty Mutual allegedly is responsible, pursuant to a corporate transaction between The Ohio Casualty Insurance Company and Great American Insurance Company; (ii) the insurance policies listed on Exhibit A; and (iii) the XOV Alleged Policy.

1.1.24. "Protected Parties" means any of the Diocese Parties, the Reorganized Debtor (as shall be defined in the Plan), and the Parish Parties and, in their capacity as such, their respective predecessors and successors, and all of the foregoing Person's, past,

present, and future members, shareholders, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, volunteers, attorneys, professionals, insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns; but an individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Protected Party with respect to that Tort Claim. Protected Party also includes the other insured entities, and, in their capacity as such, their respective predecessors and successors, and all of the foregoing Person's, past, present, and future members, shareholders, trustees, officers, directors, officials, employees, agents, representatives, servants, contractors, consultants, volunteers, attorneys, professionals, insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns. No religious order other than the Diocese itself is a Protected Party.

1.1.25. "Related Insurance Claim" means (i) any Claim by any Person against any of the Liberty Mutual Parties for defense, indemnity, contribution, subrogation, or similar relief that, directly or indirectly, arises from, relates to, or is in connection with, a Tort Claim; and (ii) any Extra Contractual Claim that, directly or indirectly, arises out of, relates to, or is in connection with, any Tort Claim, including any Claim that, directly or indirectly, arises out of, relates to or is in connection with, any of the Liberty Mutual Parties' handling of any Tort Claim.

1.1.26. "Reorganized Debtor" shall have the meaning ascribed in the Plan, but for purposes hereof, shall mean the Diocese after confirmation of the Plan.

1.1.27. "Settlement Amount" means the sum of $[6,500,000.00] to be paid to the Diocese for the benefit of Tort Claimants (but excluding Unknown Tort Claims) by Liberty Mutual after satisfaction of all Conditions Precedent, and pursuant to the confirmed Plan.

1.1.28. "Tort Claim" means any Claim against any of the Protected Parties or the Liberty Mutual Parties that arises out of, relates to, results from, causes, or is in connection with, in whole or in part, directly or indirectly, Abuse that took place, in whole or in part, prior to the effective date of the Plan, including any such Claim that seeks: monetary damages or any other relief, under any theory of liability, including vicarious liability; respondeat superior; any fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, supervision, retention, or misrepresentation; violation of civil rights, any other theory based on misrepresentation, concealment, or unfair practice; contribution; indemnity; public or private nuisance; or any other theory, including any theory based on public policy or any acts or failures to act by any of the Protected Parties, Liberty Mutual Parties, or any other Person for whom any of the Protected Parties or Liberty Mutual Parties are allegedly responsible, including any such Claim asserted against any of the Parties in connection with the Diocese's Reorganization Case. "Tort Claim" includes any Unknown Tort Claim.

1.1.29. "Tort Claimant" means any Person holding a Tort Claim, including but not limited to any Claims articulated or set forth in proofs of claim filed with the Bankruptcy Court in the Reorganization Case.

1.1.30. "UCR" means Michael R. Hogan as the unknown claimants representative, appointed pursuant to that certain Order Appointing Unknown Claimants' Representative entered by the Bankruptcy Court [Docket No. 328].

1.1.31. "Unknown Tort Claim" means any Tort Claim that is neither filed, nor deemed filed, by the proof of claim bar date in the Diocese's bankruptcy case ("Claim Filing Date") and is held by an individual who: (i) was continuously between the Claim Filing Date and the Plan's effective date under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2, and 3 (or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4); (ii) has a Tort Claim that was barred by the statute of limitations as of the Claim Filing Date, but is no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revises previously time-barred Tort Claims; (iii) claims he or she was incapable of knowing of the existence of his or her Tort Claim as of the Claim Filing Date for any reason, including alleged memory repression or suppression; or as otherwise defined by subsequent order of the Bankruptcy Court; or (iv) any other individual or class of individuals the UCR can identify that would have a Tort Claim on, or prior to, the effective date of the Plan.

1.1.32. "XOV Alleged Policy" means the alleged insurance policy issued to the Diocese by Great American Insurance Company with a policy number of XOV0770553 referenced in the Diocese's Opposition to Liberty Mutual's Motion for Summary Judgment filed in the Coverage Suit, ECF No. 193, at 1, 35.

## 2. THE REORGANIZATION CASE AND PLAN FOR REORGANIZATION

2.1.    Not later than five (5) days after the last Party signs this Agreement, the Diocese shall file a motion in the Bankruptcy Court (the "Approval Motion") in form and substance acceptable to the Liberty Mutual Parties and the Diocese, seeking entry of an order approving this Agreement and authorizing the Parties to undertake the transactions contemplated by this Agreement (the "Approval Order").

2.1.1.    The Diocese shall provide written notice of the Approval Motion to (i) all Tort Claimants to the extent they are known by the Diocese, (ii) counsel for the Committee, (iii) the UCR, (iv) all Persons who have filed notices of appearance in the Reorganization Case, and (v) all Persons known to have provided general or professional liability insurance to the Diocese Parties. The Diocese shall serve all claimants identified above at the address shown on their proofs of claim or to their counsel of record or, if no proof of claim was filed, then at the address on the Diocese's schedules. The Diocese shall also serve the attorney for each Tort Claimant. The Diocese shall serve known Tort Claimants even if not scheduled or the subject of a proof of claim, to the extent known to the Diocese. The Diocese shall also serve any and all co-defendants and their counsel (to the extent of record) in any pre-petition

litigation brought by Tort Claimants at the last address shown on any filed appearance or, if such co-defendant is proceeding *pro se*, then to the last address of record for such *pro se* co-defendant.  The Diocese shall provide notice of the Approval Motion in a form and substance acceptable to Liberty Mutual.

2.2.    If any Person, including, without limitation, the Commiteee, files an objection to the Approval Motion, the Diocese shall file a written response, in a form acceptable to the Liberty Mutual Parties, and shall take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order. The Parties will cooperate with the Diocese, including making all appropriate submissions.

2.3.    The Diocese shall file a Plan, including all exhibits, schedules, and related documents, which shall be in all respects consistent with this Agreement and shall not deprive the Liberty Mutual Parties of any right or benefit under this Agreement or otherwise adversely affect the Interests of the Liberty Mutual Parties under this Agreement.

2.3.1.  The Plan shall include an injunction (the "Channeling Injunction") in substantially the form attached as Schedule 1 to this Agreement, with only such modifications as are acceptable to the Liberty Mutual Parties, the Diocese and the Parishes, pursuant to section 105 of the Bankruptcy Code, barring and permanently enjoining all Persons who have held or asserted, or may in the future hold or assert, Claims from taking any action, directly or indirectly for purposes of asserting, enforcing or attempting to assert or enforce any Channeled Claim and channeling such Channeled Claims to a trust or trusts established pursuant to the Plan ("Trust"), to which all Channeled Claims are channeled as the sole and exclusive source of payment of any such Channeled Claims.

2.3.2.  The Plan shall also include an injunction (the "Supplemental Injunction") in substantially the form attached as Schedule 2 to this Agreement, with only such modifications as are acceptable to the Liberty Mutual Parties, the Diocese and the Parishes, pursuant to sections 105(a) and 363 of the Bankruptcy Code.

2.4.    In the Reorganization Case, the Diocese shall seek and obtain entry of an order in form and substance acceptable to the Liberty Mutual Parties that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) contains the Supplemental Injunction; (iv) provides that this Agreement is binding on the Trust, the reorganized Diocese, and any successors of the Trust or reorganized Diocese; and (v) provides all protections to the Liberty Mutual Parties against Tort Claims that are afforded to settling insurers under the Plan (the "Plan Confirmation Order").

2.4.1.  The Plan and Plan Confirmation Order must be in all respects consistent with this Agreement and contain no provisions that diminish or impair the benefit of this Agreement to the Liberty Mutual Parties.

2.4.2.  In seeking to obtain the Plan Confirmation Order, the Diocese must: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to

8

overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.4.3.   The form and manner of notice of the hearing to confirm the Plan and the form and manner of notice of the hearing as to the adequacy of the disclosure statement pertaining thereto are subject to advance approval by the Liberty Mutual Parties, which approval cannot be unreasonably withheld.   The Diocese shall publish notice of the Plan, balloting and disclosure statement relating to the Plan, twice in a national publication and such other publications, to be agreed to by the Parties, and at times and in substance agreed to by the Parties.

2.4.4.   Prior to entry of the Plan Confirmation Order, the Diocese shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Tort Claim.   If the Bankruptcy Court lifts the stay as to any Tort Claim prior to the Plan Confirmation Order, the Diocese shall defend itself against that Tort Claim and comply with the terms of the stay relief order.   If the Diocese fails to defend that Tort Claim, then the Liberty Mutual Parties shall have the right, but not the duty, to defend and/or indemnify the Diocese against that Tort Claim and any costs incurred by the Liberty Mutual Parties in defending and/or indemnifying the Diocese shall be deducted from the Settlement Amount.   In such event, the Diocese will cooperate with the Liberty Mutual Parties in the defense and/or indemnification of such Tort Claim.

2.5.    The Diocese agrees that the Trust and Plan shall provide that the assets in the Trust shall be used solely for payment of indemnity and expenses relating to reimbursing the United States government for reimbursement obligations for any payments ("Conditional Payments") made pursuant to Section 1395y(b)(2)(B) of the Medicare Secondary Payer Act, codified at 42 U.S.C. § 1395y, and the regulations promulgated thereunder, found at 42 C.F.R. § 4.11.1 *et seq.* ("MSPA"), applicable to any Tort Claimant who claims he or she is eligible to receive, is receiving, or has received Medicare benefits ("Medicare Beneficiary") and, after satisfaction thereof, to such Medicare Beneficiaries and Tort Claimants. Except for the payment of the Settlement Amount, the Liberty Mutual Parties shall not be obligated to make any other payments, including any payments to the Trust.

2.6.    The Diocese Parties and Parish Parties will undertake all reasonable actions and cooperate with the Liberty Mutual Parties in connection with their reinsurers.

