# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MINNESOTA

In re:

Diocese of Duluth,

           Debtor-in-Possession.

Case No.:  15-50792

Chapter 11

## FIRST MODIFIED JOINT DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DIOCESE OF DULUTH AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**GRAY PLANT MOOTY**

Phillip Kunkel
1010 West Street Germain
Suite 600
St Cloud, MN 56301
320-252-4414
Fax : 320-252-4482
phillip.kunkel@gpmlaw.com

and

**ELSAESSER ANDERSON CHTD**

J. Ford Elsaesser
Bruce A. Anderson
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
208-667-2900
brucea@eaidaho.com
ford@eaidaho.com

Attorneys for the Diocese of Duluth, Debtor, and Debtor in Possession

**STINSON, LLP**

Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

Attorneys for the Official Committee of Unsecured Creditors for the Diocese of Duluth

Dated: July 9, 2019

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................................................1

I. INTRODUCTION .............................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS.............................................................................2

III. EXPLANATION OF CHAPTER 11 ...............................................................................4

    A.  Overview of Chapter 11..........................................................................................4

    B.  Chapter 11 Plan .......................................................................................................5

    C.  Confirmation of a Chapter 11 Plan..........................................................................5

    D.  Summary of Classification and Treatment of Claims ..............................................6

IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
    THE PLAN ...................................................................................................................7

V. VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN........................................10

    A.  Manner of Voting on Plan ......................................................................................10

    B.  Claim Holders Entitled to Vote...............................................................................11

    C.  Classes Impaired and Entitled to Vote on the Plan .................................................11

    D.  Vote Required for Class Acceptance........................................................................11

VI. THE DEBTOR AND ITS OPERATIONS.........................................................................12

    A.  Pre-Petition ............................................................................................................12

    B.  Need for Reorganization.........................................................................................13

    C.  Response to Sexual Abuse ......................................................................................15

VII. THE CHAPTER 11 CASE ............................................................................................16

    A.  The Chapter 11 Filing............................................................................................16

    B.  Retention of Counsel .............................................................................................16

    C.  Appointment of Creditors' Committee....................................................................16

    D.  Unknown Claims Representative ............................................................................16

    E.  Asset Sales and Other Dispositions; Planned Dispositions .....................................17

    F.  Bar Dates and Objections to Claims........................................................................17

    G.  Plan Exclusivity......................................................................................................18

    H.  Post-Petition Operations and Select Financial Information......................................18

    I.   Post-Petition Litigation – Adversary Proceeding 16-05012 Regarding Insurance
       Coverage:................................................................................................................19

    J.   Settlement Negotiations and Mediations. ...............................................................20

    K.  The Insurance Settlements. .....................................................................................21

CORE/3008165.0002/154242258.1

VIII. SUMMARY OF THE PLAN ........................................................................................22

   A.  General ...........................................................................................................................23

      A.  Brief Explanation of Chapter 11 ...............................................................................23

      B.  Acceptance of the Plan ..............................................................................................23

      C.  Classification of Claims Generally ...........................................................................24

   B.  Classification and Treatment of Claims Under the Plan ...............................................24

      A.  Unclassified Claims ..................................................................................................24

      B.  Priority Tax Claims ...................................................................................................26

      C.  Class 1 – Priority Claims ..........................................................................................26

      D.  Class 2 – Governmental Unit Claims .......................................................................26

      E.  Class 3 – Tort Claims Other Than Unknown Tort Claims ..........................................27

      F.  Class 4 - Unknown Tort Claims ...............................................................................28

      G.  Class 5 – General Unsecured Claims ........................................................................30

      H.  Classes 6A and 6B – Abuse Related Contingent Claims ...........................................30

   C.  Means for Execution of the Plan ..................................................................................31

      A.  Establishment of Trust ..............................................................................................31

      B.  Funding of Trust .......................................................................................................31

      C.  Establishment of Reserve Accounts ..........................................................................31

      D.  Liquidation and Payment of Tort Claims ..................................................................31

      E.  Treatment of Executory Contracts and Unexpired Leases .........................................33

   D.  Procedure for Determination of Claims Other than Tort Claims Based on the Sexual
      Abuse Proof of Claim Form ........................................................................................33

      A.  Objection to Claims. .................................................................................................33

      B.  Disputed Claims. ......................................................................................................33

      C.  Treatment of Contingent Claims. ..............................................................................33

   E.  Provisions Governing Distributions .............................................................................33

      A.  Distribution Only to Holders of Allowed Claims ......................................................33

      B.  Transmittal of Distributions. .....................................................................................34

      C.  Timing of Distributions .............................................................................................34

      D.  Form of Distributions ................................................................................................35

      E.  No Professional Fees or Expenses. ............................................................................35

      F.  Claim Estimation. .....................................................................................................35

      G.  No Interest on Claims. ...............................................................................................35

      H.  Withholding Taxes ....................................................................................................36

      I.  No *De Minimis* Distributions. ....................................................................................36

J.  Manner of Cash Payments. ......................................................................36

IX. CONDITIONS TO EFFECTIVE DATE ..............................................................36

A.  Conditions to Occurrence of Effective Date ..............................................36

B.  Notice of Effective Date ..........................................................................37

C.  Effect of Non-Occurrence of Conditions ..................................................37

X. EFFECT OF PLAN CONFIRMATION ...............................................................37

A.  Dissolution of Committee ........................................................................37

B.  Discharge and Injunction ........................................................................37

C.  Channeling Injunction ............................................................................38

D.  Supplemental Settling Insurer Injunction ................................................40

A.  Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurer Entities ..............................................................................................40

E.  Permanent Injunction Against Prosecution of Released and Channeled Claims ..............41

F.  Exculpation and Limitation of Liability of Exculpated Parties ........................42

G.  Timing ...................................................................................................42

H.  No Bar on Certain Claims ........................................................................43

XI. CHILD PROTECTION PROTOCOLS ...............................................................43

XII. THE REORGANIZED DEBTOR .....................................................................43

A. Continued Corporate Existence ................................................................43

B. Vesting of Assets ....................................................................................43

C. Identify of Officers of Reorganized Debtor ................................................43

D. Further Authorization ..............................................................................44

XIII. CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN ..............................44

A. Causes of Action/Avoidance Actions ........................................................44

B. Retention of Jurisdiction ..........................................................................44

C. Modification of the Plan ..........................................................................46

D. Severability ............................................................................................47

E. Section 1146 Exemption ..........................................................................47

F. Management of the Reorganized Debtor ....................................................47

XIV. CONFIRMATION PROCEDURES ..................................................................47

A.  Solicitation of Votes; Acceptance ............................................................48

B.  Confirmation Hearing ..............................................................................48

C.  Best Interests of Creditors Test ................................................................49

D.  Feasibility ..............................................................................................50

E.  Cram Down ............................................................................................50

CORE/3008165.0002/154242258.1

XV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .....51

    A.  Liquidation Under Chapter 7 of the Bankruptcy Code......................................................51

    B.  Alternative Chapter 11 Plans ...........................................................................................51

XVI. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ..........................................51

    A.  The Trust..........................................................................................................................52

    B.  Federal Income Tax Consequences to Holders of Claims.................................................53

XVII. VOTING INSTRUCTIONS............................................................................................54

XVIII. CONCLUSION ............................................................................................................55

## EXHIBITS

| | |
|---|---|
| Exhibit A: | Chapter 11 Joint Plan of Reorganization Proposed by the Diocese of Duluth (Filed as a Separate Document) |
| Exhibit B: | Order Approving the Disclosure Statement (Proposed) |
| Exhibit C: | Liquidation Analysis |
| Exhibits D – H: | Insurer Settlement Agreements |

CORE/3008165.0002/154242258.1

# DISCLOSURE STATEMENT[1]

On December 7, 2015 (the "**Petition Date**"), the Diocese of Duluth (the "**Debtor**") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**").  Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**").  The Debtor seeks confirmation of its *Joint Chapter 11 Plan of Reorganization* (as it may hereafter be amended or modified, the "**Plan**").

Pursuant to §1125 of the Bankruptcy Code, the Debtor and the Official Committee of Unsecured Creditors (the "Committee") now submit this Disclosure Statement (the "**Disclosure Statement**") in connection with the Plan.

## I.

## INTRODUCTION

The Debtor and the Committee provide this Disclosure Statement to all of the Debtor's known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan.  All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in its entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in its entirety by reference to the Plan (a copy of which accompanies this Disclosure Statement as **Exhibit A**).

BY ORDER DATED _____ __, 2019 (THE "**DISCLOSURE STATEMENT ORDER**"), THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH INCLUDES AND DESCRIBES THE PLAN, AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE CREDITORS OF THE DEBTOR TO MAKE AN INFORMED DECISION ABOUT THE PLAN.  A COPY OF THE DISCLOSURE STATEMENT ORDER IS ATTACHED HERETO AS **EXHIBIT B**.  ONLY HOLDERS OF ALLOWED CLAIMS IN CLASS 3 (TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS), CLASS 4 (UNKNOWN TORT CLAIMS), CLASS 5 (GENERAL UNSECURED CLAIMS) AND CLASSES 6A AND 6B (ABUSE RELATED CONTINGENT CLAIMS), ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE DEEMED ACCEPTING CLASS 1 AND CLASS 2 CLAIMS, THE DEBTOR IS SOLICITING ACCEPTANCES OF THE PLAN FROM ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTOR.  ALL HOLDERS

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to them in the Plan.

OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE ATTACHED DISCLOSURE STATEMENT ORDER. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS.  **TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, EXECUTED AND ACTUALLY RECEIVED BY THE DEBTOR BY 5:00 P.M. (PREVAILING CENTRAL TIME), ON _____, 2019 (THE "VOTING DEADLINE").**

The Bankruptcy Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan.  No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement.  All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for _____, 2019 at 9:30 A.M. (Prevailing Central Time) (the "Confirmation Hearing") at the United States Bankruptcy Court, 300 South Fourth Street, Minneapolis, MN.  This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court will then also receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

## II.

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR ON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT AND ALL EXHIBITS THERETO WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR ANY SUCH APPLICABLE DOCUMENT SHALL GOVERN. UNLESS OTHERWISE SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER**

THE DATE HEREOF. THIS DISCLOSURE STATEMENT DOES NOT REFLECT EVENTS THAT MAY OCCUR AFTER THAT DATE AND MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ESTIMATED VALUE OF THE DEBTOR'S PROPERTY AND/OR THE ESTIMATED ASSETS TO BE GENERATED FROM THE LIQUIDATION OF THE DEBTOR'S ASSETS, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PROPOSED PLAN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, THE DEBTOR AND ITS ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

ALTHOUGH THE DEBTOR'S PROFESSIONALS AND THE COMMITTEE'S PROFESSIONALS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED ON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE DEBTOR'S PROFESSIONALS AND THE COMMITTEE'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO

**REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION. SUCH PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all Exhibits and Schedules to the Plan and Disclosure Statement) in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. Except for the Debtor and certain of the Professionals it has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtor. You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan pursuant to the procedures set forth in the Solicitation Package, which will be sent under separate cover.

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE DEBTOR AND COMMITTEE URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

**A.    Overview of Chapter 11**

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its operations in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a "Debtor-in-Possession" unless the Bankruptcy Court orders the appointment of a trustee. In the Debtor's Case, the Debtor remains as the Debtor-in-Possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against a debtor or otherwise interfere with its property or operations. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed Chapter 11 plan.

4

**B.      Chapter 11 Plan**

The formulation of a Chapter 11 plan is the principal purpose of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate. A Chapter 11 plan may provide anything from a complex restructuring of a debtor's operations and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of a plan, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan. The Plan incorporates a compromise reached among the Debtor and the Committee that the Debtor and the Committee believe provides a fair and equitable allocation of the Debtor's assets that will be distributed to creditors and treatment of all Claims against the Debtor.

After a Chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, Section 1125 of the Bankruptcy Code requires the Debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the Plan. **This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.**

**C.      Confirmation of a Chapter 11 Plan**

If all classes of Claims accept the Plan, the Bankruptcy Court may confirm the Plan if the Bankruptcy Court independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. **The Debtor and the Committee believe that the Plan satisfies all the applicable requirements of Section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or, where applicable, interest in a particular class vote in favor of a plan for the Bankruptcy Court to determine that such class has accepted the plan. Rather, a class of claims or interests will be deemed to have accepted a plan if the Bankruptcy Court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class. **Only the holders of allowed Claims and Tort Claims who actually vote will be counted as either accepting or rejecting the Plan.**

Furthermore, classes that are to receive no distribution under a plan are conclusively deemed to have rejected such plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.