2.7.    The Parties shall cease all litigation activities against each other in the Coverage Suit; provided, however, that each Party may take whatever steps that, in its sole judgment, are necessary to defend its interests as long as it remains a party in the Coverage Suit and may also take steps regarding the sealing of certain information that was provided to the District Court in the Coverage Suit.

2.8.    The Diocese shall use its reasonable efforts to obtain the dismissal of other Claims, if any, against the Liberty Mutual Parties by any other insurer in the Coverage Suit.

9

2.9.    The Parties covenant not to sue each other until (a) the Bankruptcy Orders become Final Orders, at which time this covenant is superseded by the releases provided in Section 4, or (b) the date on which this Agreement is terminated.  As of the Effective Date, the Diocese Parties and the Parish Parties:

    2.9.1.   will withdraw all outstanding tenders of Claims to the Liberty Mutual Parties for defense and indemnity;

    2.9.2.   will not tender any Claims to the Liberty Mutual Parties; and

    2.9.3.   will not request the Liberty Mutual Parties to fund any judgments, settlements, or defense costs.

2.10.    The Liberty Mutual Parties shall have no obligation to pay, handle, object, or otherwise respond to any Claim, unless this Agreement is terminated.

## 3.  PAYMENT OF THE SETTLEMENT AMOUNTS AND DISMISSAL OF COVERAGE SUIT

3.1.    <u>Conditions Precedent</u>. The Agreement shall become effective and shall be binding on the Parties, and Liberty Mutual will pay the Settlement Amount <u>only</u> after the following conditions have first been satisfied: (a) entry of a Final Order (i) approving the Approval Motion, with the form and content of notice of the motion acceptable to the Liberty Mutual Parties; and (ii) approving the form and content of notice of the Plan, ballots, and disclosure statement relating to the Plan, including publishing twice in a national publication and such other publications to be determined by the Parties and consistent with the terms of this Agreement; (b) entry of a Final Order approving the form and content of the Tort Claimants' ballot, each to be satisfactory to the Liberty Mutual Parties; (c) entry of a Final Order confirming a Plan agreed to by the Diocese in accordance with the Agreement, containing such terms and conditions as are acceptable to the Liberty Mutual Parties; (d) execution of the Agreement by all Parties in form and substance acceptable to the Parties; (e) entry of a Final Order approving of the Channeling Injunction and the Supplemental Injunction in favor of the Liberty Mutual Parties and the Protected Parties in form and substance acceptable to the Parties; and (f) entry of a Final Order approving of the releases in favor of the Liberty Mutual Parties and the Protected Parties, as are acceptable to the Parties.

3.2.    In full and final settlement of (i) all responsibilities for any and all Tort Claims that occurred or may have arisen prior to the effective date of the Plan and any and all Unknown Tort Claims; and (ii) in consideration of the sale of the Policies free and clear of all Claims and Interests of any Person, the Liberty Mutual Parties shall pay the Settlement Amount within thirty (30) days after Liberty Mutual receives written notice from the Diocese that the effective date of the Plan has occurred and directions as to transmission of the payment.

3.3.    The Parties agree that the Settlement Amount is the total amount the Liberty Mutual Parties are obligated to pay on account of (i) any and all Tort Claims, including all Unknown

Tort Claims, through the effective date of the Plan, that arise under, arising out of, relating to, or in connection with, the Policies (including Channeled Claims, any reimbursement obligations for Conditional Payments under the MSPA, and any Extra-Contractual Claims); and (ii) any and all Claims and Interests, whether known or unknown, past, present, or future, that arise under, arising out of, relating to, or in connection with the Policies.

3.4.       The Parties further agree that (i) under no circumstance will the Liberty Mutual Parties ever be obligated to make any additional payments in excess of the Settlement Amount to, or on behalf of, anyone in connection with the Policies or in connection with any Claims or Tort Claims, including any Channeled Claims and any Extra Contractual Claims; (ii) under no circumstance will the Liberty Mutual Parties ever be obligated to make any additional payments to, or on behalf of, the Diocese Parties, Parish Parties, or any Tort Claimants in connection with any certificates, or coverage under any Policies issued by the Liberty Mutual Parties with respect to any Claims that, directly or indirectly, arise out of, relate to, or are in connection with, any Tort Claims, including any Channeled Claims and any Extra Contractual Claims; and (iii) all limits of liability of the Policies, regardless of how these Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," and aggregate limits, shall be deemed fully and properly exhausted.  The Parties further agree that the Settlement Amount is the full purchase price of the Policies.

3.4.1.  The Parties agree and jointly represent that (i) the consideration to be provided by the Liberty Mutual Parties pursuant to this Agreement (including the Amount) constitutes fair and reasonable exchanges for the consideration granted to the Liberty Mutual Parties in this Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Diocese Parties and Parish Parties to the Liberty Mutual Parties pursuant to this Agreement (including the releases set forth below) constitutes a fair and reasonable exchange for the consideration granted to the Diocese Parties and Parish Parties in this Agreement (including the Settlement Amount).  The Liberty Mutual Parties are not acting as volunteers in paying the Settlement Amount, and the Liberty Mutual Parties' payment of the Settlement Amount reflects potential liabilities and obligations to the Diocese and Parishes of amounts the Liberty Mutual Parties allegedly are obligated to pay on account of any and all Claims.

3.5   Within ten (10) days after the Liberty Mutual Parties pay the Settlement Amount, the Diocese shall sign and file any necessary papers to have dismissed any action pending in connection with the Coverage Disputes, and the Diocese shall file a stipulation, that is signed by all Parties that are parties to the Coverage Suit, that dismisses with prejudice any and all claims asserted by any of the Parties against any of the other Parties.

## 4.  RELEASES and SALE FREE AND CLEAR

4.1.   <u>Diocese Parties Release of Liberty Mutual Parties</u>.  Upon payment by the Liberty Mutual Parties of the Settlement Amount, the Diocese Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Liberty Mutual Parties and any of their reinsurers or retrocessionaires from any and all past, present, and unknown Claims that occurred, or may have arisen, prior to the effective date of the Plan and that directly or

indirectly, arise out of, relate to, or are in connection with, the Tort Claims, the Coverage Disputes, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties or for which the Liberty Mutual Parties are responsible for, including any Channeled Claims, Extra-Contractual Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with, the Reorganization Case. This release specifically includes all unknown Claims that are based, in whole or in part, on the Tort Claims, the Coverage Dispute, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties, or for which the Liberty Mutual Parties are responsible.

4.2.　　Liberty Mutual Release of Diocese Parties.　Upon the Diocese's dismissal of the Coverage Suit, with prejudice, the Liberty Mutual Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Diocese Parties from any and all past, present, and unknown Claims that, occurred, or may have arisen, prior to the effective date of the Plan that directly or indirectly, arise out of, relate to, or are in connection with, the Tort Claims, the Coverage Disputes, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties, including any Channeled Claims, Extra-Contractual Claims, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with, the Reorganization Case. This release specifically includes all unknown Claims that are based, in whole or in part, on the Tort Claims, the Coverage Disputes, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties, or for which Liberty Mutual is responsible.

4.3.　　Parish Parties Release of Liberty Mutual Parties.　Upon payment by the Liberty Mutual Parties of the Settlement Amount, the Parish Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Liberty Mutual Parties and any of their reinsurers or retrocessionaires from any and all past, present, and unknown Claims, including any Claims that directly or indirectly, arise out of, relate to, or are in connection with, the Tort Claims, the Coverage Disputes, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties or for which Liberty Mutual is responsible, including any Channeled Claims, Extra-Contractual Claims, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case.　This release specifically includes all unknown Claims that are based, in whole or in part, on the Tort Claims, the Coverage Disputes, the Coverage Dispute, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties, or for which Liberty Mutual is responsible.

4.4.　　Liberty Mutual Release of Parish Parties.　Upon the Diocese's dismissal of the Coverage Suit, with prejudice, the Liberty Mutual Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Parish Parties from any and all past, present, and unknown Claims, including any Claims that directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims, the Coverage Disputes, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties, including any Channeled Claims, Extra-Contractual Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case. This

release specifically includes all unknown Claims that are based in whole or in part on the Tort Claims, the Coverage Disputes, the Coverage Suit, the Policies, or any other binder, certificate, or policy of insurance, issued by the Liberty Mutual Parties or for which Liberty Mutual is responsible.

4.5.     Unless otherwise provided in the Plan, the releases contained in this Section shall be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978), and all Tort Claimants reserve their rights against religious orders and any Persons not covered under the Policies, who will remain severally liable on any Claims.

4.6.     From and after the first day on which the Plan Confirmation Order is a Final Order, the Diocese Parties shall not assert against the Liberty Mutual Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, including any Unknown Tort Claim, that occurred or may have arisen prior to the effective date of the Plan (including any Tort Claim that arises under or relates to the Policies or any other binder, certificate, or policy of insurance issued by any of the Liberty Mutual Parties, any Channeled Claim, any Extra Contractual Claim, and/or any other matter released pursuant to Section 4).

4.7.     From and after the first day on which the Plan Confirmation Order is a Final Order, the Parish Parties shall not assert against the Liberty Mutual Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any Claim, including any Tort Claim, and any other Claim that arises under or relates to the Policies or any other binder, certificate, or policy of insurance issued by any of the Liberty Mutual Parties, any Channeled Claim, any Extra Contractual Claim, and/or any other matter released pursuant to Section 4.