**Classes 3 (Tort Claims other than Unknown Tort Claims), 4 (Unknown Tort Claims), 5 (General Unsecured Claims), and 6A and 6B (Abuse Related Contingent Claims) are impaired under the Plan and entitled to vote on the Plan.**

**Classes 1 (Priority Claims), 2 (Governmental Unit Claims) are deemed unimpaired under the Plan and are deemed to accept the Plan.**

CORE/3008165.0002/154242258.1

In general, a Bankruptcy Court also may confirm a Chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan.  For a Chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, a plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that have not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides:  (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class.  **The Debtor and the Committee believe that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.**

**D.       Summary of Classification and Treatment of Claims**

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims, the relative allocations of property to holders of such Claims, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan.  However, the Debtor believes that a broad overview of what, in their opinion, the Debtor and creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan and the proposed treatment of each such Class under the Plan.  This summary is qualified in its entirety by reference to the Plan:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Priority Claim | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | Tort Claims Other Than Unknown Tort Claims | Impaired | Yes |
| 4 | Unknown Tort Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 6A | Abuse Related Contingent Claims | Impaired | Yes |
| 6B | Abuse Related Contingent Claims | Impaired | Yes |

As discussed in the Liquidation Analysis attached hereto as **Exhibit C**, the Debtor estimates that recoveries for holders of Classes 3, 4, 5, 6A, and 6B will be greater than in liquidation under Chapter 7 of the Bankruptcy Code because the total amount of property available for distribution is greater under the Plan than in liquidation under Chapter 7. In addition, the Debtor believes that theoretical distributions under a Chapter 7 case would likely be delayed due to the time it will take a Chapter 7 trustee to assess the Debtor's assets, review and analyze claims, and evaluate and litigate claims against third parties. Holders of allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

IV.

**QUESTIONS AND ANSWERS REGARDING THIS
DISCLOSURE STATEMENT AND THE PLAN**

**Why is the Debtor sending me this Disclosure Statement?**

The Debtor and the Committee are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of the Plan, Section 1125 of the Bankruptcy Code requires the preparation and approval of a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

The Plan is based on two groups of settlements. One group of settlements is among the Diocese, the Diocese Parties, and the Settling Insurer Entities and amounts to $30,700,000.00. This settlement is evidenced by Insurance Settlement Agreements that have previously received Bankruptcy Court approval. In general terms, the Insurance Settlement Agreements provide for (a) the Settling Insurers' buy back of their policies from the Diocese Parties and (b) injunctions which prohibit, amongst others, Tort Claimants from suing the Settling Insurer Entities.

The other settlement is among the Diocese, the Diocese Parties, and the Committee and amounts to $8,500,000.00. All settlements together provide that the Tort Claimants will receive the grand total sum of $39,200,000.00, which will be payable to the Trust set up through the Plan and Disclosure Statement process. The funds will be allocated pursuant to the Trust Distribution Protocols attached as Exhibit D to the Plan. In addition, a fund in the amount to be determined will be established to pay Unknown Tort Claimants pursuant to the Plan, the Trust Distribution Protocols, and other Plan documents.

CORE/3008165.0002/154242258.1

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

If the Plan is not confirmed, the Debtor believes it is unlikely that the Debtor will be able to reorganize. The Plan memorializes a comprehensive settlement between the Debtor and the Committee, which allocates a substantial portion of the Debtor's assets to the Trust that will be established for the benefit of Tort Claimants and Unknown Tort Claimants. In addition, confirmation of the Plan is necessary to effectuate the settlement with the Debtor's insurance carriers that will be used to fund the Plan and the Trust created pursuant to the Plan for the benefit of holders of Tort Claims and Unknown Tort Claims. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated in the Plan could be implemented and what holders of Claims would ultimately receive on account of their Claims. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan on account of, among other things, the cost of negotiating, drafting and potentially litigating an alternative Plan, as well as complex litigation regarding Tort Claims and the potential loss of funds from insurance carriers pursuant to settlements. Moreover, non-confirmation of the Plan may result in dismissal of this case in its entirety. For a more detailed description of the consequences of this scenario, see "Best Interests of Creditors Test," which begins on page 47 hereof, and the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

**If the Plan provides that I get a distribution, do I get it upon confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"[2]**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective. References to the "Effective Date" means the later of 30 days or the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter, based on, among other things, the amount of cash available to satisfy Claims, the time that the Abuse Claims Reviewer requires to complete his analysis of certain Tort Claims, the amount of Claims outstanding against the Debtor, and the Trustee's business judgment. The Tort Claims Reviewer analyzes the Tort Claims pursuant to the Trust Distribution Protocols. The Trust will distribute the funds after review of the Tort Claims is complete pursuant to the terms of the Plan, the Confirmation Order, the Trust Distribution Protocols, the Trust Agreement, the applicable releases, and any other applicable Plan documents.

**Where is the cash required to fund the Plan coming from?**

The cash required to fund the Trust that will pay holders of Class 3 and 4 Claims, will come from (i) $8.5 million or more of cash from the Debtor, and (ii) $30,700,000.00 of cash from the Settling Insurers. The cost to fund payments to holder of Class 4 Claims will come from cash from the Debtor. The cash required to fund payments for Professional Claims and costs of the Trust

---

[2] The descriptions' capitalized terms in response to this question are qualified in their entirety by reference to the definitions in the Plan.

will come from the Debtor and/or the Reorganized Debtor. To fund its requirement to pay the $8,500,000.00, the Debtor anticipates selling certain real property, using available cash savings, taking out a substantial loan, and the balance coming from the Catholic faithful, via contributions from the various Catholic Entities, including parishes, missions and programs within the Diocese.

In consideration for these contributions the Settling Insurer Entities and the Protected Parties (including the foregoing Catholic Entities) will be protected from litigation under the Plan and be beneficiaries of the Channeling Injunction, Permanent Injunction, and Supplemental Settling Insurer Injunction contained in the Plan. In addition, Tort Claimants must sign a general release of the Protected Parties and Settling Insurer Entities as a prerequisite to receiving settlement amounts through the Plan and from the Trust.

**Will there be any releases granted to parties other than the Debtor as part of the Plan?**

Yes. *See* "Exculpation and Limitation of Liability," which begins on page 39. A Tort Claimant's distribution is conditioned upon the Tort Claimant delivering a general release to Protected Parties and Settling Insurer Entities. The Ballots for the Tort Claimants contain the releases.

**Will there be any injunctions entered pursuant to the Plan?**

Yes. The Settling Insurer Entities and Protected Parties obtain the "Discharge and Injunction," which is quoted in section X.A below, the "Channeling Injunction," which is quoted in section X.C below, the "Supplemental Settling Insurer Injunction," which is quoted in section X.D below, and the "Permanent Injunction Against Prosecution of Released and Channeled Claims," which is quoted in section X.E below. These injunctions will require holders of Tort Claims and Related Insurance Claims to seek an exclusive remedy provided in the Plan and preclude claimants from pursuing Claims against the parties protected by such injunctions whether or not such claimants receive a distribution under the Plan.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of a Claim in Classes 3, 4, 5, 6A, and 6B (collectively, the "**Voting Classes**"), you may vote for or against the Plan by completing the Ballot and returning it as set forth in the Solicitation Packages which will be mailed out. See "Voting Instructions," which begins on page 10.

**What is the deadline to vote on the Plan?**

All Ballots must be actually received by the Debtor no later than 5:00 p.m. (Prevailing Central Time) on [●], 2019 (the "**Voting Deadline**").

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2019 to take place at 9:30 a.m. (Prevailing Central Time) before the Honorable Judge Robert J. Kressel, United States Bankruptcy Judge, in the United States Bankruptcy Court, Courtroom [●], 300 South Fourth Street, Minneapolis, MN. The Confirmation Hearing may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served on the Debtor and certain other parties, by no later than [●], 2019 at 5:00 p.m. (Prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit A**, it might not be considered by the Bankruptcy Court.

**What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds a debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the case and the Plan. A detailed description of the Bankruptcy Court's post-confirmation jurisdiction is provided in Section 16.1 of the Plan.

**Do the Debtor and the Committee recommend voting in favor of the Plan?**

Yes. The Debtor and the Committee recommend voting for the Plan because the Plan provides for a larger distribution, at the estimated Effective Date of the Plan, to the Debtor's unsecured creditors, including holders of Tort Claims and Unknown Tort Claims, than would otherwise result from liquidation or any other reasonably available alternative. Accordingly, the Debtor and the Committee recommend that holders of Claims in Voting Classes support Confirmation of the Plan and vote to accept the Plan.

**V.**

**VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN**

**A.     Manner of Voting on Plan**

Before voting, this Disclosure Statement, as well as the Plan, should be read in its entirety. You should only use the Ballot sent to you in the Solicitation Package to cast your vote for or against the Plan.

10

**Ballots must be completed, dated, signed and returned pursuant to the procedures set forth in the Solicitation Package.**

**B.      Claim Holders Entitled to Vote**

Under the Bankruptcy Code, any holder of a claim in a class that is "impaired" under a plan is entitled to vote to accept or reject the plan, unless such class of claims neither receives nor retains any property under the plan (in which case such class is deemed to have rejected the plan). Bankruptcy Code §1124 provides generally that a Claim is impaired if the legal, equitable or contractual rights of the claim are altered.

Subject to the exceptions provided below, any holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim holder has filed a Proof of Claim with respect to a Disputed Claim.  Pursuant to Bankruptcy Rule 3018(a), Class 3 Tort Claims shall be estimated at $1.00 for voting purposes only.  The actual amount payable on account of Class 3 Tort Claims will be determined pursuant to the Allocation Plan.

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Debtor or by an order of the Bankruptcy Court in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan.  In other words, only holders of allowed Claims, Class 3 Claims (Tort Claims other than Unknown Tort Claims which are estimated for voting purposes only at $1.00 for each Claim), Class 4 Unknown Tort Claims (estimated for purposes only at $1.00 for each Claim), Class 5 General Unsecured Claims, and Classes 6A and 6B Abuse Related Claims, may vote to accept or reject the Plan.  A Claim to which an objection has been filed by the Debtor or any other party-in-interest no later than _____, 2019, or a Claim (i) that is listed on the Debtor's schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding Proof of Claim has not been filed is not an allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court allows the Claim (in whole or in part) by Final Decree.  Upon request of a party-in-interest, the Bankruptcy Court may temporarily allow or estimate a Disputed Claim for purpose of voting on the Plan.  Ballots cast in respect of Claims other than allowed Claims, and Tort Claims will not be counted.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**C.      Classes Impaired and Entitled to Vote on the Plan**

Claim holders in Classes 3, 4, 5 6A, and 6B are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.  Any controversy as to whether any Claim or class of Claims is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

**D.      Vote Required for Class Acceptance**

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in

11

number of holders of allowed claims in that class who cast ballots.[3]  Class 3 Claims shall be estimated at $1.00 each for voting purposes only.  As such, if more than half of the number of Class 3 Claimants who vote cast Ballots in favor of the Plan, will be deemed to have accepted the Plan.  The vote for Class 4 will be cast by the Unknown Claims Representative.

## VI.

## THE DEBTOR AND ITS OPERATIONS

### A.    Pre-Petition

Every Catholic entity, including the Debtor, is subject to church law also called Canon Law.  The Debtor is structured and operates in accordance with Canon Law and is a juridic person under Canon Law.  The Debtor is also a legal civil entity organized as a religious Diocesan Corporation under Minnesota Statutes Section 315.16.

The Roman Catholic Church is comprised of territories, known as Dioceses, each of which is subject to the authority of a Bishop who is responsible for the spiritual and pastoral well-being of the people who live within that Diocese.  The Diocese of Duluth was established by the Vatican in 1889.

The Diocese is the ecclesiastical entity subject to the authority of the Bishop of the Diocese, currently Bishop Paul D. Sirba, who was appointed as Bishop, effective December 14, 2009.  Bishop Sirba is responsible to govern the Diocese, following the precepts of Canon Law, the ecclesiastical law for the Roman Catholic Church.