4.8.     As set forth in the Approval Order, upon entry of the Bankruptcy Orders as Final Orders, the Liberty Mutual Parties, for the consideration stated herein, shall buy back the Policies free and clear of all Interests of all Persons, including all Interests of the Diocese Parties, the Parish Parties, any other Person claiming coverage by, through, or on behalf of, any of the Diocese Parties, the Parish Parties, any other insurer, and any Tort Claimant. This sale is pursuant to sections 363(b) and 363(f) of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Liberty Mutual Parties are good faith purchasers of the Policies within the meaning of section 363(m) of the Bankruptcy Code and (ii) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies and constitutes reasonably equivalent value, and (iii) the releases in this Agreement and the buyback of the Policies comply with the Bankruptcy Code and applicable non-bankruptcy laws. As set forth in the Approval Order, upon entry of the Bankruptcy Orders as Final Orders, the Policies shall be terminated and of no further force and effect. The Liberty Mutual Parties' payment of the Settlement Amount shall constitute the Liberty Mutual Parties' full and complete performance of any and all obligations under the Policies, including any performance owed to the Diocese Parties, and exhausts all limits of liability of the Policies. All Interests the Diocese Parties or the Parish Parties may have had, may presently have, or in the future may have, in the Policies or any other binder, certificate, or policy of insurance issued by the

13

Liberty Mutual Parties shall be released. The Diocese Parties and the Parish Parties accept the Settlement Amount in full and complete satisfaction of all the Liberty Mutual Parties' past, present, and future obligations, including any obligations to any of the Diocese Parties and the Parish Parties under the Policies or arising therefrom, if any, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever, whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such claims arise from, relate to, or are in connection with the Tort Claims, the Unknown Tort Claims, the Coverage Disputes, the Coverage Suit, the Channeled Claims, the Reorganization Case, or otherwise under the Policies.

4.9.    If, contrary to the intent of the Parties, any Claims released pursuant to this Section 4 of the Agreement, including any past, present or unknown Claim for insurance coverage under the Policies or any other Claim by the Diocese Parties or the Parish Parties against any of the Liberty Mutual Parties, are deemed to survive this Agreement, even though they are encompassed by the terms of the releases set forth in this Section 4 of this Agreement, the Parties hereby forever, expressly, and irrevocably waive entitlement to, and agree not to assert, any and all such Claims.

4.10.   All of the releases and other benefits provided in this Agreement by the Diocese Parties and the Parish Parties to the Liberty Mutual Parties are at least as favorable as the releases and other benefits that the Diocese and Parishes have provided to any other one of the Diocese's or Parish's insurers in the Reorganization Case. If the Diocese or Parish(es) enters into any agreement with any other one of its insurers in the Reorganization Case that provides that insurer with releases or other benefits that are more favorable than those contained in this Agreement, then this Agreement shall be deemed to be modified to provide the Liberty Mutual Parties with those more favorable releases and/or benefits. However, the provision at Section 7.2 that the duty to defend, indemnify, and hold harmless the Liberty Mutual Parties not extend to nor include claims that are or may be made against Liberty Mutual by other insurers, shall not be modified. The Diocese Parties and Parish Parties shall notify the Liberty Mutual Parties promptly of the existence of such more favorable releases or benefits.

4.11.   Neither the releases set forth in this Section 4 nor any other provisions in this Agreement are intended to apply to or have any effect on the Liberty Mutual Parties' right to reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Policies or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties.

4.12.   This Section 4 is not intended to, and shall not be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Agreement.

## 5. TERMINATION OF AGREEMENT

In the event i) the Bankruptcy Orders do not become Final Orders of the Bankruptcy Court within one year from the date on which the Agreement is executed by all the Parties, or ii) a Plan is filed or confirmed that is inconsistent with the terms of the Agreement or is otherwise unacceptable to Liberty Mutual, or iii) the Reorganization Case is dismissed or converted, then

Liberty Mutual may terminate the Agreement upon fifteen (15) days' notice to the Diocese, immediately following which the Agreement shall be null and void and of no force or effect.

## 6.  REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1.    The Parties separately represent and warrant as follows:

6.1.1.  To the extent it is a corporation, including a non-profit corporation, or other legal entity, it has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court;

6.1.2.  This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

6.2    The Diocese Parties and Parish Parties represent and warrant that they have not and will not assign any Interests in the Policies or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties or for which the Liberty Mutual Parties has responsibility.

6.3    The Diocese Parties and the Parish Parties represent and warrant that they are the owners of the Policies and that no other Person has legal title to the Policies.

6.4    The Diocese Parties and Parish Parties each represent and warrant that they have not in any way assisted, and shall not in any way assist, any Person in the establishment of any Claim against the Liberty Mutual Parties.

6.5    The person(s) executing this Agreement on behalf of the parties in Sections 1.1.10(i), (ii), and (iii) and Sections 1.1.18(i), (ii) and (iii) (collectively, the "Other Diocese-/Parish Parties") represents and warrants that he/she has received authority from such Other Diocese /Parish Parties, as the case may be, to execute this Agreement on their behalf and to provide the releases identified in Section 4 above on behalf of such Other Diocese-/Parish Parties. Notwithstanding the foregoing, nothing in the definition of Other Diocese-/Parish Parties is intended to suggest or should be construed to mean that any Person included in this definition is owned, directed, supervised or controlled by the Diocese or Parishes.

6.6    The Parties have completed a reasonable search for evidence of any Policies issued by the Liberty Mutual Parties to the Diocese Parties and Parish Parties that might afford coverage with respect to any Tort Claim.  Other than the alleged Policies identified in Exhibit A, no such Policies or acknowledgments of coverage have been identified.  Notwithstanding the foregoing, nothing in this Agreement, including the Schedules or Exhibits thereto, shall be construed as, or deemed to be, an admission or evidence that any binder, certificate, or policy of insurance was in fact issued and/or affords coverage in connection with the Tort Claims.

## 7.  ACTIONS INVOLVING THIRD PARTIES

7.1.    For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Policies, the Diocese Parties and Parish Parties hereby agree as follows:

    7.1.1.   If any other insurer of the Diocese Parties or Parish Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Liberty Mutual Parties as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of the Liberty Mutual Parties' alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation of any of the Liberty Mutual Parties for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Agreement, the Diocese Party(ies) or Parish Party(ies), as applicable, shall voluntarily reduce its judgment or Claim against, or settlement with, such other insurer(s) to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against the Liberty Mutual Parties. To ensure that such a reduction is accomplished, the Liberty Mutual Parties shall be entitled to assert this Section 7 as a defense to any action against them brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Liberty Mutual Parties from any liability for the judgment or Claim. Moreover, if a non-settling insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against any of the Liberty Mutual Parties, such Claim may be asserted as a defense against the Trust (under the Plan contemplated by the Agreement) in any coverage litigation (and the Trust may assert the legal and equitable rights of the Liberty Mutual Parties in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such non-settling insurer to the Trust (or Diocese Parties or Parish Parties) shall be reduced dollar for dollar by the amount so determined.

    7.1.2.   The Liberty Mutual Parties shall not seek reimbursement for any payments they are obligated to make under this Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other insurer of the Diocese or Parishes unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from any of the Liberty Mutual Parties. The Diocese and Parishes shall use their respective reasonable best efforts to obtain from all insurers with which it settles agreements similar to those contained in this Section 7.

7.2.    The Diocese and Parishes shall defend, indemnify, and hold harmless the Liberty Mutual Parties with respect to any and all released claims pursuant to Section 4 above, including all Tort Claims made by: (i) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any of the Policies; (ii) any Person who has made, will make, or can make a Tort Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Tort Claim under the Policies; (iv) provided, however, this indemnification does not extend to, nor does it include, claims that are or may be made against Liberty Mutual by other insurers.  This indemnification includes Tort Claims made by Persons over whom the Diocese or Parishes do not have control, including any other Person who asserts Claims against or rights to coverage under the

16

Policies. The Diocese's and Parishes' obligation to indemnify the Liberty Mutual Parties under this Section 7.2 shall not exceed the Settlement Amount. The Liberty Mutual Parties may undertake the defense of any Claim upon receipt of such Claim. The Liberty Mutual Parties agree to notify the Diocese or Parishes, as applicable, as soon as practicable of any Claims identified in this Section 7.2 and of their choice of counsel. The Liberty Mutual Parties' defense of any Claims shall have no effect on the Diocese's or Parishes' obligation to indemnify the Liberty Mutual Parties for such Claims, as set forth in this Section 7.2. The Diocese or Parishes, as applicable, subject to the limitations above regarding the maximum amounts the Diocese and Parishes' must pay, shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Liberty Mutual Parties in defending such Claims. In defense of any such Claims, the Liberty Mutual Parties may settle or otherwise resolve a Claim only with the prior consent of the Diocese and Parishes, which consent shall not be unreasonably withheld. To the extent this Section 7.2 may give rise to pre-Effective Date administrative claims, which have not been provided for in the Plan, such claims shall pass through the Plan unimpaired.

7.3. If any Person attempts to prosecute a Channeled Claim against any of the Liberty Mutual Parties following the Petition Date, then promptly following notice to do so from the Liberty Mutual Parties, the Diocese will file a motion and supporting papers, supported by the Parishes, to obtain an order from the Court, pursuant to Bankruptcy Code §§ 362 and 105(a), protecting the Liberty Mutual Parties from any such Claims until the Bankruptcy Orders become Final Orders, or, alternatively, this Agreement is terminated under Section 5.

## 8. MISCELLANEOUS

8.1. If any proceedings are commenced to invalidate or prevent the enforcement or implementation of any of the provisions of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

8.2. The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.

8.3. The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Reorganization Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

8.4.     This Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.  It is further agreed that the terms of this Agreement are contractual in nature and not mere recitals.

8.5.     This Agreement may be modified only by a written amendment signed by the Parties, and no waiver of any provision of this Agreement or of a breach thereof shall be effective, unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate, or be construed as a waiver of any other provision or breach.

8.6.     By entering into this Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted, or may in the future assert in connection with any matter outside the scope of this Agreement.  No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties, including, without limitation, the existence of insurance coverage, with respect to matters outside the scope of this Agreement.  All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

8.7.     This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession of liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.  Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, including, without limitation, the existence of insurance coverage,  except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.7, in (i) an action or proceeding to enforce the terms of this Agreement, including any use as set forth in Section 7 or (ii) any possible action or proceeding between any of the Liberty Mutual Parties and any of their reinsurers.  This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Liberty Mutual Parties' obligations under any of Policies or any other binder, certificate, or policy of insurance or any acknowledgment of coverage issued by the Liberty Mutual Parties, with respect to any Claims against any of the Liberty Mutual Parties. Except as otherwise provided in this Agreement, nothing herein shall alter, modify, or otherwise change, the terms, conditions, limitations, and exclusions of the Policies.