The Diocese serves a geographical area consisting of 10 northern Minnesota counties, including Aitkin, Carlton, Cass, Cook, Crow Wing, Itasca, Koochiching, Lake, Pine and St. Louis counties (the "Region").  There are 75 parishes and approximately 53,000 Catholic individuals in the Region.  These individuals and parishes are served by approximately 75 priests and 58 deacons.  The Diocese currently employs approximately 34 individuals, which includes clergy and laity.  Each parish is expected to help fund the Diocese.  Beginning July 1, 2019, the assessment that each parish pays to fund the general operations of the Diocese is set at 18.75% of the parish's envelope and plate collections taken at Mass.  Each parish promotes an annual appeal to the parishioners to assist in meeting its annual assessment obligation.  As a religious organization, the Diocese has no significant, ongoing for-profit business activities or business income.  The Diocese's revenue primarily derives from donations and parish assessments.

In addition to the 75 parishes, there are 11 Catholic schools in the Region, educating Pre-K to 8 graders (collectively, the "Schools"), with a total enrollment of over 1,498 students.  Various other Catholic-based social and community service organizations operate in the Region, including four Catholic nursing homes and two Catholic hospitals.  Parishes, the Schools, and other separately incorporated Catholic entities within the Diocese's Region are not under the fiscal or operating control of the Diocese.  These other entities created to promote the mission of the Church in the Region include the Seminarian Endowment Fund, Human Life and Development Fund, and

---

[3] In the case of Tort Claims based on Sexual Abuse Proof of Claim Forms and Future Tort Claims, such claims will be deemed allowed in the amount of $1.00 claims for voting purposes only.

12

the Catholic Religious Education Endowment Fund.  Each of these entities is incorporated as a separate non-profit corporation under Chapter 317(A) or § 315.16 of the Minnesota Statutes.

The Debtor maintains a number of departments, including Finance and Facilities (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Catholic Schools (responsibilities include leadership development and ensuring Catholic identity in schools), Development and Stewardship (responsibilities include parish development efforts and programs to support a culture of stewardship), Marriage and Family Life (responsibilities include marriage preparation, family programs, and efforts to promote the dignity of life from conception to death), Continuing Formation of Clergy (responsibilities include clergy formation, planning and leadership development support), Communications (responsibilities include publication of the Northern Cross diocesan newspaper, diocesan websites, social media and other communications), the departments of Youth and Young Adult Ministry as well as Evangelization and Catechesis (responsibilities include out-reach in teaching and forming young disciples in the faith), Social Apostolate (responsibilities include leadership in the areas of social concern and providing support to those in desperate situations), Indian Ministry (directors responsibilities include representing the diocese at various church, civic and tribal functions and serves as the voice that brings Indian concerns to the attention of the Bishop), Vocations (responsibilities include recruitment, education and formation of seminarians and candidates for permanent diaconate), Safe Environment (responsibilities include establishing 'safe environment' programs, working with parents, civil authorities, clergy, parish staffs, educators, and community organizations to provide education and training for children, youth, parents, ministers, educators and others about ways to make and maintain a safe environment for children).  More specific information is available on the Diocese's website at http://www.dioceseduluth.org.

The Debtor contends that each ecclesiastical entity (a Parish, for example) within the Diocese is a juridic person in Canon (ecclesiastical) law.  The Pastor for each Parish is appointed by the Bishop, but in Canon law, the Pastor of each Parish is the steward of the property of the parish to which he is appointed.

The Diocese does not operate under the corporation sole model.  Parish property located in the Region is held by 75 separate parish corporations, each of which has been civilly organized and exists under Section 315.15 of the Minnesota Statutes.  Each Parish Corporation in the Region owns the separate property used in the operation of the parish, normally including the church itself, administrative offices, and, in most cases, a rectory that serves as the pastor's (priest's) residence.

**B.      Need for Reorganization**

Over the last several decades, some clergy members in the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of sexual abuse.  This conduct runs contrary to the teaching and traditions of the Church.  The Diocese has worked for more than two decades to meet the needs of survivors without filing for Chapter 11 reorganization.  Since the 1990s, the Diocese has directed substantial resources towards providing financial, psychological, pastoral, and spiritual support to survivors.  In February, 2014, plaintiff Doe 30 filed a lawsuit in Ramsey County District Court against the Diocese of Duluth, the Oblates of Mary Immaculate (OMI), and the Diocese of New Ulm.  The suit alleged that the three entities

13

should be held liable under various theories of negligence and nuisance, for the actions of OMI priest Vincent Fitzgerald. The plaintiff's claim was based on Fitzgerald's sexual abuse of him in 1978, while plaintiff was a parishioner of a New Ulm parish.

OMI reached a settlement with Doe 30, and the Diocese of New Ulm's motion for summary judgment was granted in August, 2015, dismissing all claims made against them.

On October 19, 2015, trial commenced on Doe 30's remaining claims against the Diocese of Duluth. The Diocese did not dispute that Doe 30 had been sexually abused by Fitzgerald, but maintained that it had no knowledge that Fitzgerald had or would abuse children.

The jury returned a verdict in Doe 30's favor in the amount of $8,166,000. It found that the Diocese of Duluth had negligently supervised and negligently retained Fitzgerald, and attributed 60% of Doe 30's damages to that negligence.

Judgment was accordingly entered on November 5, 2015, against the Diocese in the amount of $4,899,600. That judgment was stayed for thirty days, pursuant to court rule, until Saturday, December 5, 2015. During the stay the Diocese unsuccessfully attempted to reach a negotiated settlement with Doe 30's attorneys.

In addition to the Doe 30 judgment, the Diocese, was also a party to 18 pending civil actions (six (6) lawsuits and twelve (12) notices of claim).

The Diocese was concerned that with the very large judgment in the Doe 30 case, the Diocese would be left with insufficient assets to fairly compensate other claimants and creditors and would result in a disproportionate allocation of the limited funds available to the Diocese.

In addition, although the Diocese was current on its vendor obligations, it faced other financial issues in addition to claims involving allegations of clergy sexual abuse, including, for example, an underfunding obligation under its pension plans and potential claims of parishes.

Faced with the likely prospect of adverse judgments being entered in the other six (6) pending cases, and the ongoing prospect of additional adverse judgments against the Diocese by the remaining claimants which collectively would jeopardize the financial viability of the Diocese and its ability to carry on its mission, a Chapter 11 Bankruptcy Petition was filed on December 7, 2015.

Since the Petition Date, 125 Proofs of Claim have been filed in the Bankruptcy Case by alleged clergy abuse survivors against the bankruptcy estate of the Debtor. As a result of the commencement of litigation by the Debtor against its five (5) liability insurers and following a series of mediation efforts, the Debtor has reached agreement with each of its five (5) liability insurers concerning the payment of claims, all of which settlements have been approved by the Bankruptcy Court. The Debtor and the Committee through mediation have now successfully negotiated both the monetary compensation to be provided to the sexual abuse Tort Claimants and the non-monetary undertakings by the Diocese which will assist with the healing of sexual abuse Tort Claimants and mitigating the risk of any such abuse in the future for inclusion in the reorganization plan.

14

C.    **Response to Sexual Abuse**

In 1992, the Diocese issued a written Sexual Misconduct Policy to protect minors from clergy abuse, and in that same year held workshops for priests and Church personnel on ministry-related sexual misconduct. Included in the implementation of the policy was the establishment of the Sexual Misconduct Investigation Committee (SMIC), a panel of primarily laypersons to advise the bishop on matters related to clergy misconduct.

In 2003, the Sexual Misconduct Policy was updated to be in compliance with the publication of the Charter for the Protection of Children and Young People (the "Charter") from the United States Conference of Catholic Bishops (USCCB). At that time, the name of SMIC was changed to the Diocesan Review Board (DRB). Victim Advocates were also named and their contact information placed in the *Northern Cross* and on the Diocesan website.

Also in 2003, background checks were required for clergy, employees and volunteers in the Diocese. In 2005, an online training program provided through the Boy Scouts of America was implemented. The program could be described as "an awareness session which better equips adults to protect children in the world around them. Online training has evolved with the adoption of a program from Catholic Mutual called *Safe Haven – IT'S UP TO YOU* and continues to be required of all clergy, Catholic school and parish employees, as well as all volunteers who have regular or unsupervised interaction with children under the age of 18.

In 2005, the Diocese established the Department of Safe Environment whose primary job is the implementation of the Charter and to ensure the completion of background checks, safe environment training for clergy, Diocesan and parish employees and volunteers working with minor children, and an age-appropriate, Church-approved personal safety instruction for minors in Schools, Faith Formation Programs and Youth Ministry Programs called Circle of Grace. The department also completes annual compliance audits under the terms of the Charter.

In furtherance of the goal of preventing sexual abuse of minors in the Church, the Diocese has voluntarily released the names, assignment histories, and current status of clergy members against whom "credible claims" of sexual abuse of a minor have been made. To date, the Diocese has publicly disclosed thirty-six (36) priests with credible claims of sexual abuse of a minor. Of these men, seventeen (17) are priests of the Diocese of Duluth, thirteen (13) are order priests and six (6) are from other dioceses. In regard to each individual against whom a credible claim has been made, including priests from other dioceses and religious orders, the Diocese has disclosed background and biographical information, on its Diocesan website.

These disclosures are ongoing. If a claim is determined to be credible, whether from the review of clergy files by outside experts or otherwise, the Diocese will share this information with the public by adding the name of the clergy member to the disclosure section of its website. The Diocese believes that disclosure is critically important if it is to do all that it can to keep children safe, help survivors of abuse heal, and regain the trust and confidence of our communities.

In December 2012, the Diocese implemented diocesan-wide processes to ensure that any report of sexual abuse of a minor by clergy is promptly reported to law enforcement. In the event any such claim is not manifestly false or frivolous, the accused clergy member will also be placed

CORE/3008165.0002/154242258.1

on a leave of absence pending an investigation of the claim by police and then the Diocese.  During the leave of absence, the accused clergy will not be permitted to engage in any public ministry.

## VII.

## THE CHAPTER 11 CASE

### A.    The Chapter 11 Filing

The Debtor commenced its Case on December 7, 2015 (the "**Petition Date**").  The Debtor's Case was assigned to the Honorable Robert Kressel, United States Bankruptcy Judge.  The Bankruptcy Court has entered several orders in this Chapter 11 case, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the Bankruptcy Court's website: **www.mnb.uscourts.gov.**

### B.    Retention of Counsel

Subsequent to the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its businesses as the Debtor-in-Possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  By order of the Court, Elsaesser Anderson, Chtd. was authorized to act as bankruptcy counsel and Gray Plant Mooty as local counsel for the Debtor for this case.

### C.    Appointment of Creditors' Committee

Pursuant to §§1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee appointed the Committee to serve in the Debtor's case.  The Committee consists of three (3) individuals who hold Tort Claims against the Debtor.

The Committee retained the law firm of Stinson Leonard Street LLP (now "Stinson, LLP") to represent it throughout this case.  Since its appointment, the Committee has taken an active role in the Debtor's case and been involved in virtually every major event that transpired during the Chapter 11 process, including taking an active role in an asset sale, acting as party to 4 of the 5 of the Insurance Settlement Agreements, and jointly assisting in the terms of the Plan with the Debtor and its Settling Insurers, and negotiating with other similarly situated claimants over the terms of the Plan and the procedures for allocating funds to Tort Claimants.

The Committee has also performed its investigatory function by reviewing information supplied by the Debtor and third parties, as well as conducting its investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other creditors.  The Committee also commenced certain litigation to enhance creditor recoveries as discussed below.

### D.    Unknown Claims Representative

On November 21, 2017, the Debtor moved for the appointment of U.S. District Judge Michael R. Hogan, retired, as Unknown Claims Representative for the Debtor-in-Possession, and on January 4, 2018 an Order was entered approving Judge Hogan's appointment.  The Unknown Claims Representative is the legal representative for those claimants filing Tort Claims as defined

in Section 83 of the Plan, for which a Claim was not timely filed on the Bar Date. The Unknown Claims Representative's responsibilities and duties include: (i) undertaking an investigation and analysis to assist the Bankruptcy Court in determining the estimated number of Unknown Tort Claims and Claim amounts held by the Unknown Tort Claimants; (ii) filing Proofs of Claim on behalf of all Unknown Tort Claimants by the Bar Date or any Bankruptcy Court ordered extension thereof; (iii) negotiating with the Debtor and other appropriate parties the Plan provisions for the evaluation, determination, and amounts of Unknown Tort Claims and number of Unknown Tort Claimants; (iv) advocating the legal position of the Unknown Tort Claimants before the Bankruptcy Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Unknown Tort Claimants; (v) taking all other legal actions reasonably necessary to represent the interests of the Unknown Tort Claimants; and (vi) serving as an independent fiduciary acting on behalf of all Unknown Tort Claimants.