8.8.     None of the Parties shall make any public statements or disclosures (i) regarding each other's rationale or motivation for negotiating or entering into this Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Policies or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties, including handling of, or involvement in connection with, the

Tort Claims or the resolution of the Tort Claims, the Coverage Disputes, and/or the Coverage Suit.

8.9.    The Parties have received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated at arm's length.

8.10.    Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

8.11.    All notices, demands, or other communication to be provided pursuant to this Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the Diocese Parties:


Rev. James Bissonette
Diocese of Duluth
2830 East 4th Street
Duluth, MN  55812


and


With a copy to:

Ford Elsaesser, Esquire
Bruce A. Anderson, Esquire
Elsaesser Anderson, Chtd.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID  83815
Email:  ford@eaidaho.com
            brucea@eaidaho.com


and

Phillip Kunkel Esquire
Gray Plant Mooty
        500 IDS Center
        80 South Eighth Street
        Minneapolis, MN USA 55402
Email:  Phillip.Kunkel@gpmlaw.com

If to the Liberty Mutual Parties, to:

>Steven R. White, Esquire
>Asst. Vice President and Sr. Corporate Counsel
>Liberty Mutual Insurance
>175 Berkeley Street
>Boston, MA  02116
>Steven.white@libertymutual.com

>With a copy to:

>Nancy D. Adams, Esquire
>Kevin J. Walsh, Esquire
>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
>One Financial Center
>Boston, MA 02111
>NDAdams@mintz.com
>KJWalsh@mintz.com

If to the Parish Parties:

>John D. Kelly, Esquire
>Hanft Fride, P.A.
>1000 U.S. Bank Place
>130 W Superior Street
>Duluth, MN 55802-2094
>Email:  jdk@hanftlaw.com

8.12.    All notices, demands, or other communication to be provided pursuant to this Agreement prior to entry of the Plan Confirmation Order shall also be sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to Robert T. Kugler, Stinson Leonard Street, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, Email: Robert.kugler@stinson.com.

8.13.    This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile or other electronic image, which facsimile or other electronic image counterparts shall be deemed to be originals.

8.14.    Nothing contained in this Agreement shall be deemed or construed to constitute (i) an admission by any of the Liberty Mutual Parties that the Diocese Parties, Parish Parties, or any other Person was or is entitled to any insurance coverage under the Policies or any other binder, certificate, or policy of insurance issued by the Liberty Mutual Parties or as to the validity of any of the positions that have been or could have been asserted by the Diocese Parties or Parish Parties, (ii) an admission by the Diocese Parties as to the validity of any of

the positions or defenses to coverage that have been or could have been asserted by the Liberty Mutual Parties or the validity of any Claims that have been or could have been asserted by the Diocese Parties or Parish Parties against the Liberty Mutual Parties, or (iii) an admission by the Diocese Parties, Parish Parties or the Liberty Mutual Parties of any liability whatsoever with respect to any of the Tort Claims.

8.15.   All of the Persons included in the definition of Liberty Mutual Parties are intended beneficiaries of this Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Agreement, there are no third-party beneficiaries of this Agreement.

8.16.   The Parties warrant and represent that they have not sold, assigned, encumbered, or otherwise transferred, in any manner, all or any portion of the Claims released in, and covered by, this Agreement.

8.17.   The Diocese Parties, Parish Parties and the Liberty Mutual Parties shall be responsible for their own fees and costs incurred in connection with the Tort Claims, the Coverage Disputes, the Coverage Suit, and the Reorganization Case, this Agreement, and the implementation of this Agreement.

8.18.   The following rules of construction shall apply to this Agreement:

8.18.1. Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

8.18.3. The wording of this Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The wording of this Agreement shall not be construed in favor of or against any Person.

8.18.4. The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Agreement when the stated intent is not achieved.

8.19.   The Bankruptcy Court in the Reorganization Case shall retain exclusive jurisdiction to interpret and enforce the provisions of this Agreement, which shall be construed in accordance with Minnesota law.

8.20.   This Agreement and the obligations under this Agreement shall be binding on the Parties and shall survive the entry of the Plan Confirmation Order.

8.21.   This Agreement shall be effective on the Effective Date.

[Remainder of page left blank intentionally]

IN WITNESS WHEREOF, the **Parties** have duly executed this <u>Agreement</u> as of the last date indicated below.

**On behalf of the Diocese of Duluth**

By: _Reverend James B. Bissonette_
       Reverend James B. Bissonette

Title:  Vicar General, Diocese of Duluth

Date: _____11 29_____, 2019

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. James' Church, Aitkin
a Minnesota religious corporation**


By: _____
          Reverend David Forsman

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of Fatima Church, Garrison a Minnesota religious corporation**

By: _____
      Reverend Elias Gieske

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Family Church, Hillman a Minnesota religious corporation**

By: _____

      Reverend Elias Gieske

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of Hope Church, Aurora
a Minnesota religious corporation**

**By:** _____
      **Reverend Peter Lambert**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of the Snows Church, Big Fork a Minnesota religious corporation**

**By:** _____

      **Reverend Thomas Galarneault**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

*Duluth Settlement Agreement*
*Parish*
*Signature Page*

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Michael's Church, Northome a Minnesota religious corporation**

**By:** _____

**Reverend Thomas Galarneault**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

*Duluth Settlement Agreement*
*Parish*
*Signature Page*

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Catherine's Church, Squaw Lake a Minnesota religious corporation**

**By: _____**
        **Reverend Thomas Galarneault**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Francis' Church, Brainerd a Minnesota religious corporation**

**By:** _____

    **Reverend Anthony Wroblewski**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the All Saints Church, Baxter
a Minnesota religious corporation**

**By:** _____

      **Reverend Anthony Wroblewski**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Thomas' Church, Pine Beach a Minnesota religious corporation**

**By:** _____

    **Reverend Anthony Wroblewski**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Andrew's Church, Brainerd a Minnesota religious corporation**

**By:** _____

      **Reverend Daniel Weiske**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mathias' Church, Fort Ripley a Minnesota religious corporation**

**By: _____**
      **Reverend Daniel Weiske**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Francis' Church, Carlton a Minnesota religious corporation**

**By:** _____

     **Reverend David Tushar**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary & Joseph's Church, Sawyer a Minnesota religious corporation**

**By:** _____

      **Reverend David Tushar**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Queen of Peace Church, Cloquet a Minnesota religious corporation**

**By:** _____

       **Reverend Justin Fish**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Family Church, Cloquet
a Minnesota religious corporation**

**By:** _____

     **Reverend Justin Fish**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Chisholm a Minnesota religious corporation**

**By:** _____

      **Reverend Anthony Craig**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of Sacred Heart Church, Buhl
a Minnesota religious corporation**

**By:** _____

       **Reverend Anthony Craig**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary's Church, Cook
a Minnesota religious corporation**

**By:** _____

       **Reverend Nicholas Nelson**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Cross Church, Orr
a Minnesota religious corporation**


**By:** _____
      **Reverend Nicholas Nelson**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Martin's Church, Tower a Minnesota religious corporation**

**By:** _____
      **Reverend Nicholas Nelson**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Crosby
a Minnesota religious corporation**


**By:** _____
      **Reverend Elias Gieske**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Deerwood a Minnesota religious corporation**

**By:** _____
     **Reverend Elias Gieske**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Immaculate Heart Church, Crosslake a Minnesota religious corporation**

**By:** _____

      **Reverend Blake Rozier**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Emily's Church, Emily a Minnesota religious corporation**

**By:** _____

      **Reverend Blake Rozier**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary's Church, Deer River a Minnesota religious corporation**

**By:** _____

    **Reverend Gabriel Waweru**

Title:  Administrator

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Ball Club
a Minnesota religious corporation**

**By:** _____

      **Reverend Gabriel Waweru**

Title:  Administrator

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Charles' Church, Cass Lake a Minnesota religious corporation**

**By:** _____

      **Reverend Gabriel Waweru**

Title:   Administrator

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Rosary Cathedral, Duluth a Minnesota religious corporation**

**By:** _____
      **Reverend Peter Muhich**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary Star of the Sea Church, Duluth**
**a Minnesota religious corporation**


**By:** _____
      **Reverend Peter Muhich**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of Mercy Church, Duluth a Minnesota religious corporation**

**By: _____**

    **Reverend Peter Muhich**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Benedict's Church, Duluth a Minnesota religious corporation**

**By:** _____

      **Reverend Joel Hastings**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. James' Church, Duluth
a Minnesota religious corporation**

**By:** _____
    **Reverend Richard Kunst**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. John's Church, Duluth
a Minnesota religious corporation**

**By:** _____
     **Reverend Drew Braun**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Gnesen
a Minnesota religious corporation**

**By:** _____
    **Reverend Drew Braun**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Lawrence's Church, Duluth a Minnesota religious corporation**

**By:** _____
    **Reverend Ryan Moravitz**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Family Church, Duluth a Minnesota religious corporation**

**By:** _____

      **Reverend Ryan Moravitz**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Duluth
a Minnesota religious corporation**

**By:** _____
    **Reverend Ryan Moravitz**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Michael's Church, Duluth
a Minnesota religious corporation**

**By:** _____
      **Reverend Francis Kabiru**

Title:   Administrator and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Agnes' Church, Walker
a Minnesota religious corporation**

**By:** _____
        **Reverend Timothy Lange**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Sacred Heart Church, Hackensack a Minnesota religious corporation**

**By:** _____

    **Reverend Timothy Lange**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Raphael's Church, Duluth a Minnesota religious corporation**

**By:** _____

**Reverend James Bissonette**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

*Duluth Settlement Agreement*
*Parish*
*Signature Page*

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Rose's Church, Proctor a Minnesota religious corporation**

**By:** _____

      **Reverend James Bissonette**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Anthony's Church, Ely
a Minnesota religious corporation**

**By:** _____

**Reverend William Skarich**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Pius' Church, Babbitt
a Minnesota religious corporation**

**By:** _____

      **Reverend William Skarich**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as
of the last date indicated below.

**On behalf of the Resurrection Church, Eveleth
a Minnesota religious corporation**

**By:** _____

      **Reverend Michael Garry**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Gilbert a Minnesota religious corporation**