Once the Unknown Claims Representative has completed his analysis, he will issue his report and recommendation. The number of Unknown Tort Claimants will be estimated for purposes of Plan confirmation. The treatment of Unknown Tort Claims is set forth below in the discussion of the treatment of Class 4 Claims.

**E.     Asset Sales and Other Dispositions; Planned Dispositions**

As detailed on Schedule A of the Debtor's Schedules, as of the Petition Date, the Debtor owned approximately 5 parcels of real property. The Debtor has sold, or intends to sell or encumber the following property:

1.   **Bishop's Residence**: Physical address of 303 Ridgewood Road, Duluth, MN. The Debtor plans to sell the Bishop's residence, which value is set forth on the Schedules at $548,400.00, for roughly net $500,000.00. The net proceeds will be used to fund the Debtor's portion of the contribution of $8,500,000.00 into the Trust on behalf of the Tort Claimants.

2.   **Undeveloped Land**: Physical address is 16898 Carlson Lake Road, Brainerd, MN. On or about June 23, 2016, the Debtor sold the undeveloped land for gross price of $120,000.00. The net proceeds were used to continue the Debtor's ministry, and such proceeds were transferred to the General Operating Account.

**F.     Bar Dates and Objections to Claims**

By Order dated January 7, 2016 (the "**Bar Order**"), the Bankruptcy Court set May 25, 2016 (the "**Bar Date**") as the last day for creditors, including Tort Claimants, to file a proof of claim. A notice of the Bar Date was sent to in excess of 150 parties. In addition, publication notice of the Bar Date was made in approximately 22 regional and local newspapers on two (2) separate occasions, and was made available for posting at various radio and TV stations, and at Catholic and governmental agencies.

The Debtor and the Committee's Professionals have reviewed the Claims filed by creditors. A total of 125 Class 3 Claims have been timely filed in the Debtor's Chapter 11 Case. Various Parishes, missions or programs also filed 29 contingent indemnification claims, as they were sued

17

as co-defendant along with the Debtor on various abuse allegations. The Debtor also filed 56 additional proofs of claim as unsecured claims, for Parishes, missions and programs, which may have a claim of contingent indemnification against the Debtor.

In addition, 3 non-Tort Claims were scheduled, and 2 Proofs of Claim have been timely filed.

To the extent the Debtor has the right to object to Claims (only the Trust has the right to object to Tort Claims) and deems it prudent and/or cost effective to object to Claims, the Plan provides that the Debtor has sixty (60) days from the Effective Date to file objections to filed Claims. If the Debtor fails to object to a properly filed Claim on or before sixty (60) days from the Effective Date, then such Claim will be deemed allowed if such Claim is a non-Tort Claim and will be entitled to the Distribution under the Plan applicable to the particular class in which such Claim is classified. The Plan provides that Tort Claims will not be allowed Claims, but treated as provided in the Plan.

## G.   Plan Exclusivity

Pursuant to §1121 of the Bankruptcy Code, a debtor-in-possession is granted a 120-day exclusive period from the Chapter 11 filing date to file a plan of reorganization. During such time, only the Debtor can file a plan of reorganization. However, the Bankruptcy Code provides that the court can increase a debtor's exclusive period to file and confirm a plan of reorganization for cause shown up to eighteen (18) months after commencement of the case. As of August 7, 2017, the Debtor's exclusive right to file a Plan terminated.

## H.   Post-Petition Operations and Select Financial Information

Since the Petition Date, the Debtor has continued to operate its business. During a typical month, the Debtor spends approximately $293,056.00.

Set forth below is a summary of the Debtor's remaining assets as of April 30, 2019:

1.   **Funds in Investment Account**. As of April 30, 2019, the Debtor had $752,230.00 on deposit and investments of $137,541.00. Such investments are not all liquid.

2.   **Operating Cash**. As of April 2019, the Debtor maintained approximately $829,919.00 in cash in its operating account.

3.   **Real Estate**. The Debtor currently owns four parcels of real property with a value of approximately $614,900.00, as follows:

- Bishop's Residence, located in Duluth, MN, valued at $548,400.00, pursuant to tax records;

- Baroga Cross Land, located in St. Louis County, valued at $1,100.00, pursuant to tax records;

18

- Crow Wing Chapel, located in Crow Wing County, valued at $65,400.00, pursuant to tax records;

- Pastoral Center, located in Duluth, MN, fractional interest, unknown value.

4.      The Debtor currently owns personal property (accounts receivable, prepaid expenses including insurance, workman's compensation, furniture and fixtures), with a scheduled value of $1,344,400.00.  It is believed these assets are worth substantially less than as scheduled due to receivables that are not collectible.  The true asset value is believed to be roughly in the range of $300,000.00.

**I.      Post-Petition Litigation – Adversary Proceeding 16-05012 Regarding Insurance Coverage:**

A complaint was filed by Debtor against Liberty Mutual Group, Catholic Mutual Relief Society of America, Fireman's Fund Insurance Company, Church Mutual Insurance Company and the Continental Insurance Company, seeking declaratory judgment to determine the extent of the rights of the Debtor in insurance policies and certificates and to the extent which that interest may be property of the estate under 11 U.S.C. § 541.  In a nutshell, the Debtor sought to determine the extent of coverage as to the sexual abuse claims raised against the Debtor.

On February 6, 2017, Liberty Mutual Group, Fireman's Fund Insurance Company, and Continental Insurance Company filed in the Adversary Proceeding a Motion to Withdraw Reference, and on February 22, 2017 the Bankruptcy Court forwarded to the District Court the Motion to Withdraw Reference and Plaintiffs' Objection thereto.  On July 24, 2017 the Adversary Proceeding was transferred to the U.S. District Court, District of Minnesota, and was assigned Case No. 17-CV-3254.

The Debtor reached a settlement with the Fireman's Fund Insurance Company in the amount of $975,000.00, which was approved by the Bankruptcy Court on January 4, 2018, and with the Catholic Mutual Relief Society of America in the amount of $8,950,000.00, which was approved by the Bankruptcy Court on January 14, 2018.  On June 28, 2018 the Debtor reached agreement with Church Mutual Insurance Company in the amount of $250,000.00, which was approved by the Bankruptcy Court on June 28, 2018.

Also on June 28, 2018, the Debtor reached agreement via settlement with the Continental Insurance Company for settlement in the amount of $15,000,000.00, again made payable on behalf of the Tort Claimants of the Debtor.

Cross motions between the Debtor and Liberty Mutual Group were pending, the Debtor and Liberty Mutual Group reached a settlement by which Liberty Mutual Group agreed to pay the sum of $6,500,000.00 to the Debtor for the benefit of the Tort Claimants.  This settlement, which is the final settlement, has been approved by the Bankruptcy Court on March 7, 2019.  The settlement amounts, with the exception of the Fireman's Fund portion, are available to fund the amounts due the Tort Claimants.

CORE/3008165.0002/154242258.1

With the exception of the Liberty Mutual settlement, the Committee has been a party to each and every Insurance Settlement Agreement.

All settlements are set forth in the summary chart below.

| Insurer | Settlement Amount |
|---------|-------------------|
| Catholic Mutual | $8,950,000 |
| CNA | $15,000,000 |
| Fireman's Fund | $975,000[4] |
| Church Mutual | $250,000 |
| Liberty Mutual | $6,500,000 |

Copies of the Insurance Settlement Agreements, as approved by the Bankruptcy Court, are attached as Exhibits D through H.

**J.     Settlement Negotiations and Mediations.**

The parties engaged in four mediated settlement negotiations under the supervision of the Honorable Gregg W. Zive and the Honorable Jan M. Symchych (Ret.) between March 2016 and 2019.  Extensive negotiations took place among the Debtor, its counsel, state-court counsel representing claimants, including those on the Committee, and the Settling Insurers' representatives and their counsel.  The negotiations and mediation were extensive and intensive. As a result of the mediations and further negotiations, the Debtor and Settling Insurers, with the support of the Plaintiffs, agreed on essential terms of a settlement and have negotiated the terms and details of the Insurance Settlement Agreements.

In February of 2016, the Debtor moved for appointment of the mediator, in this case the Honorable Gregg W. Zive, to mediate all issues between the Debtor, the Committee and Plaintiffs, and insurance carriers.  The Debtor, the Committee and insurance carriers participated in mediation before the Honorable Gregg W. Zive commencing on July 19, 2016.  At that time the Parties participated in a productive two-day mediation session.  Under the direction of Judge Zive, an additional mediation session was held the week of November 14, 2016.  While progress was made, the Parties did not come to terms on an agreement since there were very many insurance issues pending.  A third mediation was held in the spring of 2018, where settlement with CNA was reached.

Finally, on February 26, 2019, mediation was commenced with the Honorable Judge Jan M. Symchych (Ret.).  This time it was known that all settlements were made with insurance carriers, and that the Liberty Mutual settlement was pending Court approval.  Thus, the issues set

---

[4] Unlike the other settlements, the Fireman's Fund settlement resulted in an immediate payment to the Diocese.  The Fireman's Fund settlement proceeds have been used by the Diocese to fund the ongoing coverage litigation with the remaining insurers, per Court Order.

for mediation were as to the contributions of the Debtor towards the ultimate settlement to be made with the Committee and Tort Claimants. This final mediation was successful and resulted in the Debtor agreeing to contribute $8,500,000.00 to the fund for the benefit of the Tort Claimants.

**K.    The Insurance Settlements.**

Principal terms of the Insurance Settlement Agreements include:

**Settlement Amount/Purchase Price**. Each Diocesan Settling Insurer has, or shall pay to the Trust a portion of the $30,700,000.00 in total insurance settlement proceeds as set forth in and in accordance with the terms of its respective Insurance Settlement Agreement. Under the Insurance Settlement Agreements, the Trust is the entity to which all Tort Claims (excluding Unknown Tort Claims) are channeled as the sole and exclusive source of payment of Tort Claims against the Debtor, the Diocese Parties or the Settling Insurers.

The Insurance Settlement Agreement with Fireman's Fund in the amount of $975,000.00 provided that the $975,000.00 shall be used by the Debtor to pay Bankruptcy Court approved administrative expenses, including Professional fees and expenses.

**Releases**. The Debtor and other releasing Diocese Parties, on the one hand, and the Settling Insurers, on the other, will grant complete mutual releases as to, among other things, any and all past, present, or future Claims in connection with, relating to, or arising out of, in any manner or fashion, the Tort Claims, the policies or certificates of insurance issued by the Settling Insurers, and the reorganization case, as set forth in the Insurance Settlement Agreements and the Plan. All Tort Claimants will be required to sign a release of the Protected Parties and the Settling Insurer Entities as to their claims, except for the right of Tort Claimants to collect from the Trust and the rights of the Unknown Tort Claimants to collect from the Reorganized Debtor, in each case pursuant to the terms of the Plan.

**Sale and Buyback of Policies and Certificates**. The Debtor and other releasing Diocese Parties will sell all of their Interests in the policies of insurance, free and clear of all liens, claims, encumbrances and other Interests pursuant to 11 U.S.C. § 363.

**Channeling Injunction**. The Settling Insurers will be entitled to receive the benefit of a Channeling Injunction under the Plan and Final Decree confirming the Plan. Any and all Channeled Claims are channeled to the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and Trust Agreement as their sole and exclusive remedy for all holders of Channeled Claims.

**Supplemental Settling Insurer Injunction**. The Settling Insurers will be entitled to receive the benefit of a Supplemental Settling Insurer Injunction under the Plan and Final Decree confirming such Plan pursuant to 11 U.S.C. §§ 105(a) and 363. With the exception of the rights retained by Class 4 Claimants against the Reorganized Debtor, any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants (including Unknown Tort Claimants), perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties or Settling Insurer Entities, which,

directly or indirectly, relate to, any of the policies or certificates, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, the policies or certificates, and the Protected Parties to the extent such Interest arise from the same injury or damages asserted in connection with a Tort Claim. Notwithstanding any of the foregoing, the Unknown Tort Claimants are not releasing their claims against the Reorganized Debtor, and the Reorganized Debtor assumes the Protected Parties and Settling Insurers' liability for an obligation to pay, if any, Unknown Tort Claims.