**By:** _____

      **Reverend Michael Garry**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Louis' Church, Floodwood
a Minnesota religious corporation**

**By:** _____

      **Reverend Pio Atonio**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Immaculate Conception Church, Cromwell**
**a Minnesota religious corporation**

**By:** _____
      **Reverend Pio Atonio**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary's Church, Meadowlands a Minnesota religious corporation**

**By: _____**
     **Reverend Pio Atonio**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. John's Church, Grand Marais a Minnesota religious corporation**

**By: _____**
      **Reverend Steven Langenbrunner**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Rosary Church, Grand Portage a Minnesota religious corporation**

**By:** _____
         **Reverend Steven Langenbrunner**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Grand Rapids a Minnesota religious corporation**

**By:** _____

      **Reverend Seth Gogolin**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Augustine's Church, Cohasset
a Minnesota religious corporation**

**By:** _____

**Reverend Seth Gogolin**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Blessed Sacrament Church, Hibbing a Minnesota religious corporation**

**By:** _____

**Reverend Gabriel Waweru**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Patrick's Church, Hinckley
a Minnesota religious corporation**

**By:** _____

    **Reverend Joseph Sirba**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Luke's Church, Sandstone a Minnesota religious corporation**

**By:** _____

**Reverend Joseph Sirba**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

*Duluth Settlement Agreement*
*Parish*
*Signature Page*

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Thomas' Church, International Falls
a Minnesota religious corporation**

By: _____
       **Reverend Benjamin Hadrich**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Columban's Church, Little Fork
a Minnesota religious corporation**

**By:** _____
     **Reverend Benjamin Hadrich**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Edward's Church, Longville a Minnesota religious corporation**

**By:** _____

      **Reverend Keith Bertram**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Paul's Church, Remer
a Minnesota religious corporation**

**By:** _____

     **Reverend Keith Bertram**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Family Church, McGregor a Minnesota religious corporation**

**By:** _____

    **Reverend David Forsman**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of Fatima Church, McGrath**

By: _____
      **Reverend David Forsman**

Title:  Pastor of Holy Family Church, McGregor, surviving parish religious corporation to Our Lady of Fatima Church, McGrath by reason of merger

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Angels' Church, Moose Lake
a Minnesota religious corporation**

By: _____

      Reverend Kristoffer McKusky

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary's Church, Willow River a Minnesota religious corporation**

By: _____
          Reverend Kristoffer McKusky

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Isidore's Church, Sturgeon Lake a Minnesota religious corporation**

**By:** _____

      Reverend Kristoffer McKusky

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Cecilia's Church, Nashwauk
a Minnesota religious corporation**


**By:** _____
       **Reverend Joseph Sobolik**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Mary Immaculate Church, Coleraine a Minnesota religious corporation**

**By:** _____

      **Reverend Joseph Sobolik**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Our Lady of the Lakes Church, Pequot Lakes**
**a Minnesota religious corporation**


**By:** _____
     **Reverend Michael Patullo**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Immaculate Conception Church, Pine City
a Minnesota religious corporation**


**By:** _____
       **Monsignor Aleksander Suchan**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Joseph's Church, Beroun
a Minnesota religious corporation**

**By:** _____
     **Monsignor Aleksander Suchan**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Spirit Church, Two Harbors a Minnesota religious corporation**

**By:** _____
      **Reverend Steve Laflamme**

Title:  Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the St. Mary's Church, Silver Bay a Minnesota religious corporation**

**By:** _____

      **Reverend Steve Laflamme**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Holy Spirit Church, Virginia
a Minnesota religious corporation**

**By:** _____

     **Reverend Brandon Moravitz**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

IN WITNESS WHEREOF, the Parties have duly executed this Settlement Agreement as of the last date indicated below.

**On behalf of the Newman Catholic Campus Ministries at U.M.D., Duluth**
**a Minnesota religious corporation**

**By:** _____
       **Reverend Michael Schmitz**

Title:   Pastor and Vice-President

Date: _____, 2019

Witness: _____

*Duluth Settlement Agreement*
*Parish*
*Signature Page*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

On behalf of Liberty Mutual Insurance Company

By: _____

Title: _Snr. Technical Claim Spc._

Date: _3/5/2019_

Witness: _Eliza Ull / Ryga Glanders_

*Duluth Settlement Agreement*
*Liberty Mutual*
*Signature Page*

3" = "l" "81256693v.12" ""

## <u>Schedule 1</u>

All terms in bold or underline in this <u>Schedule 1</u> shall have the meanings given to them in the Agreement, Release, and Policy Buyback ("<u>Agreement</u>") between and among the Diocese Parties, the Parish Parties, and the Liberty Mutual Parties.

**Channeling Injunction**. In consideration of the undertakings of the Liberty Mutual Parties and the Protected Parties pursuant to the Agreement, the payment of the Settlement Amount, and other consideration, and to further preserve and promote the agreements between and among the Protected Parties and the Liberty Mutual Parties, and the protections afforded the Protected Parties and the Liberty Mutual Parties pursuant to Section 105 of the Bankruptcy Code:

a.      any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims; and

b.      all Persons who have held or asserted, presently hold or assert, or may in the future hold or assert any Channeled Claim are hereby permanently stayed, restrained, and enjoined from taking any action, directly or indirectly, for the purpose of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any of the Protected Parties and the Liberty Mutual Parties, including:

(i)      commencing, continuing, or otherwise proceeding to take, in any manner, any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or the Liberty Mutual Parties or against the property of any of the Protected Parties or the Liberty Mutual Parties;

(ii)     enforcing, attaching, collecting, or recovering, by any manner or means, from any Protected Parties or Liberty Mutual Parties, or from the property of any Protected Parties or the Liberty Mutual Parties, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Protected Parties or Liberty Mutual Parties;

(iii)    creating, perfecting, or enforcing any lien of any kind against any Protected Parties or Liberty Mutual Parties, or the property of any Protected Parties or Liberty Mutual Parties, with respect to any such Channeled Claim;

(iv)    asserting, implementing, or effectuating any Channeled Claim of any kind against:

(1)      any obligation due any Protected Parties or Liberty Mutual Parties;

(2)      any Protected Parties or Liberty Mutual Parties; or

(3)      the property of any Protected Parties or Liberty Mutual Parties.

(v)      taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and

(vi)      asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties or Liberty Mutual Parties or the property of the Protected Parties or Liberty Mutual Parties.

Except as otherwise expressly provided in the Plan, the provisions of the Channeling Injunction will further operate, as between all Protected Parties and the Liberty Mutual Parties, as a mutual release of all Claims as against each such Protected Party and Liberty Mutual Party. The foregoing channeling provisions are an integral part of the Plan and are essential to its implementation.

## Schedule 2

All terms in bold or underline in this Schedule 2 shall have the meanings given to them in the Agreement, Release, and Policy Buyback ("Agreement") between and among the Diocese Parties, the Parish Parties, and the Liberty Mutual Parties.

**Supplemental Injunction Preventing Prosecution Of Claims Against Liberty Mutual Parties**. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Liberty Mutual Parties pursuant to the Agreement, including Liberty Mutual's buyback of the Policies free and clear of all interests pursuant to Section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, non-settling insurers, and all others holding interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Agreement) against any of the Protected Parties, Liberty Mutual Parties, or other Person covered or allegedly covered under the Policies and which relate to any Tort Claims that are covered or alleged to be covered under the Policies, or any insurance claims related to such Tort Claims, are hereby permanently stayed, restrained, and enjoined from taking any action, directly or indirectly, to assert, enforce, or attempt to assert or enforce any such interest against the Liberty Mutual Parties, including:

a.      Commencing, continuing, or otherwise proceeding to take, in any manner, any action or other proceeding against the Liberty Mutual Parties or the property of the Liberty Mutual Parties;

b.      Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against the Liberty Mutual Parties or the property of the Liberty Mutual Parties;

c.      Creating, perfecting, or enforcing any lien of any kind against the Liberty Mutual Parties or the property of the Liberty Mutual Parties;

d.      Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Liberty Mutual Parties or the property of the Liberty Mutual Parties; and

e.      Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

Any and all Persons holding Interests or Claims of any kind arising under the Policies shall be permanently enjoined from pursuing such Interests or Claims against the Liberty Mutual Parties.

**Settlement Agreement Injunctions.**  Any injunction contained in the Agreement is incorporated into the Plan by reference, is deemed fully set forth in the Plan, is approved by the Parties and is in addition to the injunctions expressly set forth in the Plan.

**Permanent Injunction Against Prosecution of Released and Channeled Claims.** Except as otherwise expressly provided in the Plan, for the consideration described herein, all Persons who have held, hold, or may hold Channeled Claims or Claims against the Diocese Parties, any Party, or the Protected Parties, including any of the Parish Parties or the Liberty Mutual Parties, whether known or unknown, and their respective civil law and Canon Law officers, directors, officials, representatives, council members, employees, accountants, agents, attorneys, and all others acting for or on their behalf, will be permanently enjoined on and after the effective date of the Plan from: (a) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Claim, including, but not limited to, any Tort Claim or any Unknown Tort Claim against the Parties or the property of the Parties; (b) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Parties or the property of the Parties, with respect to any discharged Claim or Channeled Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Parties or the property of the Parties with respect to any discharged Claim or Channeled Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Parties with respect to any discharged Claim or Channeled Claim; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or any documents relating to the Plan, including, the Trust agreement. The foregoing injunctive provisions are an integral part of the Plan and are essential to its implementation.

**Term of Injunctions or Stays and Confirmation of Settlements.** On the effective date of the Plan, the injunctions provided for in the Plan and the Agreement shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable. All injunctions and/or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any of the Liberty Mutual Party that has purchased its Policy in a Section 363 Sale, are permanent and will remain in full force and effect following the effective date of the Plan and are not subject to being vacated or modified.

<u>Exhibit A</u>

Policies Issued to the Diocese Parties or Parish Parties Potentially Affording Coverage in connection with the Tort Claims.