**Permanent Injunction Against Prosecution of Released and Channeled Claims**. Except as otherwise expressly provided in the Plan, for the consideration described in the Insurance Settlement Agreements, all Persons who have held, hold, or may hold Channeled Claims or Claims against the Diocese Parties, the Protected Parties, or the Settling Insurance Entities, whether known or unknown, will be permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner, any action or any other proceeding of any kind, including, but not limited to, any Tort Claim or any Unknown Tort Claim against the Settling Insurance Entities or the property of the Settling Insurance Entities with respect to any Claim or Channeled Claim; (b) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Settling Insurance Entities or the property of the Settling Insurance Entities, with respect to any Claim or Channeled Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Settling Insurance Entities or the property of the Settling Insurance Entities with respect to any Claim or Channeled Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Settling Insurance Entities with respect to any Claim or Channeled Claim; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or any documents relating to the Plan, including, the Trust Agreement.

**Indemnification of Settling Insurer Entities.** The Trust indemnifies the Settling Insurer Entities against Tort Claims (other than Unknown Torn Claims) and the Reorganized Debtor indemnifies the Settling Insurer Entities against Tort Claims, including reasonable attorneys' fees, costs and expenses in defense and in enforcement of the injunctions provided in the Plan.

**Conditions to Settling Insurers' Payments**. The Settling Insurers' payments are conditioned on, among other things entry of the Confirmation Order, and such Order becoming a Final Order. The Plan must be in all aspects consistent with the Insurance Settlement Agreements and contain no provisions that diminish or impair the benefits to which the Settling Insurers are entitled under the Insurance Settlement Agreements. The Insurance Settlement Agreements have previously been approved by the Bankruptcy Court, have been incorporated into the Plan, and will survive the confirmation and Effective Date of the Plan, subject to the limitations set forth in the Plan.

## VIII.

## SUMMARY OF THE PLAN

The Debtor and the Committee submit that the treatment of creditors under the Plan is more favorable than the treatment creditors would receive if the case were converted to Chapter 7.

22

Therefore, the Debtor and the Committee submit that the Plan is in the best interests of the creditors and the Debtor and the Committee recommend acceptance of the Plan by holders of Claims in Classes 3, 4, 5, 6A, and 6B.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

## A.      General

### A.      Brief Explanation of Chapter 11

Chapter 11 is the principal business or operations reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business or operations for the benefit of itself and its creditors.  Upon the filing of a petition for reorganization under Chapter 11 and during the pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect claims or enforce liens against the Debtor, including the commencement of any sexual abuse litigation.

Confirmation and consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  In general, a plan divides the claims against a debtor into separate classes and allocates plan distributions among those classes.  If the legal, equitable and contractual rights of a class are unaffected by a plan, such class is considered "unimpaired".  All unimpaired classes are deemed to have accepted a plan and therefore are not entitled to vote thereon.  Bankruptcy Code §1126(g), on the other hand, provides that all classes of claims that do not receive or retain any property under a plan on account of such claims are deemed to have rejected such plan.  All classes of claims that are considered "impaired" are entitled to vote on a plan.

Under the Bankruptcy Code, acceptance of a plan is determined by class; therefore, it is not required that each holder of a claim in an impaired class vote in favor of a plan in order for the Bankruptcy Court to confirm a plan.  Generally, each impaired class must vote to accept a plan; however, the Bankruptcy Court may confirm a plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept a plan and certain other statutory tests are satisfied.  Many of these tests are designed to protect the interests of creditors who either do not vote or vote to reject such plan but who will nonetheless be bound by such plan if it is confirmed by the Bankruptcy Court.

### B.      Acceptance of the Plan

As a condition to confirmation, Bankruptcy Code §1129(a) requires that: (a) each impaired class of claims votes to accept the plan; and (b) the plan meets the other requirements of §1129(a). As explained above, classes that are unimpaired are deemed to have accepted the plan and therefore are not entitled to vote thereon, and classes that do not receive or retain any property under the plan are deemed to have rejected the Plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims classified in impaired Classes that are to receive distributions under the Plan.

CORE/3008165.0002/154242258.1

An impaired class of claims will be deemed to have accepted a plan if holders of at least two-thirds in dollar amount and a majority in number of claims in such class who cast timely ballots vote to accept the plan.

## C.       Classification of Claims Generally

Bankruptcy Code Section 101(5) defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code Section 1123 provides that a plan of reorganization shall designate classes of claims against a debtor. Bankruptcy Code Section 1122 further requires that each class of claims contain only claims that are "substantially similar" to each other. The Debtor believes that they have classified all Claims in compliance with the requirements of Sections 1122 and 1123. However, it is possible that a holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtor would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims may necessitate a re-solicitation.

## B.       Classification and Treatment of Claims Under the Plan

The following describes the classification of Claims under the Plan and the treatment that holders of Claims, whether Tort Claims or otherwise, are to receive if the Plan is confirmed and becomes effective. A Claim is classified in a particular Class only to the extent that the Claim fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim fits within the description of such different Class.

## A.       Unclassified Claims

The Plan does not classify Administrative Claims, statutory fees due to the United States Trustee, or Priority Tax Claims, but does provide for the following treatment of such Claims.

1.       **United States Trustee Fees.** All fees payable by the Debtor under Section 1930 of Title 28 of the United States Code that have not been paid prior to the Effective Date shall be paid by the Debtor or the Reorganized Debtor on or before the Effective Date. In addition, the Debtor, or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, shall be liable for and shall pay such fees until the entry of a Final Decree in this case or until the case is converted or dismissed. The Reorganized

24

Debtor shall file post-confirmation operating reports with the Bankruptcy Court and the United States Trustee until a final decree is entered.

2.    **Administrative Claims.**  An "Administrative Claim" is a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the Estate or operating the Debtor's businesses after the commencement of a Chapter 11 case, loans and advances made to the Debtor after the Petition Date, compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331 or 503, certain retiree benefits, certain reclamation Claims, and all fees and charges against the Estate pursuant to Chapter 123 of Title 28 of the United States Code.

The Plan provides that each holder of an Allowed Administrative Claim (including, without limitation, the professionals' fees and expenses incurred by the Professionals and allowed in a Final Order of the Bankruptcy Court) shall be paid in full, in Cash, by the Reorganized Debtor (i) within seven (7) days after the later to occur on the Effective Date or the date the Order allowing such Administrative Claim becomes a Final Order; or (ii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Administrative Claim and the Debtor.

The Debtor estimates that the aggregate final amounts due to professionals shall total approximately $1,300,000. This includes the professional fees of Elsaesser Anderson, Chtd., bankruptcy counsel for the Debtor, and Stinson, LLP, counsel for the Creditors' Committee. It also includes the fees of Blank Rome, insurance counsel; Gray Plant Mooty, counsel to the Debtor and Johnson, Killen and Seiler, PA, corporate counsel to the Debtor. The $1,300,000 in professional fees represents the Debtor's best estimate of the unpaid fees due through the Effective Date.

With respect to the trade Claims arising after the Petition Date representing obligations incurred by the Debtor in the ordinary course of its businesses consistent with past practice, such trade Claims shall be paid in the ordinary course of business. The Debtor estimates that post-petition ordinary course payables as of the Effective Date will be approximately $83,131.00. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, the Plan provides that each holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Debtor on the Effective Date or the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

The Plan further provides that Professional Persons with Claims for services rendered during this Chapter 11 Case, must file requests for payment within forty-five (45) days after notice of the Effective Date is filed with the Bankruptcy Court.

Administrative Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order (including, without limitation, Claims for professionals' fees and expenses) shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. After the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of the Professional Persons employed by the Debtor in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.

Administrative Claims representing fees and expenses of Professionals that are employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan may be paid by the Debtor or the Reorganized Debtor, after notice and a hearing, or by the Trust from contributions by the Debtor or the Reorganized Debtor in addition to the amounts payable to Tort Claimants under the Plan.

Administrative Claims representing fees and expenses of Professionals that are employed by the Debtor prior to the Effective Date of the Plan shall not be paid by the Trust.

### B.    Priority Tax Claims

A "Priority Tax Claim" is an Unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of the Bankruptcy Code §507(a)(8). The Debtor has no pre-petition tax claims entitled to priority.

### C.    Class 1 – Priority Claims

1.    Definition. A Class 1 Claim means an allowed claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

2.    Treatment. Unless the holder of an allowed Class 1 Claim and the Diocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an allowed claim (or as soon thereafter as is practicable).

### D.    Class 2 – Governmental Unit Claims

1.    Definition. A "Class 2 Claim" means an allowed claim of Governmental Units not otherwise a Priority Claim.

2.    Treatment. Unless the holder of an allowed Class 2 Claim and the Diocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 2 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective

CORE/3008165.0002/154242258.1

Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an allowed claim (or as soon thereafter as is practicable).

**E.    Class 3 – Tort Claims Other Than Unknown Tort Claims**

1.    Definition. A Class 3 Claim means a Tort Claim other than an Unknown Tort Claim ("Class 3 Claim").  A "Class 3 Claimant" shall mean a holder of a Class 3 Claim.

2.    Summary. The Plan creates a Trust to fund payments to Class 3 Claimants entitled to such payments under the Plan, Trust Agreement and Trust Distribution Plan. Class 3 Claimants' share of the Trust Assets as provided by the Trust Distribution Plan is the only amount, if any, they will be entitled to receive from the Protected Parties and Settling Insurer Entities. Distribution from the Trust does not preclude Claims or recoveries by Tort Claimants against Persons who are not Protected Parties or Settling Insurer Entities for the liability of such Persons not attributable to the causal fault or share of liability of Protected Parties or Settling Insurer Entities under the Settling Insurer Entity Policies. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of causal liability or fault.

3.    Reservation. Except with respect to the Protected Parties and the Settling Insurer Entities, nothing in the Plan is intended to affect, diminish, or impair the rights of any Tort Claimant against any Person named or that could be named as a defendant in a lawsuit based on the Abuse that forms the basis for his or her Tort Claim except that the rights of Tort Claimants against third-parties, including joint tortfeasors, does not include the right of Tort Claimants to collect or to obtain a reallocation of the share of any judgment initially allocated to a Protected Party to any third-party based on the causal fault or share of liability of Protected Parties.  Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with a Tort Claim shall not be liable for any Protected Party's share of liability or fault. Under no circumstances will the reservation of such Tort Claimant's rights against any other Person impair the discharge, Channeling Injunction, Permanent Injunction, or Supplemental Settling Insurer Injunction with respect to any Protected Party, the Reorganized Debtor or Settling Insurer Entities.

4.    Treatment. The Protected Parties' and Settling Insurer Entities' liability for and obligation to pay, if any, Class 3 Claims shall be assigned to and assumed by the Trust. Each Class 3 Claim will be estimated solely for purposes of voting. The Protected Parties and the Settling Insurer Entities shall have no further liability in connection with Class 3 Claims.

CORE/3008165.0002/154242258.1

5.      Release and Certification. No Class 3 Claimant shall receive any payment on any award unless and until such Class 3 Claimant has executed the Release of the Protected Parties and Settling Insurer Entities attached as Exhibit E to the Plan. Notwithstanding the foregoing, nothing in this Article requires any Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party or Settling Insurer Entity, and such Claims are reserved. But in no event may a Tort Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall be provided by the Trustee with a copy of the executed Release upon reasonable request and provision of an appropriate, executed confidentiality agreement and shall not be liable for any Protected Parties' share of liability or fault. The release of these Class 3 Claims is pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties or Settling Insurer Entities upon request.

## F.      Class 4 - Unknown Tort Claims

1.      Definition. A Class 4 Claim means a Unknown Tort Claim ("Class 4 Claim"). A "Class 4 Claimant" shall mean a holder of a Class 4 Claim.

2.      Summary. Plan requires that the Reorganized Debtor fund payments to Class 4 Claimants entitled to such payments under the Plan and Trust Distribution Plan. Class 4 Claimants will not receive any distributions from the Trust or from any Trust Assets. Payment by the Reorganized Debtor and/or distribution from the Trust does not preclude Claims or recoveries by Tort Claimants against Persons other than the Protected Parties and Settling Insurer Entities for the liability of such other Persons not attributable to the causal fault or share of liability of Protected Parties or Settling Insurer Entities under the Settling Insurer Entity Policies. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of liability or fault.