<u>Diocese of Duluth</u>:

- Policy Number CLA 770553 issued by Agricultural Insurance Company, with a policy period of February 1, 1964 to February 1, 1967;

- Policy Number 3GA 26 24 22 issued by Agricultural Insurance Company, with a policy period of February 1, 1967 to February 1, 1970;

- Policy Number 3GA 29 96 59 issued by Agricultural Insurance Company, with a policy period of February 1, 1970 to February 1, 1973; and

- Policy Number 4GA 12 60 79 issued by American Empire Insurance Company, with a policy period of February 1, 1973 to February 1, 1976 (cancelled April 24, 1973)


<u>St. Mary's Silver Bay</u>:

- Policy Number MP 37 01 17 issued by Agricultural Insurance Company with a policy period of July 24, 1970 to July 24, 1973

<u>St. Christopher Church</u>:

- Policy Number 1812545 with a policy period of January 1, 1967 to January 1, 1970;

- Policy Number 1992946 with a policy period of January 1, 1970 to January 1, 1973;

- Policy Number 5546611 with a policy period of January 1, 1973 to January 1, 1976; and

- Policy Number 3289506 with a policy period of January 1, 1976 to January 1, 1979.

Exhibit B

List of Parish Corporations

| | |
|---|---|
| St. James' Church, Aitkin | Our Lady of Fatima Church, Garrison |
| Holy Family Church, Hillman | Our Lady of Hope Church, Aurora |
| Our Lady of the Snows Church, Big Fork | St. Michael's Church, Northome |
| St. Catherine's Church, Squaw Lake | St. Francis' Church, Brainerd |
| All Saints Church, Baxter | St. Thomas' Church, Pine Beach |
| St. Andrew's Church, Brainerd | St. Mathias' Church, Fort Ripley |
| St. Francis' Church, Carlton | St. Mary & Joseph's Church, Sawyer |
| Queen of Peace Church, Cloquet | Holy Family Church, Cloquet |
| St. Joseph's Church, Chisholm | Our Lady of Sacred Heart Church, Buhl |
| St. Mary's Church, Cook | Holy Cross Church, Orr |
| St. Martin's Church, Tower | St. Joseph's Church, Crosby |
| St. Joseph's Church, Deerwood | Immaculate Heart Church, Crosslake |
| St. Emily's Church, Emily | St. Mary's Church, Deer River |
| St. Joseph's Church, Ball Club | St. Charles' Church, Cass Lake |
| Holy Rosary Cathedral, Duluth | St. Mary Star of the Sea Church, Duluth |
| Our Lady of Mercy Church, Duluth | St. Benedict's Church, Duluth |
| St. James' Church, Duluth | St. John's Church, Duluth |
| St. Joseph's Church, Gnesen | St. Lawrence's Church, Duluth |
| Holy Family Church, Duluth | St. Joseph's Church, Duluth |
| St. Michael's Church, Duluth | St. Agnes' Church, Walker |

| | |
|---|---|
| Sacred Heart Church, Hackensack | St. Raphael's Church, Duluth |
| St. Rose's Church, Proctor | St. Anthony's Church, Ely |
| St. Pius' Church, Babbitt | Resurrection Church, Eveleth |
| St. Joseph's Church, Gilbert | St. Louis' Church, Floodwood |
| Immaculate Conception Church, Cromwell | St. Mary's Church, Meadowlands |
| St. John's Church, Grand Marais | Holy Rosary Church, Grand Portage |
| St. Joseph's Church, Grand Rapids | St. Augustine's Church, Cohasset |
| Blessed Sacrament Church, Hibbing | St. Patrick's Church, Hinckley |
| St. Luke's Church, Sandstone | St. Thomas' Church, International Falls |
| St. Columban's Church, Little Fork | St. Edward's Church, Longville |
| St. Paul's Church, Remer | Holy Family Church, McGregor |
| Our Lady of the Fatima Church, McGrath | Holy Angels' Church, Moose Lake |
| St. Mary's Church, Willow River | St. Isidore's Church, Sturgeon Lake |
| St. Cecilia's Church, Nashwauk | Mary Immaculate Church, Coleraine |
| Our Lady of the Lakes Church, Pequot Lakes | Immaculate Conception Church, Pine City |
| St. Joseph's Church, Beroun | Holy Spirit Church, Two Harbors |
| St. Mary's Church, Silver Bay | Holy Spirit Church, Virginia |
| Newman Catholic Campus Ministries at U.M.D., Duluth | |

*Exhibit B*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No.: 15-50792 |
| Diocese of Duluth, | Chapter 11 |
| Debtor-in-Possession. | |

## DECLARATION OF JAMES R. MURRAY

I, James R. Murray, declare as follows:

1.      I am a partner at the law firm Blank Rome LLP, which is Special Insurance Counsel to the Debtor in this case. This Declaration is filed in support of its Motion to Approve the Settlement Agreement, Release, and Policy Buy Back (the "Agreement") between the Debtor and Liberty Mutual Insurance Company ("Liberty Mutual"). The Agreement includes, among other things, the sale of insurance policies for which the Debtor contends Liberty Mutual is responsible free and clear of interests, as detailed in the Agreement.

2.      I was lead counsel in, and have been personally and directly involved with, the insurance coverage litigation and the negotiations that led to the settlements that the Agreement memorializes.

3.      On December 7, 2015, the Debtor filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). More than 120 individuals have filed proofs of claim (the "Claims") in the bankruptcy, asserting that they were sexually abused by priests and, among other claims, the Debtor was negligent in supervising these priests.

4.      In the bankruptcy proceedings, the Debtor initiated an adversary action on June 24, 2016 against Liberty Mutual and four other insurance companies that either sold or were responsible for general liability insurance policies that the Debtor contended covered the Claims.

Declaration of James R. Murray

After the Bankruptcy Court granted two of the Debtor's summary judgment motions, all of the insurer defendants in the adversary action settled with the Debtor, except one – Liberty Mutual.[1]

5.      Liberty Mutual contends, for a variety of reasons, some of which are set forth below, that it owes little or no coverage in connection with the Claims. The Debtor disagrees, but given the time and financial resources it would take for the parties to litigate the insurance coverage issues to completion, the risks of litigation, and the potential for appeals to further delay recoveries to the estate, it is in the Debtor's best interest to resolve the Claims and disputes consensually.

6.      Between June 2016 and November 2018, the Debtor and Liberty Mutual engaged in extensive litigation in an adversary proceeding before the Bankruptcy Court and later before the U.S. District Court for the District of Minnesota (the "District Court") concerning the coverage available for the Claims.

7.      The Debtor contended that Liberty Mutual was responsible for four general liability policies that two of Liberty Mutual's predecessors, Agricultural Insurance Company ("Agricultural") and American Empire Insurance Company ("American Empire"), each sold to the Debtor from 1964 to 1973: (1) Agricultural policy number CLA 770553 with a policy period of 2/1/1964 to 2/1/1967 and limits of $50,000 per person and $100,000 per occurrence; (2) Agricultural policy number 3GA 26 24 22 with a policy period of 2/1/1967 to 2/1/1970 and limits of $50,000 per person, $100,000 per occurrence and $100,000 aggregate; (3) Agricultural

---

[1] The settlement agreements have been filed in the Bankruptcy Court. *See In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn.), Dkt. Nos. 316 at 7 (settlement with Catholic Mutual Relief Society), 320 at 9 (settlement with Fireman's Fund Insurance Company), 337 at 7 (settlement with Church Mutual Insurance Company), and 338 at 7 (settlement with Continental Insurance Company). The Bankruptcy Court has approved all of the settlements. *Id.*, Dkt. Nos. 326 (order approving settlement with Catholic Mutual Relief Society), 327 (order approving settlement with Fireman's Fund Insurance Company), 346 (order approving settlement with Church Mutual Insurance Company), and 347 (order approving settlement with Continental Insurance Company).

policy number 3GA 29 96 59, with a policy period of 2/1/1970 to 2/1/1973 and limits of $50,000

per person, $100,000 per occurrence and $100,000 aggregate; and (4) American Empire policy

number 4GA 12 60 79 with a policy period of 2/1/1973 to 2/1/1976 (cancelled 4/24/1973) and

limits of $300,000 per occurrence and $300,000 aggregate.

8.      In addition to the foregoing four policies, the Debtor contended that Great

American Insurance Company ("Great American") sold the Debtor a policy with $1 million per

occurrence limits for which Liberty Mutual was responsible.

9.      The Debtor contended that each of the foregoing policies provided coverage for

the Claims.  For example, the Debtor contended that (1) each act of abuse triggered a separate

per occurrence limit, (2) the per occurrence limits were annualized, and (3) the aggregate limits

did not apply to limit the overall coverage for the Claims.  Moreover, the Debtor contended that

no exclusions or other limitations in the policies applied to preclude coverage.

10.      Liberty Mutual acknowledged responsibility for the Agricultural and American

Empire policies.  It nevertheless asserted that the Debtor failed to satisfy its *prima facie* burden

of proof concerning the terms and conditions of the Agricultural and American Empire policies.

As to the Great American policy, Liberty Mutual denied that it ever existed.

11.      In addition to asserting that the Debtor did not meet its burden of proof to show

the terms and conditions of the Agricultural or American Empire policies or the existence of the

Great American policy, Liberty Mutual also asserted numerous coverage defenses.  For example,

to the extent that there is coverage under the policies, Liberty Mutual contended that the

coverage available under the policies was limited by the applicability of the aggregate limits (and

any reduction in the aggregate limits resulting from prior indemnity payments) and the

applicability of a single per occurrence or per person limit per policy.  To reduce coverage even

further, Liberty Mutual asserted that the relevant "occurrence" for purposes of determining the

Declaration of James R. Murray                    3

number of per occurrence limits that apply is the negligent supervision of the abusers by a particular bishop, rather than each instance of abuse.

12.     Liberty Mutual also contended that coverage for the claims was barred in whole or in part by certain terms, conditions, limitations, and exclusions under some or all of the policies. Liberty Mutual, for instance, asserted that the Debtor had the burden of proving, among other things, that the abuse was caused by an "occurrence" under the policies. According to Liberty Mutual, the claimants' alleged injuries were not caused by an "occurrence" under any of the policies where a reasonably prudent person in the position of the Debtor knew or should have known that the priest's abuse of the claimant was substantially probable as a result of continuing exposure caused by their willful indifference. Liberty Mutual also asserted that one of the policies contained an intentional acts exclusion that bars coverage for the Claims.