3.      Reservation. Except with respect to the Protected Parties (other than the Reorganized Debtor) and the Settling Insurer Entities, nothing in the Plan is intended to affect, diminish, or impair the rights of any Unknown Tort Claimant against any Person named or that could be named as a defendant in a lawsuit based on the Abuse that forms the basis of his or her Unknown Tort Claim except that the rights of Unknown Tort Claimants against third-parties, including joint tortfeasors, does not include the right of Unknown Tort Claimants to collect or to obtain a reallocation of the share of any judgment initially allocated to a Protected Party to any third-party based on

28

the causal fault or share of liability of Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of an Unknown Tort Claim shall not be liable for any Protected Party's share of liability or fault. Under no circumstances will the reservation of such Unknown Tort Claimant's rights against any other Person (including the Reorganized Debtor) impair the Channeling Injunction, Permanent Injunction, Supplemental Settling Insurer Injunction with respect to any Protected Party, Settling Insurer Entities or the Reorganized Debtor (except for the Reorganized Debtor's obligations to pay such claims under the Plan of Reorganization).

4.      Treatment. The Protected Parties' and Settling Insurer Entities' liability for and obligation to pay, if any, Class 4 Claims shall be assumed by the Reorganized Debtor. The maximum amount of the Reorganized Debtor's obligation to pay Class 4 Claimants shall be determined by the Unknown Claims Representative in his report and recommendation which is incorporated by reference and attached to the Plan as Exhibit A. With the exception of the Reorganized Debtor, the Protected Parties and the Settling Insurer Entities shall have no further liability therefor. The Diocese will submit all potential Class 4 Claimants' information to the Unknown Tort Claim Representative for determination of the potential claimant's inclusion as a Class 4 Claimant. Individuals determined to hold a Class 4 Claim shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 4 Claim pursuant to the factors in the Trust Distribution Plan, before any payment shall be made on a Class 4 Claim by the Reorganized Debtor.

5.      Determination of Class 4 Claims. Class 4 Claims will not be channeled to the Trust. Class 4 Claims will be determined by the Tort Claims Reviewer in accordance with the Tort Claims Trust Distribution Protocols and shall be paid solely by the Reorganized Debtor.

6.      Release and Certification. No Class 4 Claimant shall receive any payment on any award unless and until such Class 4 Claimant has executed the Release of Protected Parties and Settling Insurer Entities attached as Exhibit F to the Plan. Notwithstanding the foregoing, nothing in this Article requires any Unknown Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party (excluding the Reorganized Debtor) or a Settling Insurer Entity and such Claims are reserved. But in no event may a Class 4 Claimant collect on that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with an Unknown Tort Claim shall be provided by the Reorganized Debtor with a copy of the executed Release upon reasonable request and provision of an appropriate, executed confidentiality agreement and shall not be liable for any Protected Parties' share of liability or fault. The release of these Class 4 Claims

29

against Protected Parties (excluding the Reorganized Debtor) and Settling Insurer Entities is pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Reorganized Debtor shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties or Settling Insurer Entities upon request.

### G.     Class 5 – General Unsecured Claims

1. Definition. A Class 5 Claim means (1) any claim arising out of the rejection of any executory contract, or (2) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case ("Debtor's Schedules") or as to which the holder of such claim timely filed a claim.

2. Treatment. The holders of Class 5 Claims shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 5 Claim, without interest, in two equal installments. The first installment shall be due within 90 days following the Effective Date. The second installment shall be due and payable within 180 days following the Effective Date.

### H.     Classes 6A and 6B – Abuse Related Contingent Claims

1. Class 6A Definition. A Class 6A Claim means (i) any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 3, and (ii) the Claim of any insurers or other Persons who are subrogated to the Claims identified in Section 4.7(a)(i).

2. Class 6A Treatment. Claims in Class 6A shall be allowed or disallowed in accordance with Section 502(e)(1) of the Bankruptcy Code, and Class 6A Claims will receive no distribution under the Plan and will be channeled to the Trust. The treatment of Class 6A Claims shall include the release and certification procedures contemplated under Sections 4.3 and 4.4 above. The Plan does not allow Tort Claimants to collect that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with a Tort Claim shall not be liable for any Protected Party's share of liability or fault.

3. Class 6B Definition. A Class 6B Claim means (i) any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 4 Claim, and (ii) the Claim of any insurers or other Persons who are subrogated to the Claims identified in Section 4.7(b)(i).

4.      Class 6B Treatment. Claims in Class 6B shall be allowed or disallowed in accordance with Section 502(e)(1) of the Bankruptcy Code, and Class 6B Claims will receive no distribution under the Plan and will be assumed by the Reorganized Debtor.  The treatment of Class 6B Claims shall include the release and certification procedures contemplated under Sections 4.3 and 4.4 above. The Plan does not allow Tort Claimants to collect that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with a Tort Claim shall not be liable for any Protected Party's share of liability or fault

## C.      Means for Execution of the Plan

### A.      Establishment of Trust

On the Confirmation Date, the Trust will be established in accordance with the Trust Documents.  The Debtor shall qualify as a Qualified Settlement Fund pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. DW Harrow & Assoc., LLC will be the Trustee.

### B.      Funding of Trust

(a)      Within two (2) business days after the order confirming the Plan becomes a non-appealable order, Debtor will fund the trust in the amount of $8,500,000.00.

(b)      Each Diocesan Settling Insurer has, or shall pay to the Trust a portion of the $30,700,000.00 in total insurance settlement proceeds as set forth in and in accordance with the terms of its respective Insurance Settlement Agreement.

### C.      Establishment of Reserve Accounts

As set forth in the Trust Agreement and Article VI of the Plan, the Trustee shall establish Reserves for various purposes, including the payment of the Tort Claims. The Reorganized Debtor shall establish the Unknown Tort Claim Reserve Fund in the amount provided for in the Unknown Tort Claims Representative's Report and Recommendation, which is attached as Exhibit A to the Plan. The Reorganized Debtor shall maintain the Unknown Tort Claim Reserve Fund until the later of (i) fifteen days after the Reorganized Debtor provides written notice to the Trustee that the Unknown Tort Claim Reserve Fund has been exhausted or (ii) the occurrence of the sixth (6th) anniversary of the Effective Date.

### D.      Liquidation and Payment of Tort Claims

1.      The Trust shall pay Tort Claims in accordance with the terms of the Plan, Confirmation Order and Trust Documents.

31

2.     Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estate or any Settling Insurer or relating to the treatment of Tort Claims, except that the Reorganized Debtor shall be liable for all fees and expenses of the Trust and for payment of Unknown Tort Claims; or (ii) otherwise modify the rights or obligations of the Estate as otherwise set forth in the Plan.

3.     Effect of No Award On Tort Claims.  If a Tort Claimant is denied payment pursuant to the Trust Distribution Protocols, the holder of such Tort Claim will have no further rights against the Trust, Trustee or the Protected Parties.

4.     Treatment of Attorneys' Fees and Costs of Tort Claimants.  Subject to the treatment of Qualified Counsel Fees and Qualified Counsel Costs pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive payment from the Trust will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. The Protected Parties will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants.  The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions relating to Qualified Counsel Fees and Qualified Counsel Costs.

5.     Treatment of Punitive Damages.  Claims for punitive or exemplary damages in connection with any of the Tort Claims will be treated as penalty Claims and will receive no distribution under the Plan.

6.     Withdrawal of Tort Claims.  A Class 3 Claimant may withdraw the Claim at any time on written notice to the Trustee.  If withdrawn, the Claim will be withdrawn with prejudice and may not be reasserted.

7.     Before the Trustee will pay a Tort Claim to any Class 3 Claimant, the Trust and the Class 3 Claimant must comply with Article VI and Section 6.12(e) of the Plan and its subsections.

8.     The failure by one or more Medicare Beneficiaries or other Class 3 Claimants to comply with Section 6.12(e) of the Plan and its subsections shall not delay or impair the payment by the Trustee to any other Medicare Beneficiary or other Class 3 Claimant complying with these provisions.

9.     If the Class 3 Claimant is an estate of a Class 3 Claimant, then the letters or documentation required pursuant to Section 6.12(e) of the Plan need not be dated within 90 days of the date of payment by the Trustee to such claimant.

CORE/3008165.0002/154242258.1

E.      **Treatment of Executory Contracts and Unexpired Leases**

Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtor that have not been rejected by Order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor.  In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.  The contracts which will be assumed by the Debtor, shown in their total amount, are as follows:  None, all equipment leases have expired.

D.      **Procedure for Determination of Claims Other than Tort Claims Based on the Sexual Abuse Proof of Claim Form.**

A.      **Objection to Claims.**

Notwithstanding the occurrence of the Effective Date and except as to any Claim that has been Allowed prior to the Effective Date or any Tort Claim, the Reorganized Debtor may object to the Allowance of any Claim against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an objection within sixty (60) days after the Effective Date.

B.      **Disputed Claims.**

Except as to any Tort Claim, no payments or other distributions will be made to holders of Disputed Claims until such Claims are allowed Claims pursuant to Final Order.

C.      **Treatment of Contingent Claims.**

Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.

E.      **Provisions Governing Distributions**

A.      **Distribution Only to Holders of Allowed Claims.**

Except as otherwise provided in the Plan, distributions under the Plan and the Plan documents will be made only to the holders of allowed Claims and in the case of Tort Claims, only pursuant to the Plan and the Trust documents and only after delivery of appropriate releases.   Until a Disputed Claim becomes an Allowed Claim, the holder of that Disputed Claim will not receive any distribution otherwise provided to the claimants under the Plan or the Plan documents.  If necessary in determining the amount of a *pro rata* distribution due to the holders of Allowed

33

Claims in any Class, the Reorganized Debtor or the Trustee, as applicable, will make the *pro rata* calculation as if all Unresolved Claims were Allowed Claims in the full amount Claimed or in the Estimated Amount.  When an Unresolved Claim in any Class becomes an Allowed Claim, the Reorganized Debtor or the Trustee, as applicable, will make full or partial distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the Order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

### B.      Transmittal of Distributions.

Except as otherwise provided in the Plan, in the Plan documents, or in an Order of the Bankruptcy Court, distributions to be made under the Plan, Confirmation Order or Trust Documents to Class 3 Claimants will be made by the Trustee and Distributions to all other claimants will be made by the Reorganized Debtor.  Distributions to Class 3 Claimants will be made (a) to the client trust account for attorneys of record of Class 3 Claimants, (b) if the Class 3 Claimant does not have an attorney of record, to the latest mailing address set forth in a Proof of Claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such claimant, or to such other address as may be provided to the Reorganized Debtor or Trustee, as applicable, by such claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such claimant to the Reorganized Debtor or Trustee, as applicable, to the mailing address set forth in the Schedules filed by the Debtor in this Case.  Distributions to other claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the claimant, (b) if the claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such claimant, or to such other address as may be provided to the Reorganized Debtor, as applicable, by such claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such claimant to the Reorganized Debtor, to the mailing address set forth in the Schedules filed by the Debtor in this Case. If a claimant's Distribution is not mailed or is returned to the Reorganized Debtor or Trustee because of the absence of a proper mailing address, the Reorganized Debtor or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such claimant from information generally available to the public and from such party's own records, but shall not be liable to such claimant for having failed to find a correct mailing address.  The Trustee shall have no liability to a Class 3 Claimant on account of Distributions made to the client trust account of a Class 3 Claimant's attorney.

### C.      Timing of Distributions.

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan documents, whenever any payment to be made is due on a day other than a business day, such payment will instead be made on the next business day, with interest to the extent expressly contemplated by the Plan or any applicable agreement or instrument.  Any claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Reorganized Debtor or Trustee, as applicable, as undeliverable or is deemed to be an undeliverable Distribution, provide the Reorganized Debtor or Trustee, as applicable with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed

34

to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtor, the Trust, the Trustee or its property.  Any undeliverable Distributions that are not claimed under this Section will become available to distribute to other claimants or be retained by the Reorganized Debtor in accordance with the Plan.  Nothing in the Plan requires the Reorganized Debtor, the Trust or the Trustee to attempt to locate any claimant whose Distribution is undeliverable.  If an instrument delivered as a Distribution to a claimant is not negotiated within one hundred and twenty (120) days after such instrument was sent to the claimant, then the instrument shall be null and void, the claimant shall be deemed to have waived such Distribution, and it shall become available cash.