13.     Liberty Mutual also asserted that two of the policies contain a professional services exclusion that bars coverage for the Claims. The Debtor disputed Liberty Mutual's various positions, which could have the effect of limiting coverage under each policy.

14.     On December 19, 2016, the Debtor filed three motions for partial summary judgment in the Bankruptcy Court. These motions sought rulings to establish (1) the proper legal test for determining the number of occurrences, (2) the inapplicability of the professional services exclusion, and (3) the existence of the Great American policy. The Bankruptcy Court granted two of the Debtor's motions, holding that the relevant "occurrence" for calculating the number of occurrences is each instance of sexual abuse of a claimant and the professional services exclusion did not apply to a claim involving sexual abuse. The Bankruptcy Court, however, denied the Debtors' motion with respect to the existence of the Great American policy, finding that, although the Debtor made a *prima facie* case establishing the existence of the Great

American policy, the record showed a real controversy over a material issue concerning the existence of the policy that must be resolved by the finder of fact.

15.    After the insurance coverage litigation was transferred from the Bankruptcy Court to the District Court, the Debtor and Liberty Mutual engaged in extensive fact, expert, and third-party discovery. After the close of discovery, the Debtor and Liberty Mutual filed cross motions for summary judgment in the District Court. The Debtor's motion for summary judgment requested that the District Court adopt and confirm the Bankruptcy Court's orders granting partial summary judgment in favor of the Debtor on the legal test for determining the number of occurrences and the inapplicability of the professional services exclusion. Liberty Mutual moved for summary judgment with respect to three issues:  (1) the applicability of aggregate limits to the Claims; (2) the applicability of a single occurrence limit per policy; and (3) the non-existence of the Great American policy.

16.    While the cross motions for summary judgment were pending, the Debtor and Liberty Mutual engaged in settlement discussions. The Debtor and Liberty Mutual reached a settlement by which Liberty Mutual agreed to pay the sum of $6,500,000.00 to the Debtor for the benefit of the claimants. Prior to the District Court's resolution of the motions for summary judgment, the Debtor and Liberty Mutual jointly withdrew the summary judgment motions. Thus, the District Court did not decide the motions.

17.    The settlement between the Debtor and Liberty Mutual benefits the claimants. If no settlement had been reached with Liberty Mutual, the Debtor faced a risk that the District Court would rule against the Debtor on one or more of the issues raised in the summary judgment motions, any one of which could limit coverage. Even if the District Court had ruled in the Debtor's favor on one or more of the issues, the Debtor would likely have had to go to trial to resolve disputed factual issues, such as whether the allegations of abuse were sufficiently

Declaration of James R. Murray          5

accidental from the perspective of the Debtor to constitute an "occurrence" covered by the policies. At trial, Liberty Mutual would have undoubtedly attempted to prove that no "occurrence" existed and thus the Debtor was not entitled to any coverage, by contending that, among other things, the Debtor was allegedly aware that priests sexually abused minors, allowed abusers to return from treatment to their parishes without informing the parishioners, and did not supervise or have any policies or procedures regarding the supervision of priests. According to Liberty Mutual, as early as 1958 the Debtor was aware that priests sexually abused minors.

18.    The trial would likely have been followed by post-trial motions and appeals. On appeal, the Court of Appeals could have reversed any rulings by the District Court in favor of the Debtor. In addition to prolonging the final determination of the coverage issues possibly for years, with no guarantee that the Debtor would prevail, the Debtor would continue to incur costs throughout the process, which would erode the value of the Debtor's estate and the resources available from the Debtor's estate to pay the Claims.

19.    In light of (1) the costs to the Debtor's estate to litigate its coverage claims against Liberty Mutual, (2) the time it will take to obtain a final determination of the Debtor's rights and claims under the insurance policies, (3) the risk that the Debtor may not prevail in litigation of the issues, (4) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the dispute potentially for years, and (5) the desire to obtain the maximum value promptly from Liberty Mutual under the policies to use toward the resolution of Claims, the Debtor determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the dispute between the Debtor and Liberty Mutual.

20.    The interests of creditors weigh in favor of approval of the Agreement.

Declaration of James R. Murray             6

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this 31ˢᵀ day of January 2019.

James R. Murray

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Diocese of Duluth,

          Debtor-in-Possession.

Case No.: 15-50792

Chapter 11

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN THE DIOCESE , THE PARISHES AND LIBERTY MUTUAL INSURANCE COMPANY

## INTRODUCTION

The above-referenced debtor submits this memorandum in support of its Motion for an Order Approving Settlement Agreement between the Diocese, the Parishes and Liberty Mutual Insurance Company (the "Motion). The Court should approve the Settlement Agreement, attached to the Motion as **Exhibit A**, because it is in the best interests of the Diocese and the Diocese's bankruptcy estate. The Settlement Agreement resolves all Tort Claims between Liberty Mutual, the Parishes, and the Diocese.

## ARGUMENT

Compromise is favored by the law as a normal part of the reorganization process. *In re Trism, Inc.*, 282 B.R. 662. 666 (B.A.P. 8th Cir. 2002). Rule 9019 of the Federal Rules of Bankruptcy Procedure provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor and indenture

> trustees as provided in Rule 2002 and to any other entity as the
> court may direct.

Fed. R. Bankr. P. 9019(a).

"A decision to approve or disapprove a proposed settlement under Bankruptcy Rule 9019 is within the discretion of the bankruptcy judge." *In re Trism, Inc.*, 282 B.R. at 666 (citing *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135-36 (8th Cir. 1984)). Bankruptcy Rule 9019 vests a bankruptcy court with "broad authority to approve or disapprove all compromises and settlements affecting the bankruptcy estate." *In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997). In exercising its discretion, a court should consider the following factors:

1. The probability of success in the litigation;
2. The difficulties, if any, to be encountered in the matter of collection;
3. The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it;
4. The paramount interests of the creditors and a proper deference to their reasonable views in the premises; and
5. Whether the conclusion of the litigation promotes the integrity of the judicial system.

*In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d at 1135-36 (citing *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir. 1929), and *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968)); *In re Bates*, 211 B.R. at 343; *see also In re Farmland Indus., Inc.*, 289 B.R. 122 (B.A.P. 8th Cir. 2003).

Consideration of these factors allows a court to determine whether a settlement is "fair and equitable," *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. at 424, and in the best interests of the estate. *In re Trism, Inc.*, 282 B.R. at 668. A court's function is not to ensure that the proposed settlement is the best possible

settlement obtainable. Rather, the court must determine only whether the settlement falls below the lowest point on the range of reasonableness. *In re Hanson Indus., Inc.*, 88 B.R. 942, 945 (Bankr. D. Minn. 1988); *see also In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985). In this instance, consideration of these factors compels the conclusion that the Settlement Agreement should be approved.

On June 24, 2016, the Diocese initiated the Coverage Litigation against Liberty Mutual Insurance Company, Catholic Mutual Relief Society of America, Fireman's Fund Insurance Company, Church Mutual Insurance Company, and the Continental Insurance Company (collectively, "the Insurers"). The Coverage Litigation has been complicated with procedural and substantive motions and involves interpretation of multiple insurance agreements and litigation of disputed legal positions and defenses.

The Diocese, Parishes, Insurers and the Committee participated in two formal mediation sessions. Unfortunately, mediation did not result in a settlement. Rather, the parties have been engaged in motion practice, including procedural motions and motions for partial summary judgment.  There was a third mediation between Liberty Mutual and Attorney Jeffrey Anderson.  After that mediation, the Diocese and Liberty Mutual engaged in substantial fact discovery and briefed cross-motions for summary judgment.  Even after resolution of the cross-motions for summary judgment, numerous issues would likely remain which would require resolution by a fact finder.  If a settlement is not reached, it may take years to conclude the Coverage Litigation.

In light of (i) the significant costs to the Diocese's estate to litigate its coverage claims against Liberty Mutual; (ii) the considerable time it would take to obtain a final determination

of the Diocese's rights and claims under the Policies; (iii) the risk that the Diocese may not prevail in litigation of the issues; (iv) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the disputes potentially for years; and (v) the desire to obtain promptly the maximum value from Liberty Mutual under the Policies, the Diocese has determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the dispute with Liberty Mutual.

**Probability of Success in Litigation**

Given the inherent uncertainty with respect to the outcome of the Coverage Litigation, this factor weighs heavily in favor of the approval of the Settlement Agreement. The Coverage Litigation involves interpretation of multiple insurance agreements and litigation of disputed legal theories and defenses.  Liberty Mutual is a well-represented party with the motivation, the resources, and the demonstrated willingness to litigate the multiple significant coverage issues that arise in this complicated legal setting.

Although the Diocese is confident of the merits of its positions, there can be no guarantee that the Diocese would ultimately be successful in any Coverage Litigation. Moreover, there is the prospect that Coverage Litigation could continue for several years including appeals and the possibility that it could produce a mixed result for the Debtor.

**Likely Difficulties in Collection**

Absent settlement, it is highly possible that the Abuse Claims for which Debtor contends Liberty Mutual is responsible to afford coverage would be liquidated and paid over years. Resolution of the Coverage Litigation, including appeals, could take years. This factor weighs in favor of settlement.

DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN THE DIOCESE , THE PARISHES AND LIBERTY MUTUAL INSURANCE COMPANY  -4

**The Complexity of the Litigation Involved, and the Expense, Inconvenience, and Delay**

The Coverage Litigation involves the interpretation of many historical insurance agreements and requires the adjudication of disputed legal and factual issues, including, but not limited to, the number of occurrences, the applicability of aggregate and per occurrence limits of liability, the annualization of certain limits of liability, an insured's burden of proof with respect to the terms and conditions of insurance policies and whether the abuse claims constitute an "occurrence" under the applicable policies.  The litigation is complicated, time consuming and expensive. Moreover, to access coverage, abuse claims would have to be liquidated over years. In the absence of the Settlement Agreement, the Diocese anticipates that there will be a substantial delay in collecting insurance proceeds from Liberty Mutual.