### D.    Form of Distributions.

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan documents, all Distributions will be made, at the option of the Reorganized Debtor or Trustee, by a check by first class mail, postage prepaid, or by wire transfer.

### E.    No Professional Fees or Expenses.

No professional fees or expenses incurred by a claimant will be paid by the Debtor, the Reorganized Debtor or the Trustee with respect to any Claim except as specified in the Plan or the Trust Documents.

### F.    Claim Estimation.

In order to effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting, on account of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.  Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate a Class 3 Claim.

### G.    No Interest on Claims.

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any

Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### H.      Withholding Taxes.

The Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtor may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

### I.      No *De Minimis* Distributions.

Except as to Class 5 Claims, no cash payment of less than $100 will be made by the Reorganized Debtor or the Trustee to any holder of an Allowed Claim. No consideration will be provided in lieu of the *de minimis* distribution that is not made under this Article. Allowed Claims that are entitled to a *pro rata* distribution of less than $100 shall continue to accrue until such time as the *pro rata* distribution on account of such Claim will be $100 or more.

### J.      Manner of Cash Payments.

Cash payments to domestic claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or, at the Trustee's option, by wire transfer from a domestic bank. Cash payments to foreign claimants may be paid, at the Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

## IX.

## CONDITIONS TO EFFECTIVE DATE

### A.      Conditions to Occurrence of Effective Date

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

1. Entry of Confirmation Order. The Confirmation Order has become a Non-Appealable Order;

2. The Trust. The Trust shall have been formed; and

3. Debtor Payments. The payments and assignments discussed in Section 5.1(b)(2)(i) and (iii) of the Plan shall have been received by the Trust.

CORE/3008165.0002/154242258.1

**B.**     **Notice of Effective Date**

The Plan Proponents shall file a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**C.**     **Effect of Non-Occurrence of Conditions**

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or release of any claims by or against the Protected Parties or the Settling Insurer Entities; (ii) prejudice in any manner the rights of the Protected Parties, the Trust or the Settling Insurer Entities; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or the Settling Insurer Entities in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurer Entities in any court or other forum.

**X.**

**EFFECT OF PLAN CONFIRMATION**

**THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN AND THE DIOCESE INSURANCE SETTLEMENT AGREEMENTS DO NOT RELEASE OR IMPAIR A TORT CLAIMANT'S RIGHT TO RECOVER ON ANY TORT CLAIM AGAINST ANY PERPETRATOR OF SEXUAL ABUSE OR ANY SUCCESSOR OF THE DEBTOR AFTER THE EFFECTIVE DATE OF THE PLAN FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DEBTOR OR ANY PROTECTED PARTY.**

**A.**     **Dissolution of Committee**

On the Effective Date, the Committee shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediator, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

**B.**     **Discharge and Injunction**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor shall be discharged from any and all Claims that arose prior to the Effective Date, including all Tort Claims and Related Insurance Claims, and including interest, if any, on any of the foregoing, regardless

of whether it is alleged to have accrued before or after the Petition Date (each a "**Discharged Claim**"). For the avoidance of doubt, Discharged Claim includes any disallowed Claim. All Persons who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Discharged Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Discharged Claim against the Debtor, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or lien of any kind against the Debtor, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) asserting any setoff right of contribution, indemnity, subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any action, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this injunction, the Plan or confirmation order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of the Plan. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing. For the avoidance of doubt, nothing in Plan Section 13.2 relieves the Reorganized Debtor of its obligations to Class 4 claimants contained in Plan Section 4.4 (which obligations are post-petition obligations and obligations of the Reorganized Debtor under the terms of the Plan) until the later of (i) thirty days after the Reorganized Debtor provides written notice to the Trustee that the Unknown Tort Claim Reserve Fund has been exhausted or (ii) the occurrence of the sixth (6th) anniversary of the Effective Date.

## C.     Channeling Injunction

Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurer Entities:

A.     In consideration of the undertakings of the Protected Parties and Settling Insurer Entities under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective Insurance Settlement Agreements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurer Entities, and pursuant to Section 105 of the Bankruptcy Code:

1.     any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

CORE/3008165.0002/154242258.1

2.      all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurer Entities, including:

a.      commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurer Entities or against the property of any of the Protected Parties or Settling Insurer Entities;

b.      enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurer Entities, or the property of any of the Protected Parties or Settling Insurer Entities, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurer Entities;

c.      creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurer Entities, or the property of the Protected Parties or the Settling Insurer Entities;

d.      asserting, implementing or effectuating any Channeled Claim of any kind against:

(i)      any obligation due any of the Protected Parties or Settling Insurer Entities;

(ii)      any of the Protected Parties or Settling Insurer Entities; or

(iii)      the property of any of the Protected Parties or Settling Insurer Entities.

e.      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

f.      asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurer Entities, or the property of the Settling Insurer Entities.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  It is intended that the channeling of the Channeled Claims as provided in Section 13.3 of the Plan shall inure to the benefit of the Protected Parties and Settling Insurer Entities. In a successful action to enforce the injunctive provisions of this Section in

response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

"Channeled Claim(s)" means any Tort Claim, Related Insurance Claim, Medicare Claim, Extra-Contractual Claim, or other Claim against any of the Protected Parties, the Settling Insurer Entities or any Person qualifying as an insured under any Settling Insurer Entity Policy to the extent such Claim arises from the same injury or damages asserted as a Tort Claim against the Protected Parties or Settling Insurer Entities, that directly or indirectly arises out of, relates to, or is in connection with such Tort Claim, Related Insurance Claim, Medicare Claim, Extra-Contractual Claim, or other Claim covered by the Channeling Injunction and Supplemental Settling Insurer Injunction in Articles VII and XIII of the Plan; provided, however, that Channeled Claims shall not include any rights of a holder of a Class 4 Claim or Class 6B Claim against the Reorganized Debtor, nor any Claim against (i) an individual who perpetrated an act of Abuse that forms the basis of a Tort Claim with respect to that Tort Claim; or (ii) any religious order, diocese or archdiocese (other than the Diocese itself).

"Protected Party" generally means any of the Diocese Parties, the Reorganized Debtor, the Parish Parties and the Other Insured Entities and their respective predecessors and successors, assigns and associated Persons. But an individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Protected Party for that Tort Claim and any religious order, archdiocese or diocese, other than the Diocese itself, is not a Protected Party.

"Settling Insurer Entities" generally means the Settling Insurers that entered into Insurance Settlement Agreements relating to the Settling Insurer Entity Policies issued to the Debtor or the Parishes and their respective predecessors and successors, assigns and associated Persons.

## D.    Supplemental Settling Insurer Injunction

On the Effective Date of the Plan, the Supplemental Settling Insurer Injunction shall take effect. It provides in pertinent part:

A.    **Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurer Entities**. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchases of insurance policies or Interests in insurance policies from the Diocese, Other Insured Entities, and Catholic Entities pursuant to Section 363(f) of the Bankruptcy Code:

B.    With the exception of the rights against the Reorganized Debtor retained by the holders of the Unknown Tort Claims, any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, other insurers, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties, the Settling Insurer Entities, or any other Person covered or

40

allegedly covered under the Settling Insurer Entity Policies, which directly or indirectly arise from, relate to, or are in connection with any Tort Claims that are covered or alleged to be covered under the Settling Insurer Entity Policies, or any Related Insurance Claims related to such Tort Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurer Entities, the Settling Insurer Entity Policies, or Protected Parties to the extent such Interests arise from the same injury or damages asserted in connection with a Tort Claim including:

1. Commencing or continuing in any manner any action or other proceeding against the Settling Insurer Entities or the Protected Parties or the property of the Settling Insurer Entities or Protected Parties;

2. Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurer Entities or Protected Parties or the property of the Settling Insurer Entities or Protected Parties;

3. Creating, perfecting, or enforcing any lien of any kind against the Settling Insurer Entities or Protected Parties or the property of the Settling Insurer Entities or Protected Parties;

4. Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurer Entities or Protected Parties or the property of the Settling Insurer Entities or Protected Parties; and

5. Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

**C.** All Claims described in this Section 7.9, except for the rights of holders of Class 4 Claims, Class 5 Claims, and Class 6B Claims against the Reorganized Debtor, shall be channeled to the Trust. This injunction shall not apply to any reinsurance Claim.

**E.** **Permanent Injunction Against Prosecution of Released and Channeled Claims**

On the Effective Date of the Plan, the Permanent Injunction Against Prosecution of Released and Channeled Claims shall take effect. It provides in pertinent part:

Except as otherwise expressly provided in the Plan, for the consideration described in the Insurance Settlement Agreements, all Persons who have held, hold, or may hold Channeled Claims or Claims against the Diocese Parties, the Protected Parties, or the Settling Insurance Entities, whether known or unknown, will be permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner, any action or any other proceeding of any kind, including, but not limited to, any Tort Claim or any Unknown Tort Claim against the Settling Insurance Entities or the property of the Settling Insurance Entities with respect to any Claim or Channeled Claim; (b) seeking the enforcement, attachment, collection or recovery by any manner

41

or means of any judgment, award, decree, or order against the Settling Insurance Entities or the property of the Settling Insurance Entities, with respect to any Claim or Channeled Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Settling Insurance Entities or the property of the Settling Insurance Entities with respect to any Claim or Channeled Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Settling Insurance Entities with respect to any Claim or Channeled Claim; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or any documents relating to the Plan, including, the Trust Agreement.  The foregoing injunctive provisions are an integral part of the Plan and are essential to its implementation.

## F.    Exculpation and Limitation of Liability of Exculpated Parties

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any claim, Cause of Action or liability to any other Exculpated Party, to any holder of a claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and Filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Committee and the Diocese and their respective officers, board and committee members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and the Channeling Injunction.

Under the Plan, "Exculpated Parties" means collectively, (i) the Diocese Parties, the Estate, and the Committee; (ii) the respective officers, directors, employees, members, attorneys, financial advisors, members of subcommittees of the board of directors, volunteers, and members of consultative bodies and councils formed under Canon Law of the persons identified in the preceding clause including with respect to their service or participation in an outside board on which they serve at the request of the Diocese or the Bishop, in their capacity as such; (iii) the Settling Insurer Entities with respect to their Settling Insurer Entity Policies; and (iv) professionals of a Person identified in the preceding clause (i) through (iii)

## G.    Timing

The injunctions, releases, and discharges to which any Settling Insurer Entity is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer(s) pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and the other provisions set forth in Article VII of the Plan are fully met.

CORE/3008165.0002/154242258.1

## H. No Bar on Certain Claims

Notwithstanding the foregoing, nothing in this shall be construed to bar either (a) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer Entity or (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy other than the Settling Insurer Entity Policies.

## XI.

## CHILD PROTECTION PROTOCOLS

The Child Protection Protocols are incorporated into the Plan.

## XII.

## THE REORGANIZED DEBTOR

### A. Continued Corporate Existence

The Diocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Minn. Stat. Section 315.16 having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

### B. Vesting of Assets

In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, claims, and interests of creditors, including successor liability claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### C. Identify of Officers of Reorganized Debtor

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on Exhibit J of the Plan.

CORE/3008165.0002/154242258.1

### D.      Further Authorization

The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

## XIII.

## CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN

The Plan contains other provisions consistent with the requirements of Chapter 11 of the Bankruptcy Code as set forth below:

### A.      Causes of Action/Avoidance Actions

Except as otherwise provided in the Plan, the Reorganized Debtor shall retain and exclusively enforce the Debtor's Causes of Action, whether arising before or after the Petition Date, in any Court or other tribunal, including without limitation, an adversary proceeding filed in this case.