**Interest of Creditors**

The Diocese, the Parishes, and Liberty Mutual all support the Settlement Agreement. The Settlement Agreement will provide survivors with a necessary mechanism for prompt recovery on their claims, without the expense or delay of proceeding within the tort system.

The Debtor has exercised its business judgment and concludes that it cannot reasonably justify the expense, delay and uncertainty of pursuing Coverage Litigation against Liberty Mutual. The proposed settlement is well within the range of likely outcomes of the insurance coverage disputes and represents an appropriate compromise and settlement taking into account the costs, risks and potential rewards of litigation. Far from falling "below the lowest point in the range of reasonableness," *Pacific Gas,* 304 B.R. at 417, the payment of $[6,500,000.00] by Liberty Mutual falls well above the lowest point; moreover, it results in a

known outcome for the Diocese and will benefit the holders of all survivors. For all of these

reasons, approval of the Agreement is in the best interest of the estate and creditors.

## <u>CONCLUSION</u>

The factors recognized in the Eighth Circuit for the approval of compromises and

settlements weigh in favor of the Court approving the Settlement Agreement. Therefore, the

Diocese respectfully requests that the Court grant the Motion and enter an Order approving the

Settlement Agreement.


Dated: this 5th day of February, 2019

**ELSAESSER ANDERSON**

/s/ Bruce A. Anderson
Bruce A. Anderson (admitted *pro hac vice*)
J. Ford Elsaesser (admitted *pro hac vice*)
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Phone: 208-263-8517
brucea@eaidaho.com
ford@eaidaho.com

-and-

**GRAY PLANT MOOTY MOOTY &
BENNETT, P.A.**

/s/ Phillip L. Kunkel
Phillip L. Kunkel (#058981)
Abigail M. McGibbon (#0393263)
101 West St. Germain
Suite 500
St. Cloud, MN 56301
Phone: 320-202-5335
phillip.kunkel@gpmlaw.com
abigail.mcgibbon@gpmlaw.com

*Attorneys for the Diocese of Duluth*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

Diocese of Duluth,

               Debtor-in-Possession.

Case No.: 15-50792

Chapter 11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2019, I electronically filed the *Notice of Hearing and Motion Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving Settlement Agreement between the Diocese, the Parishes and Liberty Mutual Insurance Company, Declaration of James R. Murray* and *Memorandum in Support of Motion* in the above-captioned matter using the CM/ECF system, which sent a Notice of Electronic Filing to the following person(s):

Nancy D. Adams on behalf of Defendant LIBERTY MUTUAL GROUP, INC.
ndadams@mintz.com

Bruce A. Anderson on behalf of Counter-Defendant Diocese of Duluth
baafiling@eaidaho.com, katie@eaidaho.com

Jeffrey R Anderson on behalf of Interested Party Certain Personal Injury Creditors
jeff@andersonadvocates.com, therese@andersonadvocates.com;erin@andersonadvocates.com

Phillip J. Ashfield on behalf of Creditor Committee Official Committee of Unsecured Creditors
phillip.ashfield@stinson.com, jess.rehbein@stinson.com

Teri E. Bentson on behalf of Counter-Claimant Liberty Mutual Group
teri.bentson@libertymutual.com

Kristi K. Brownson on behalf of Defendant LIBERTY MUTUAL GROUP, INC.
kbrownson@brownsonnorby.com, lwaskosky@brownsonnorby.com

Edwin H. Caldie on behalf of Creditor Committee Official Committee of Unsecured Creditors
Edwin.Caldie@stinsonleonard.com, jess.rehbein@stinson.com;aong.moua@stinson.com

David C. Christian, II on behalf of Interested Party Continental Insurance Company
dchristian@davidchristianattorneys.com

Benjamin J. Court on behalf of Creditor Committee Official Committee of Unsecured Creditors
benjamin.court@stinson.com, aong.moua@stinson.com;jess.rehbein@stinson.com

Everett J. Cygal on behalf of Defendant CATHOLIC MUTUAL RELIEF SOCIETY OF
AMERICA
ecygal@schiffhardin.com, cmethven@schiffhardin.com

Louis T. DeLucia on behalf of Interested Party CATHOLIC MUTUAL RELIEF SOCIETY OF
AMERICA
ldelucia@schiffhardin.com, cmethven@schiffhardin.com

J. Ford Elsaesser on behalf of Plaintiff Diocese of Duluth
ford@eaidaho.com, katie@eaidaho.com

Alyson M Fiedler on behalf of Interested Party CATHOLIC MUTUAL RELIEF SOCIETY OF
AMERICA
afiedler@schiffhardin.com, jacquaviva@schiffhardin.com

Michael G Finnegan on behalf of Interested Party Certain Personal Injury Creditors
mike@andersonadvocates.com, therese@andersonadvocates.com;erin@andersonadvocates.com

Charles E. Jones on behalf of Counter-Claimant FIREMAN'S FUND INSURANCE COMPANY
charles.jones@lawmoss.com, Brenda.murphy@lawmoss.com

John D Kelly on behalf of Interested Party Parishes of Diocese of Duluth
jdk@hanftlaw.com, saw@hanftlaw.com;dar@hanftlaw.com

Jeffrey D. Klobucar on behalf of Cross-Claimant The Continental Insurance Company
jklobucar@bassford.com, pcarter@bassford.com

Robert T. Kugler on behalf of Creditor Committee Official Committee of Unsecured Creditors
robert.kugler@stinson.com, jess.rehbein@stinson.com;aong.moua@stinson.com

Phillip Kunkel on behalf of Debtor 1 Diocese of Duluth
phillip.kunkel@gpmlaw.com

Connie A. Lahn on behalf of Defendant CATHOLIC MUTUAL RELIEF SOCIETY OF
AMERICA
clahn@btlaw.com, marobinson@btlaw.com;sofia.shaw@btlaw.com

Nauni Manty
ecf@mantylaw.com

Abigail M McGibbon on behalf of Plaintiff Diocese of Duluth
abigail.mcgibbon@gpmlaw.com

Laura K. McNally on behalf of Cross-Claimant The Continental Insurance Company

lmcnally@loeb.com, chdocket@loeb.com;poliosi@loeb.com;skunzendorf@loeb.com

Brittany Michael on behalf of Creditor Committee Official Committee of Unsecured Creditors
brittany.michael@stinson.com, jess.rehbein@stinson.com

James R. Murray on behalf of Counter-Defendant Diocese of Duluth
jmurray@blankrome.com

Christian A. Preus on behalf of Cross Defendant CHURCH MUTUAL INSURANCE
COMPANY
cpreus@bassford.com, pcarter@bassford.com

Beth A. Jenson Prouty on behalf of Defendant CHURCH MUTUAL INSURANCE COMPANY
bprouty@bassford.com

Robert Raschke on behalf of U.S. Trustee US Trustee
robert.raschke@usdoj.gov

Andrea E Reisbord on behalf of Defendant The Continental Insurance Company
areisbord@bassford.com, dshippee@bassford.com

Daniel J Schufreider on behalf of Defendant CATHOLIC MUTUAL RELIEF SOCIETY OF
AMERICA
dschufreider@schiffhardin.com

Mary F. Sieling on behalf of Interested Party Nauni Manty
mary@mantylaw.com, janet@mantylaw.com;sue@mantylaw.com

David M. Spector on behalf of Defendant CATHOLIC MUTUAL RELIEF SOCIETY OF
AMERICA
dspector@schiffhardin.com, cmethven@schiffhardin.com

Laura B Stephens on behalf of Interested Party Liberty Mutual Insurance Company
lbstephens@mintz.com

Scott E. Turner on behalf of Interested Party Continental Insurance Company
scott.turner@cna.com, jennifer.clarke@cna.com

US Trustee
ustpregion12.mn.ecf@usdoj.gov

Jeanne H. Unger on behalf of Counter-Claimant The Continental Insurance Company
junger@bassford.com, mmooney@bassford.com

John E Vukelich on behalf of Creditor Jacquelyn Paaso
jevukelich@gmail.com

Kevin J Walsh on behalf of Counter-Claimant Liberty Mutual Group
kwalsh@mintz.com, jcannata@mintz.com

Sarah J Wencil on behalf of U.S. Trustee US Trustee
Sarah.J.Wencil@usdoj.gov

Jared Zola on behalf of Counter-Defendant Diocese of Duluth
jzola@blankrome.com, nylitigationdocketing@blankrome.com;jcarter@blankrome.com

  AND I FURTHER CERTIFY that on February 5, 2019, I served the same on the following Non-ECF parties, US mail, postage prepaid:

| | |
|---|---|
| IRS DISTRICT COUNSEL<br>380 JACKSON STREET, SUITE 650<br>SAINT PAUL, MN 55101 | INTERNAL REVENUE SERVICE<br>WELLS FARGO PLACE<br>30 7TH STREET, MAIL STOP 5700<br>ST PAUL MN 55101 |
| MN DEPARTMENT OF REVENUE<br>COLLECTION ENFORCEMENT<br>551 BANKRUPTCY SECTION<br>600 NORTH ROBERT STREET<br>SAINT PAUL 55101 | OFFICE OF THE U.S. ATTORNEY<br>600 US COURTHOUSE<br>300 SOUTH FOURTH STREET<br>MINNEAPOLIS, MN 55415 |

  DATED this 5th day of February, 2019.

         */s/ Bruce A. Anderson*
         Bruce A. Anderson

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

---

In re:

Diocese of Duluth,

         Debtor-in-Possession.

Case No.:  15-50792

Chapter 11

---

### ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN THE DIOCESE, THE PARISHES AND LIBERTY MUTUAL INSURANCE COMPANY

---

This case is before the court on the debtor's motion for an order approving the settlement agreement between the Diocese, the Parishes and Liberty Mutual Insurance Company.

Based on the motion and the file,

IT IS ORDERED:

The settlement agreement attached as **Exhibit A** to the motion is approved.

 

 

_____
United States Bankruptcy Judge