### B.      Retention of Jurisdiction

1.      **By the Bankruptcy Court.** Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Sections 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain: (i) original and exclusive jurisdiction over this Chapter 11 case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in this Chapter 11 case, and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to this Chapter 11 case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

a.      over disputes concerning the ownership of claims;

b.      over disputes concerning the distribution or retention of assets under the Plan;

c.      over objections to claims, motions to allow late-filed claims, and motions to estimate claims;

d.      over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Diocese, the Estate, or Trust, or property abandoned or transferred by the Diocese, the Estate, or the Trust;

e.      over motions to approve Insurance Settlement Agreements entered into after the Effective Date by the Trustee;

f.      over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets;

g.      the removal of the Trustee and the appointment of a successor Trustee;

h.      over matters relating to the subordination of claims;

i.      to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

j.      to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

k.      to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to the Plan and any Diocesan Insurance Settlement Agreement;

l.      over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

m.      over requests for allowance of payment of claims entitled to priority under Sections 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

n.      over all Fee Applications;

o.      over matters concerning state, local, or federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

p.      over conflicts and disputes among the Trust, the Reorganized Debtor, and holders of claims, including holders of Class 3 or Class 4 Claims;

q.      over disputes concerning the existence, nature, or scope of the Diocese's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of

any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

r.      to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Diocese or its property, the Reorganized Debtor or its property, the Estate or its property, the Trust or its property, Trustee, the Professionals, or the Confirmation Order;

s.      to enter a Final Decree closing the Chapter 11 case;

t.      to enforce all orders previously entered by the Bankruptcy Court; and

u.      over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or the Plan.

2.      **By the District Court.**  Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Section 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to this Chapter 11 case.

3.      **Actions to Collect Amounts Owed Pursuant to the Plan.** Notwithstanding anything to the contrary in this Section, the Diocese, the Reorganized Debtor and the Trustee may, but are not required to, commence an adversary proceeding to collect amounts owed pursuant to the Plan for any settlements embodied in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with the Plan. Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

4.      **Case Closure.**  The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing this Chapter 11 case. In an action involving the Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Trustee from the Trust Assets in accordance with an order of the Bankruptcy Court.

## C.      Modification of the Plan

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend, modify or withdraw the Plan prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtor may, upon order, amend or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

46

### D.    Severability

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of the Debtor, in which case the term or provision may be unilaterally withdrawn by the Debtor. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Article, is valid and enforceable under its terms. In the event of a successful collateral attack on any provision of the Plan (i.e., an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of the Plan will remain binding on the Debtor, the Reorganized Debtor, the Settling Insurer, the Trustee, the Committee, all claimants, all Creditors, and all other parties in interest.

### E.    Section 1146 Exemption

Pursuant to Bankruptcy Code Section 1146(c) any transfer of property pursuant to the Plan will not be subject to any document, recording tax, stamp tax, or similar tax, mortgage tax, real estate transfer tax, or other governmental assessment in the United States, and the Confirmation Order will direct the appropriate state or local governmental officials and/or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### F.    Management of the Reorganized Debtor

The Reorganized Debtor shall continue to be managed by current management. Most of these individuals have been involved in the Debtor's affairs for many years and are well suited to continue the Debtor's mission. Those managers, their titles and salaries consist of:

> Bishop Paul D. Sirba, salary $30,816.00
> Vicar General James Bissonette, salary $-0-
> Franz Hoefferle - Financial Officer, salary $75,949.00

### XIV.

### CONFIRMATION PROCEDURES

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code §1129 must be met. This includes, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of holders of Claims in each impaired Class.

CORE/3008165.0002/154242258.1

**A.      Solicitation of Votes; Acceptance**

The Debtor is soliciting the acceptance of the Plan from all holders of Claims in Classes that are impaired under the Plan and receiving Distributions thereunder.  Using this criteria, holders of only Claims in Classes 3, 4 and 5 are entitled to vote on the Plan.  In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Classes 3, 4, 6A, and 6B will be deemed to have accepted the Plan if the Plan is accepted by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that has cast Ballots on the Plan and that are eligible to vote for or against the Plan. The Debtor may file a motion to estimate each Class 3 Claim at $1.00 each for voting purposes only.  The actual amount payable to holders of Allowed Class 3 Claims will exceed $1.00. This is consistent with the procedure followed in other mass tort bankruptcy cases and the Tort Proof of Claim forms intentionally did not provide for a dollar amount for the Claims as the Claims are unliquidated tort claims.

**B.      Confirmation Hearing**

Bankruptcy Code §1128(a) requires the Bankruptcy Court, after notice, to hold the **Confirmation Hearing** after the period for submission of Ballots has expired.  The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.  Bankruptcy Code § 1128(b) provides that any party in interest may object to confirmation of the Plan. Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.  Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable Robert J. Kressel, and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement on or before the time and date designated in such Order and Notice.  **FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the

CORE/3008165.0002/154242258.1

Chapter 11 Case, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable.

5.      The Debtor has disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and with public policy; and (b) the Debtor has disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtor and the nature of any proposed compensation for such insider(s).

6.      Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code. See "Best Interests of Creditors Test" below.

7.      Unless the Debtor is required to seek nonconsensual confirmation of the Plan, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over five (5) years.

9.      At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.      Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtor or the Reorganized Debtor.

11.      The Debtor believes that the Plan has been submitted in good faith and that, upon acceptance of the Plan by the voting Class, the Plan will satisfy all of the foregoing statutory requirements.

## C.      Best Interests of Creditors Test

As mentioned above, confirmation of the Plan requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor believes that in a hypothetical liquidation all creditors will receive less than they will likely receive under the Plan.  Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1.      The Plan incorporates the Trust Distribution Protocols, which were negotiated by counsel representing in excess of 75% of Tort Claimants.  There is likelihood that a Chapter 7 Trustee will be unable to implement the Trust Distribution Protocols or a similar Plan in the

absence of a confirmed Chapter 11 Plan.  As such, substantial estate resources would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

2.      A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtor, pursuant to 11 U.S.C. § 326.  Any such payment would dilute the amount of funds available to pay creditors.

3.      The Settling Insurers would not get the Channeling Injunction and/or releases provided in the Plan, nor would they make the substantial contributions they are making under the Plan without such injunctions and/or releases.

In addition, it is unlikely that the Settling Insurers would voluntarily contribute without the corresponding benefit of final resolution of Tort Claims.  Annexed hereto as **Exhibit C** is a Liquidation Analysis.  The Liquidation Analysis indicates that in a liquidation, holders of Unsecured Claims would receive a lesser distribution than provided under the Plan.

## D.      Feasibility

The Bankruptcy Code requires that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization.  Because (i) all the Tort Claims will be resolved pursuant to the Plan, (ii) the Reorganized Debtor will not be financially liable on account of any Tort Claims that occurred prior to the Petition Date except as provided in the Plan, and (iii) distributions will be made only to the extent of existing assets or future recoveries, the Reorganized Debtor and the Debtor believes the Plan is feasible.

## E.      Cram Down

The Bankruptcy Code provides a mechanism by which a Plan may be confirmed even if it has been rejected by an impaired Class of Claims.  Under the "cram down" provisions of the Bankruptcy Code (§1129(b)), the proponent of the Plan (in this case the Debtor) may request that it be confirmed despite its rejection by an impaired Class, and the Bankruptcy Court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired Class and (ii) is fair and equitable with respect to such Class.

The Bankruptcy Code sets forth specific guidelines for determining whether a Plan is fair and equitable with respect to a particular Class of Claims.  For unsecured Claims, as are those in all Classes, a Plan must provide that equity interest holders do not receive or retain any property on account of their interest.  The Debtor submits that this test which is applied to traditional corporations is inapplicable to not-for-profit corporations as there are no equity interests or junior creditors or the holders of Claims that are junior to Claims of a non-accepting Class are not receiving any property under the Plan.

In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting Class unless certain modifications are made to the terms and conditions of such non-consenting Class' treatment under the Plan, the Debtor reserves the right, without re-solicitation, to propose such modification to such non-consenting Class' treatment and to confirm the Plan.

# XV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated numerous alternatives to the Plan, including, without limitation, proposing competing Plans by the Debtor and the Committee, and the conversion of the case to case under Chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtor by a Chapter 7 Trustee. After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims. The following discussion provides a summary of the analysis of the Debtor supporting its conclusion that a Chapter 7 liquidation of the Debtor or an alternative Chapter 11 Plan for the Debtor will not provide higher value to holders of Claims.

## A.      Liquidation Under Chapter 7 of the Bankruptcy Code

If no Chapter 11 Plan can be confirmed, Debtor's case may be converted to a case under Chapter 7 (assuming the Debtor consents), in which event a Trustee would be elected or appointed to liquidate the Debtor's assets for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. In addition to the factors discussed above, the Debtor believes that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Trustee for bankruptcy and professional advisors to such Trustee and (2) the erosion in value of assets in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" environment in which such a liquidation would likely occur. Accordingly, the Debtor has determined that confirmation of the Plan will provide each holder of a Claim or equity interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under Chapter 7.

A discussion of the effects that a Chapter 7 liquidation would have on the holders of Claims is set out in the Liquidation Analysis, attached as **Exhibit C** hereto.

## B.      Alternative Chapter 11 Plans

If the Plan is not confirmed, any other party in interest could undertake to formulate a different Chapter 11 Plan. Such a Chapter 11 Plan might involve either a reorganization and continuation of the business of the Debtor or an orderly liquidation of the properties and interests in property of the Debtor. With respect to an alternative Chapter 11 Plan, the Debtor has examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtor believes that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances.

## XVI.
## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX

CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in this Case.

## A.    The Trust

The Trust is a "qualified settlement fund" ("**QSF**") within the meaning Treasury Regulations enacted under the Internal Revenue Code at 26 U.S.C. § 468B(g).  The Trust is characterized as a QSF because:

1.    The Trust is established pursuant to an Order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.    The Trust is established to resolve or satisfy one or more contested or uncontested claims that has resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to sexual abuse (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relate to: a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and,

3.    The Trust is a trust under state law.

The primary tax consequences of the Trust being characterized as a QSF are the following:

1    The Trust must use a calendar taxable year and the accrual method of accounting.

2    If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust.  Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

3    The Trust takes a fair market value basis in property contributed to it by the Debtor.

4    The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and Estate (currently 35%).  The Debtor's funding of the Trust with cash and other property is not reported by the Trust as taxable income.  However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

52

5       The Trust may deduct from its gross income a limited number of administrative expenses; the Trust in not entitled to deduct distributions paid to its beneficiaries.

6       The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants.

**B.      Federal Income Tax Consequences to Holders of Claims**

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation. Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income. Distributions to Tort Claimants may not be taxable as it may be considered compensation for personal injuries.

The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the claimant but may, as discussed below, result in a loss. Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant generally would be required to include the amount of the distribution in income when received.

A claimant receiving a distribution in satisfaction of his or her claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent

CORE/3008165.0002/154242258.1

of the ordinary deduction previously claimed.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the claimant's hands.

## XVII.

## VOTING INSTRUCTIONS

Solicitation Packages which will include copies of (i) the Disclosure Statement Approval Order, (ii) the Notice of Disclosure Statement Approval and Confirmation Hearing, (iii) the approved Form of Disclosure Statement (together with the Plan annexed thereto), and (iv) the form of Ballot shall be sent to creditors.  Procedures and deadlines for submitting the Ballot shall be included in such Solicitation Package.

--Rest of Page Intentionally Left Blank--

CORE/3008165.0002/154242258.1

# XVIII.

# CONCLUSION

The Debtor and Committee believe that confirmation and implementation of the Plan is preferable to any other alternative.  Accordingly, the Debtor and Committee urge holders of Claims to vote to accept the Plan by so indicating on its Ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Dated: July 3, 2019

CORE/3008165.0002/154242258.1

**THE DIOCESE OF DULUTH**

_____

Most Rev. Paul D. Sirba, Bishop

**GRAY PLANT MOOTY**
Phillip Kunkel
1010 West Street Germain
Suite 600
St Cloud, MN 56301
320-252-4414
Fax : 320-252-4482
phillip.kunkel@gpmlaw.com

**ELSAESSER ANDERSON CHTD**
J. Ford Elsaesser
Bruce A. Anderson
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
208-667-2900
baafiling@eaidaho.com
ford@eaidaho.com

56

**THE DIOCESE OF DULUTH**

Most Rev. Paul D. Sirba, Bishop


**GRAY PLANT MOOTY**
Phillip Kunkel
1010 West Street Germain
Suite 600
St Cloud, MN 56301
320-252-4414
Fax : 320-252-4482
phillip.kunkel@gpmlaw.com

**ELSAESSER ANDERSON CHTD**
J. Ford Elsaesser
Bruce A. Anderson
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
208-667-2900
baafiling@eaidaho.com
ford@eaidaho.com

CORE/3008165.0002/154242258.1

**AND**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

_____

By: William Weis
Its: Chairperson

**STINSON, LLP**

_/e/ Robert T. Kugler_
Robert T. Kugler
Edwin H. Caldie
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Attorneys for the Official Committee of Unsecured
Creditors of the Diocese of Duluth