EXHIBIT A
UNKNOWN TORT CLAIM REPRESENTATIVE'S REPORT AND RECOMMENDATION

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

In re:

The Diocese of Duluth,

Debtor.

Case No. 15-50792

Chapter 11

---

### UNKNOWN CLAIMS REPRESENTATIVE'S REPORT AND RECOMMENDATIONS

Michael R. Hogan, the Unknown Claims Representative ("UCR"), makes the following Report and Recommendations.

I was appointed UCR on January 14, 2018 by the United States Bankruptcy Court for the District of Minnesota in the above-titled proceeding (the "UCR Order") (Dkt. 328). This proceeding seeks to reorganize the Diocese of Duluth ("Debtor") under Chapter 11 of the United States Bankruptcy Code. It was filed to resolve approximately 125 child sex abuse claims. On July 9, 2019, the Debtor and the Official Unsecured Creditors Committee filed their Joint Chapter 11 Plan of Reorganization of the Diocese of Duluth (the "Plan") (Dkt. 386). The Debtor seeks, in part, to provide a fund to compensate any Unknown Tort Claimants (as defined in the Plan) who may assert sexual abuse claims after confirmation of the Plan, who can satisfy the conditions for compensation under the Plan.

As the representative of Unknown Tort Claimants, and in accordance with the UCR Order, I have evaluated the likely number of sexual abuse claimants, if any, who might come forward after a Plan is confirmed, and the likely value of the future claims they may assert

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 1

against the Debtor. Specifically, in a comprehensive effort to anticipate the number of

Unknown Tort Claims (as defined in the Plan) and determine the amount of a fair and

appropriate fund for Unknown Tort Claims. I have, among other things:

1. Reviewed the experiences of other dioceses and religious orders that have reorganized under Chapter 11 of the Bankruptcy Code in response to large numbers of child sex abuse claims;

2. Reviewed the extensive outreach of principal claimants' counsel in Minnesota;

3. Reviewed the comprehensive actual notice and publication effort concerning possible claims, as proposed by the Debtor and ordered by the Bankruptcy Court;

4. Studied the pattern of claims, the timing of claims in relation to incidents of abuse, and the relative dates of incidents of abuse;

5. Considered the number and pattern of pre-petition claims, the number and pattern of claims filed since the bankruptcy petition was filed, and the number of claims filed since the last date established by the Bankruptcy Court for creditors to file claims;

6. Considered the efforts of the Debtor to encourage potential abuse claimants to file claims;

7. Considered the nature and allegations of the 125 claims filed in this Chapter 11 proceeding; and

8. Considered the 2004 and 2011 reports by the John Jay College of Criminal Justice concerning sexual abuse of minors.

On December 30, 2015, the Debtor filed a "Motion for Order Granting Expedited Relief;

Establishing Deadlines for Filing Proofs of Claim; Approving Sexual Abuse Proof of Claim Form;

Approving Form and Manner of Notice Thereof; and Approving Confidential Procedures" (Dkt.

34).

The Debtor's Motion was granted by the court and entered on January 7, 2016 (Dkt. 35).

It provides, in part, as follows:

### "TIMING AND FORM OF NOTICE

12. As soon as reasonably practicable after the entry of this order, the Clerk of Court shall give notice by United States mail, first-class postage prepaid, or by electronic means, of the non- tort claim filing deadline to (a) the United States Trustee for the District of Minnesota; (b) counsel to the committee of unsecured creditors; (c) all persons and entities that have filed a notice of appearance in this case; (d) all persons and entities that have previously filed proofs of claims in this Chapter 11 case.

13. As soon as reasonably practicable, but in any event no later than five business days after the entry of this order, the debtor shall serve by United States mail, first-class postage prepaid, the Sexual Abuse Claim Filing Deadline Notice (Exhibit B) and the Sexual Abuse Proof of Claim Form (Exhibit A) on the United States Trustee, and on known Sexual Abuse Claimants who have:

  i.  Filed pending lawsuits against the debtor alleging that they were sexually abused by employees or agents of the debtor or by clergy previously assigned to the debtor or any others for whom the debtor may be liable;
  ii.  Provided to the debtor under Minn. Stat. § 549.09 a written notice of claim of sexual abuse by employees or agents of the debtor or by clergy previously assigned to the debtor or any others for whom the debtor may be liable;
  iii.  Contacted the debtor to claim that they were sexually abused as a minor by employees or agents of the debtor or by clergy previously assigned to the debtor or any others for whom the debtor may be liable;
  iv.  Are otherwise known to the debtor to be a Sexual Abuse Claimant through reasonably-ascertainable records.

14. The service of the Sexual Abuse Claim Filing Deadline Notice and Sexual Abuse Proof of Claim Form on Sexual Abuse Claimants shall be accomplished through such Sexual

Abuse Claimants' attorneys, if previously identified as counsel for such Sexual Abuse Claimant in connection with a Sexual Abuse Claim, and directly on all other known potential Sexual Abuse Claimants that have been identified and located by the debtor through reasonably diligent efforts.

15. The Publication Notice and the Sexual Abuse Claim Filing Deadline Notice shall include a reference to this court's website (www.mnb.uscourts.gov) where all claim forms shall be made available.

16. The service outlined above shall constitute service on all known creditors of the debtor. All other creditors of the debtor shall be deemed to be unknown for the purpose of service of notice of the Claim Filing Deadline.

17. The debtor shall also provide notice of the Claim Filing Deadline established in this order by causing a copy of the Publication Notice (Exhibit C) to be published as follows:

   i.   Publication four times in each of the following publications, with the first publication to occur within thirty days of the service of the claim filing deadline packages, the second publication to occur approximately thirty days after the first notice, the third publication to occur approximately thirty days after the second notice, and the fourth publication to occur approximately thirty days after the third notice:

- *National Publication*: USA Today – National Edition
- *Catholic Publications (and their respective websites)*:
    - National Catholic Reporter (National)
    - The National Catholic Register (National)
    - The Northern Cross (Regional)
- Local Publications (and their respective websites):
    - Minneapolis Star Tribune
    - St. Paul Pioneer Press
    - The Minnesota Daily
    - Duluth News Tribune
    - Post-Bulletin (Rochester)
    - St. Cloud Times
    - Brainerd Dispatch
    - Grand Forks Herald
    - Winona Daily News
    - The Bemidji Pioneer
    - Crookston Daily News
    - The Free Press (Mankato)
    - The Journal (New Ulm)

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 4

- Mesabi Daily News (Virginia)
- Hibbing Daily Tribune
- Grand Rapids Herald Review
- International Falls Journal
- The Duluthian

ii. The debtor, in consultation with the official committee of unsecured creditors, shall identify Native American publications of the Native American populations within the Diocese's geographical area. The debtor shall cause Publication Notice to be published in these publications on the same schedule set forth above.

iii. The debtor will request that the Publication Notice is published in the above listed publications in a location other than among the standard legal notices.

iv. In addition to the Publication Notice, the debtor will send copies of the Sexual Abuse Claim Filing Deadline Notice to the publications listed above and to the following:

  - The Associated Press of Minnesota
  - WCCO-AM
  - Minnesota Public Radio
  - KARE-TV
  - KMSP-TV
  - KSPR-TV
  - WCCO-TV
  - Each diocese in Minnesota

18. The debtor shall provide further notice of the Claim Filing Deadline by taking the following measures:

i. Within five business days of the entry of this order, the debtor will post the component parts of the Sexual Abuse Claim Filing Deadline Package and the Non-Tort Claim Filing Deadline on the following public website: http://www.dioceseduluth.org;

ii. Within five business days of the entry of this order, the debtor will provide a copy of the Publication Notice and component parts of the Sexual Abuse Claim Filing Deadline Package to the Survivors Network of the Abused by Priests and request that it post the same on its website at www.snapnetwork.org;

iii. Within five business days of the entry of this order, the debtor will provide a copy of the Publication Notice and component parts of the Sexual Abuse Claim Filing Deadline Package to Jeff Anderson and Associates P.A. and request that it post the same on its websites at www.andersonadvocates.com;

iv. The debtor will maintain a telephone number published on their website at http://www.dioceseduluth.org which may be used by Sexual Abuse Claimants to

       ask questions or obtain copies of the Sexual Abuse Claim Filing Deadline Package or parts thereof;

v.    Within two weeks of the service of the Sexual Abuse Claim Filing Deadline Package, the debtor will provide a copy of the Publication Notice and the Sexual Abuse Claim Filing Deadline Notice to the following offices/entities and request that each recipient publicly post such notice until the expiration of the Claim Filing Deadline: (a) The Minnesota Attorney General; (b) the county attorney, the county court administrator, and sheriff's department for each of the counties within the Diocese's geographical area; (c) the Minnesota Department of Health's locations within the Diocese's geographical area; (d) each hospital in the Diocese's geographical area; and (e) each of the 74 parishes.

vi.   The debtor will send a letter to each parish requesting that such parish display the Publication Notice and Sexual Abuse Claim Filing Deadline Notice in a prominent location within the church or school. The letter will also request that the notices be published prominently once a month in the parishes' weekly bulletins until the Claim Filing Deadline. The letter will also request that each pastor, canonical administrator, or parochial vicar remind parishioners of the availability of information concerning the Claim Filing Deadline. The letter will also request that parishes disseminate the Publication Notice and Sexual Abuse Claim Filing Deadline Notice by email to their respective distribution lists.

vii.  The debtor will mail a copy of the Sexual Abuse Claim Filing Deadline Notice to all licensed alcohol and addiction treatment centers in the state of Minnesota, as identified by counsel for the committee of unsecured creditors, and to persons identified by counsel for the official committee of unsecured creditors as licensed therapists presently working with sexual abuse claimants.

19. Each request described in paragraph 18(v) and (vi) above shall be on the debtor's letterhead and signed by an officer of the debtor. The request described in 18(vi) above, shall include a space at the bottom for the recipient to indicate whether it will comply with the request and a stamped self-addressed return envelope. The debtor will report on compliance to the committee of unsecured creditors.

20. In addition, the Clerk of Court shall post the Sexual Abuse Proof of Claim Form, the Sexual Abuse Claims Filing Deadline Notice and Publication Notice on the website for the United States Bankruptcy Court for the District of Minnesota by adding a link on the court's home page (www.mnb.uscourts.gov) to easily access filing deadline information."

The Debtor has since filed an Affidavit of Publication confirming that the notices were

published in the Duluth News Tribune, the Minneapolis Star-Tribune, and the St. Paul Pioneer

Express (Dkt. 323). In addition, counsel for the Debtor has assured me that all the other notice requirements of the order have been fulfilled.

Jeff Anderson and Associates ("JAA") represents approximately 121 (or 96.8%) of the total abuse claimants in this proceeding. JAA has represented to me that from May 2013 to May 2016, it made every effort to reach survivors of clergy sexual abuse in the state of Minnesota. This included an extensive media and advertising campaign consisting of:

- Continuous print outreach in dozens of publications across the state of Minnesota;

- Online outreach advertising through Google ads, including display and text ads, and Facebook ads;

- Radio campaigns played on prominent stations across the state of Minnesota, with specific outreach at the end of the Minnesota Child Victims Act deadline;

- Social media campaign on Twitter and Facebook, including outreach and posts directed at the Minnesota Child Victims Act deadline;

- Video advertisements on YouTube; and

- Television, radio, and newspaper interviews.

JAA also conducted dozens of press conferences and disseminated dozens of news releases around the state and country during the Minnesota Child Victims Act claim filing window.

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 7

Further, JAA did a complete review of the firm files and made every effort to contact nearly every survivor who had contacted that firm since the late 1980s. JAA also sent outreach letters to potential survivors based on school yearbooks, parish rosters, witness lists, and names provided by other survivors. The firm also reviewed dozens of perpetrator files obtained from the Archdiocese to obtain pertinent witness and survivor information. The majority of these files were released to the public during the Minnesota Child Victims Act claim filing window.

These outreach efforts in Minnesota by the Debtor and principal claimants' counsel have been prodigious, indeed, and is among the most extensive in my experience working with several Catholic dioceses and orders in several states. I do note that outreach to claimants was also extremely extensive in Montana, in part because there were three similar recent overlapping Chapter 11 proceedings in that state, which has a dispersed and relatively low population.

Studies conducted by the John Jay College of Criminal Justice in 2004 and 2011 also provide support for the position that most claims against the Diocese have already been brought. "The Nature and Scope of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States 1950-2002" ("the 2004 John Jay College Report") includes the following statistical findings:

1.  Over 70% of sexual abuse allegations were made within 30 years after the alleged abuse began.

2. 75% of the events of alleged sexual abuse occurred between 1960 and 1980. [In this proceeding, approximately 70% of abuse claimed occurred between 1960 and 1980, approximately 18% in the 1980s, and approximately 0.5% from the 1990s to the present.]

3. One-third of all sexual abuse allegations were made in 2002 and 2003 alone.

4. More abuse occurred in the 1970s than any other decade. [By far the most reported abuse in this proceeding occurred in the 1960s and 1970s.]

5. As estimated from the study data, 2.7% of all priests in religious ministry were accused of alleged sexual abuse.

6. 89.5% of all alleged abusers were born before 1950.

7. Only 5.5% of all alleged abusers committed their first offense at the age of 60 or older.

8. The average age of a priest at the first allegation of abuse was 39, and the median age was 35.

9. 149 priests with 10+ victims accounted for 26% of all incidents reported in the study. [In this proceeding, three priests with 10+ victims accounted for 38.4% of all incidents reported and ten priests with 5+ victims account for 68% of all incidents reported. All of the accused priests have been permanently removed from ministry or have died.]

10. A precipitous decline in incidents of abuse by year of occurrence took place in 1985. [Also true here.]

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 9

"The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2010" ("the 2011 John Jay College Report") contains, among other points, the following relevant findings:

1. Researchers could not point to one single cause, as neither celibacy nor homosexuality were the causes of the abuse. Social and cultural changes in the 1960s and 1970s manifested in increased levels of deviant behavior in the general society and also among priests.

2. The count of incidents per year increased steadily from the mid-1960s through the late-1970s, then declined in the 1980s and continues to remain low.

3. New reports (post-2002) have confirmed initial estimates that the distribution of incidents is stable.

4. At the time of the peak and subsequent decline in sexual abuse incidents, there was a substantial increase in knowledge and understanding in American society about victimization and the harm of child sexual abuse. Changes were made in statutes related to rape and sexual abuse of children and in reporting requirements of child abuse and neglect, an understanding of the cause of sexual offending advanced, and research related to the treatment of sexual abusers was expanded.

As noted, the allegations of initial abuse in this proceeding roughly follow the statistics in the John Jay reports. The allegations of initial abuse here by decade are as follows:

1940s  -  1

1950s  -  10

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 10

| | | |
|---|---|---|
| 1960s | - | 47 |
| 1970s | - | 40 |
| 1980s | - | 22 |
| 1990s | - | 2 |
| 2000s | - | 0 |
| 2010s | - | 3 |

In May 2013, Minnesota enacted the Minnesota Child Victims Act (Minn. Stat. 541.073) ("the CVA"), which altered, expanded, and in some cases eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse. The statute allows victims who were sexually abused when they were younger than 18 years old to bring a civil lawsuit for damages, no matter how long ago the abuse occurred. The statute provided a three-year window in the Minnesota statute of limitations to file these claims, which expired on May 25, 2016. Coincidentally, this is the same date set by the court in this proceeding as the last date a claim may be filed.

When this Chapter 11 proceeding was filed, one claim had been tried to verdict, and several other lawsuits and notices of claims had been filed. No claims have been filed since May 25, 2016.

Unknown Tort Claims may be subject to affirmative defenses that are not applicable to claims filed by May 25, 2015, the last date set by the Bankruptcy Court for creditors to file proofs of claim, because of the aggregate nature of resolution of the timely-filed claims. These include the following:

1. Potential liability on the basis of negligence may require proof of foreseeability. The following type of questions could be posed: Would a prudent person see abuse as likely to occur, possibly from a 1960s or 1970s perspective? Would liability be imposed only after a finding of custody or control?

2. Would respondeat superior liability require a finding that abuse has been committed in the course and scope of a special relationship?

3. Would there be joint-and-several liability for acts of persons in other religious orders?

4. Would a finding of Diocese control be required for liability of the Diocese?

5. Were claimants fully compensated by awards from other religious orders?

6. Does the doctrine of laches limit certain claims?

7. Did claimants mitigate damages?

8. Is some evidence of claims excluded under the First Amendment to the United States Constitution?

9. Is there sufficient admissible evidence to allow the estate of a deceased claimant to pursue a claim on their behalf?

10. Has a claimant filed a bankruptcy petition in the past, which may result in an abuse claim for damages constituting an asset of the bankruptcy estate?

The Chapter 11 sexual abuse cases filed by religious orders and dioceses responding to large numbers of sexual abuse claims certainly have similarities, but they also have significant differences. I was a principal mediator for a similar proceeding concerning the Diocese of Portland several years ago, which was handled differently than this proposed settlement in that

most of the money to pay claims was recovered through the settlement of ten insurance

coverage cases and each of approximately 150 abuse claims was settled individually. Although

there was substantial news coverage in that case, outreach by plaintiffs' counsel to prospective

claimants was less extensive than here. In addition, bankruptcy judges now often mandate

broad public outreach, as is true here. More appropriate recent comparisons in determining an

amount to be set aside for unknown claimants include:

1. The settlement of the Society of Jesus, Oregon Province, Chapter 11 proceeding, in

   which the future claims trust was for an amount representing approximately eight

   percent of the aggregate for filed claims;

2. In another example, the future trust fund for a similar proceeding in Alaska represented

   approximately five percent of the amount available for tort claimants;

3. The future trust fund for a similar proceeding in Helena, Montana represented

   approximately six percent of the claims trust;

4. The future trust fund for three similar Crosier entities in Minnesota represented

   approximately five percent of the amount available for tort claimants;

5. The future trust fund for a similar proceeding in Gallup, New Mexico was recommended

   to be approximately ten-and-a-half percent of the fund.

6. The future trust fund for a similar proceeding for the Diocese of Great Falls/Billings

   represented approximately 5% of the amount available for tort claimants.

7. The future trust fund in the Archdiocese of St. Paul and Minneapolis was approximately

   3-to-5 percent of the amount available for tort claimants. In addition, I note that there

have been several unknown claims notices or claims forms filed in the Archdiocese proceeding – all of which I have reviewed for viability. Unfortunately for all these claimants, closing of the statute of limitations window has rendered those claims not viable.

I also note that, serving as Unknown Claims Representative, I recommended the size of the unknown claims reserve in the Helena, Gallup, Crosier, Great Falls/Billings, and St. Paul and Minneapolis cases. I recommended a somewhat greater proportional reserve for the Gallup proceeding because there were so few timely-filed claims from the several Native American reservations in the diocese, and it was reasonable to conclude more would be filed. In addition, the statute of limitations in New Mexico was substantially different and more liberal than in the Crosier proceeding and the Archdiocese proceeding in Minnesota with regard to discovery guidelines.

This case is unique in several ways. First, there has been very extensive outreach to the possible claimant population.

As noted, The Minnesota Child Victims Act (Minn. Stat. § 541.073) provided a three-year window for child abuse victims with previously time-barred claims to sue their perpetrator and the institution that allowed the abuse to occur. That window closed on May 25, 2016. After that date, individuals abused while under the age of 18 are allowed to commence litigation for damages for sexual abuse only in very limited circumstances. In essence, there is very little room for an unknown claim to be filed under current Minnesota law.

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 14

Most of the claims in this proceeding involve a priest grooming a victim, then breaching the trust established by subjecting a victim to sexual abuse. This is horrific enough, but unfortunately a notable group of claims here involve physically aggressive sexual abuse. However, there are also a notable group of claims involving questionable or relatively minor claims. The presence of this latter group of claims is some evidence that outreach to possible claimants has indeed been thorough.

Comparing other religious order and diocesan cases to the factors involved here indicates that it is unlikely that many compensable unknown claims will be filed in the future.

The Debtor's counsel estimates that $39 million will be available to holders of timely tort claims upon the effective date of the Plan.

**Recommendations:**

I make the following recommendations with regard to establishing an unknown claims fund, the estimate of future claims, and other parameters. I specifically reserve the right to revise these recommendations and to modify them after full review of any changes to the Disclosure Statement and Plan containing the provisions concerning any such future claims trust.

1.    I recommend that total Diocese funding of a possible unknown claims reserve be limited to $1,200,000. Based on my work in other cases and my experience with unknown claims filed in the Archdiocese case, I believe this is a fair and appropriate limit because of the factors summarized above.

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 15

2.      Experience teaches that the settlement value of unknown claims may be substantially less than earlier-filed claims. However, giving unknown claimants the benefit of the doubt, and assuming the final count of timely-filed allowable claims herein is 125, and given the other factors considered – and especially because the Minnesota statute of limitations is so strict – a total commitment of $1,200,000 is a fair and appropriate number.

3.      I recommend that the adjudication of these claims be handled in the same manner and means, and by the same adjudicator, as is handling the adjudication of timely-filed claims, assuming that adjudicator is willing and able to serve.

4.      I further recommend that the funds available for unknown claims be funded in a manner that safeguards the balance held in reserve by the Diocese, including additional funding up to and including the total, and that it be established in a manner that gives the adjudicator discretion as far as distribution to any claim determined by the adjudicator to be valid, in such a manner that equitably preserves the balance for the remainder of the term established.

5.      Based upon my evaluation of previous future claims resolutions in other cases, I recommend that the unknown claims fund have a termination date of six years from the date of the establishment of the fund, assuming that the fund will be established under the terms of a confirmed Plan of Reorganization.

6.      I specifically reserve the right to modify these recommendations based upon facts and circumstances brought to my attention, including any changes in the Disclosure Statement and Plan, as well as any information provided by parties in interest in these cases,

including, but not limited to the Debtor, the Official Unsecured Creditors Committee, the insurance carriers, the U.S. Trustee, or any other party in interest.

7.    I recommend that the fund be established as follows:

- That the Diocese set aside funds for the future claims up to $1,200,000 for a period through the sixth year from the date of initial funding.

- That within 30 days of the effective date of the plan, the Diocese will fund, in a segregated account maintained by the Diocese, which funds can only be disbursed on the authority of the UCR, the amount of $50,000. Another $150,000 would be added to the account one year from that date, which would be approximately November 1, 2020;

- In addition, the Diocese will be required to keep a minimum balance of $200,000 or more, up to a total commitment of $1,200,000 depending on the allowance and payment of claims. In other words, if a claim is allowed, but a portion of that claim is reserved until other potential claims are filed, any advanced distribution of that claim would require the fund to be brought to a balance of $200,000 minimum, up to the total commitment of the Diocese for unknown claims of $1,200,000; and

- Any funds in the segregated account not utilized for the allowed payment of unknown claims would revert to the Diocese after the sixth anniversary of the initial funding, provided there are no pending claims.

8.    I specifically reserve the right to modify these recommendations based upon facts and circumstances brought to my attention, including any changes in the Disclosure and

Plan, as well as any information provided by parties in interest in these cases, including, but not

limited to: the Debtor, the Official Unsecured Creditors Committee, the insurance carriers, the

U.S. Trustee, or any other party in interest.

Respectfully submitted this _14th_ day of August, 2019.


MICHAEL R. HOGAN

UNKNOWN CLAIMS REPRESENTATIVE'S REPORT
AND RECOMMENDATIONS - 18

EXHIBIT B
[RESERVED]

EXHIBIT C
[RESERVED]

EXHIBIT D
TRUST AGREEMENT AND TRUST DISTRIBUTION PROTOCOL

## THE DIOCESE OF DULUTH
## TRUST AGREEMENT

This TRUST AGREEMENT is made and entered in *In re The Diocese of Duluth* ("Diocese") (Bankr. D. Minn.), Case No. 15-50792, by and between the Diocese of Duluth, and DW Harrow & Assoc., LLC ("Trustee"). This Trust Agreement is entered into pursuant to the Joint Chapter 11 Plan of Reorganization of the Diocese of Duluth (the "Plan"). Unless otherwise specifically defined herein, capitalized terms used in this Trust Agreement shall have the meanings assigned to them in the Plan. Terms defined in the Bankruptcy Code, and not otherwise specifically defined in the Plan or herein, when used herein, have the meanings attributed to them in the Bankruptcy Code.

## RECITALS

A.      On the Petition Date, the Diocese filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Diocese continued in possession of its property and has continued to operate and manage its business as debtor in possession pursuant to Sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

B.      It is anticipated that in 2019, the Bankruptcy Court will enter an order confirming the Plan (the "Confirmation Order").

C.      The Plan anticipates the existence of the Trust and the transfer and assignment to the Trust of the Trust Assets.

D.      Pursuant to the Plan, the Trust is to use the Trust Assets to pay Class 3 Claims and Class 6A Claims (together the "Trust Claims" or "Beneficiaries"), and meet indemnity and other obligations in accordance with the provisions of the Plan.

E.      Pursuant to the Plan, no Trust Assets shall be used to pay Class 4 Claims or Class 6B Claims.

F.      The Trust is established for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d).

G.      Pursuant to the Plan and the anticipated Confirmation Order, the Trustee was duly appointed as a representative of the Estate pursuant to Sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

H.      The Trust is intended to qualify as a "grantor trust" for federal income tax purposes and the Trustee shall administer and maintain the Trust in compliance with all relevant guidelines regarding liquidating trusts issued by the Internal Revenue Service (the "IRS").

**NOW, THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the premises and the provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

D-1

# ARTICLE I
## AGREEMENT OF TRUST

**1.1.    CREATION AND NAME**.  The Debtor hereby creates a trust known as "The Diocese of Duluth Settlement Trust," which is the Trust provided for in the Plan.

**1.2.    PURPOSE**.  The purpose of the Trust is to assume responsibility for preserving, managing and distributing Trust Assets to the holders of Trust Claims in accordance with the Trust Agreement and the requirements of the Plan.

**1.3.    TRANSFER OF ASSETS**.    Pursuant to the Plan and upon entry of the Confirmation Order, the Diocese will irrevocably transfer, absolutely grant, assign, convey, set over and deliver to the Trustee, and at such times as set forth in the Plan, all of its right, title and interest in and to the Trust Assets to be held in trust and for the uses and purposes stated herein and in the Plan.  The Trustee hereby agrees to accept and hold the Trust Assets in trust for the Beneficiaries subject to the terms of this Trust Agreement and the Plan.  The Trustee is hereby authorized to file with governmental authorities any documents necessary or helpful to establish the Trust.

**1.4.    IRREVOCABILITY**.  The Trust is irrevocable.  The Reorganized Debtor shall not alter, amend, revoke or terminate the Trust.  The Reorganized Debtor shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtor. The Trustee shall nevertheless have the power to amend this Trust for the purpose of conforming this Trust to the provisions of the Confirmation Order.

**1.5.    BENEFICIARIES**.  The Beneficiaries of the Trust are:

**(a)**    Class 3 Claimants whose claims are not disallowed by the Bankruptcy Court and whose claims are payable under the Trust Distribution Protocols;

**(b)**    Class 6A Claimants whose claims are not disallowed by the Bankruptcy Court and whose claims are payable under the Trust Distribution Protocols; and

**(c)**    Settling Insurer Entities and the Diocese to the extent they are indemnified by the Trust.

**1.6.    ACCEPTANCE OF ASSETS AND ASSUMPTION OF LIABILITIES.**

**(a)**    In furtherance of the purposes of the Trust, the Trustee hereby accepts the trusteeship of the Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery of assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan and the Confirmation Order.

**(b)**    In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing and distributing Trust Assets to the Beneficiaries. The Class 3 Claims will be evaluated by the Tort Claims Reviewer in accordance with the Trust Distribution Protocols ("TDP"), attached to the Trust Agreement as Exhibit 1.  Except as otherwise provided in this Trust

CORE/3008165.0002/154242262.2

Agreement, the TDP or the Plan, the Trustee shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Beneficiary Claims that the Diocese has or would have had under applicable law.

(c) The Trustee shall have all the rights, powers and duties set forth in this Trust Agreement, the TDP and the Plan, and available under applicable law, for accomplishing the purposes of the Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Trust and in accordance with applicable law. The Trustee shall have the authority to bind the Trust within the limitations set forth herein but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

(d) In furtherance of the purposes of the Trust, the Trustee assumes responsibility for: (a) making payments to Beneficiaries; (b) receiving, collecting, liquidating, maintaining and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement and the Plan. The Trust will be administered consistent with the liquidating purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the liquidation value of the Trust Assets or as otherwise provided in the Plan.

(e) **Source of Payments**. All Trust expenses and all liabilities of the Trust with respect to Trust Claims shall be payable solely by the Trustee out of the Trust Assets.

## ARTICLE II
## CORPUS OF THE TRUST

2.1. **TRUST COMPOSITION**. The Trust Assets shall include all property transferred to the Trust pursuant to the Plan and future orders of the Bankruptcy Court, including (but not limited to) all rights of every kind, nature and description transferred to the Trust pursuant to Section 5.1 of the Plan, future orders of the Bankruptcy Court, or otherwise belonging to the Trust.

2.2. **TRANSFER TO TRUSTEE**. From and after the Effective Date of the Plan, pursuant to, and at such times set forth in the Plan, title to and all rights and interests in the Trust Assets shall be transferred to the Trustee free and clear of all Liens, claims, encumbrances or Interests of any kind in such property of any other Person (including all Liens, claims, encumbrances or Interests of creditors of or holders of claims against or Interests in the Diocese) in accordance with Sections 1123, 1141 and 1146(a) of the Bankruptcy Code, except as otherwise expressly provided for in the Plan. The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.3. **TRUSTEE'S RIGHT TO AND TITLE AND INTEREST IN TRUST ASSETS**. Upon the transfer of the Trust Assets, the Trustee succeeds to all of the Diocese's, Reorganized Entity's, and the Estate's right to and title and Interest in the Trust Assets, and the

CORE/3008165.0002/154242262.2

Diocese, Reorganized Entity, and the Estate will have no further right to or title or Interest in or with respect to the Trust Assets or this Trust, except as provided herein, in the Plan or the Confirmation Order.

2.4.    **NO TAX ON TRANSFERS TO TRUST**.    Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale or assignments executed in connection with any transfer to the Trust, or receipt, or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

2.5.    **SPENDTHRIFT PROVISION**.    To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court.

2.6.    **TRUST CORPUS**.    The entirety of the Trust's corpus shall be available to pay eligible Beneficiary Claims and authorized Trust expenses.  The Trust Corpus shall be allocated, administered, and distributed as provided in the Plan.

**ARTICLE III**
**POWERS AND DUTIES OF TRUSTEE**

3.1.    **POWERS AND DUTIES**.    The Trustee shall have, in addition to any other powers and discretions conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable Bankruptcy law and/or the Plan), the Plan and other provisions in this instrument, the following powers and discretions:

(a)    To act as custodian of, receive, control, manage, liquidate, monetize and dispose of all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order;

(b)    To abandon any property, including any chose in action, which it determines in its reasonable discretion to be of *de minimis* value or of more burden than value to the Trust;

(c)    To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(d)    To enter into contracts in the course of administering the Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan;

CORE/3008165.0002/154242262.2

**(e)**     To open and maintain bank accounts on behalf of the Trust, deposit funds therein and draw checks thereon, as appropriate under this Trust Agreement, the Plan and the Confirmation Order;

**(f)**     To obtain all reasonably necessary insurance coverage with respect to any property that is or may in the future become a Trust Asset;

**(g)**     To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs and expenses of administering the Trust as provided in this Trust Agreement and the Plan.    These fees, costs and expenses include:   (a) the fees of bankruptcy management companies; (b) the fees and costs of Professionals employed by the Trustee, such as the Tort Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries or auditors; and (c) the premiums charged by insurers, including, but not limited to, professional liability insurers;

**(h)**     In accordance with the Plan and the TDP, and the evaluation of the Tort Claims Reviewer pursuant to the TDP, to make distributions to Beneficiaries who have provided signed copies of all required releases and forms. All deadlines established by the TDP are subject to extension based on the Trustee's discretion after conducting a case-by-case analysis;

**(i)**     In its discretion, to rely on the authenticity of the signature of the Tort Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Tort Claims Reviewer in the administration of the TDP and assessment of the Class 3 Claims without any verification or confirmation;

**(j)**     In its discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Trust;

**(k)**     To retain any attorney-at-law, Tort Claims Reviewer, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence. In no event, however, shall the Trustee incur fees from any professional, except the Trustee's primary legal counsel, in excess of $50,000.00 without prior approval of the Bankruptcy Court;

**(l)**     To make, sign, execute, acknowledge and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan and/or the Trust or to maintain and administer the Trust;

**(m)**     To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including Bankruptcy Rule 2004;

**(n)**     To file a motion with the Bankruptcy Court, with notice to the parties in interest, for a modification of the provisions of this Trust Agreement if the Trustee determines that such modification is necessary to conform to legal and/or administrative requirements and to the purpose of the Trust;

CORE/3008165.0002/154242262.2

**(o)**　　Upon any event terminating the Trust, to defer distribution of property from the Trust for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and expenses, although Beneficiaries' rights to distributions shall vest immediately;

**(p)**　　To comply with Bankruptcy Code Section 345 with regard to the investment of Trust Assets.  The Trustee is relieved of any obligation to diversify;

**(q)**　　To establish such accounts, funds and reserves, as required by the Plan, for ease of administration.  Nothing in this provision shall restrict the Trustee's authority to pool such accounts, funds or reserves for investment purposes or require separate bank accounts for such accounts, funds or reserves;

**(r)**　　To be responsible for only that property delivered to it and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities;

**(s)**　　To comply with the special distribution conditions outlined in Section 6.6 of the Plan.

**3.2.    LIMITATIONS ON THE TRUSTEE.**  Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

**(a)**　　To guaranty any debt;

**(b)**　　To loan Trust Assets;

**(c)**　　To make any transfer or distribution of Trust Assets other than those authorized by this Trust Agreement, the Plan or the Confirmation Order;

**(d)**　　To engage in any trade or business;

**(e)**　　To engage in any investments or activities inconsistent with the treatment of the Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

### ARTICLE IV
### TERMINATION OF THE TRUST

**4.1.    WHEN TERMINATION SHALL OCCUR**.  The Trustee shall terminate the Trust after its liquidation and the administration and distribution of the Trust Assets in accordance with this Trust Agreement and the Plan and the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan.  The Trust shall terminate no later than the eighth (8th) anniversary of the Effective Date.

**4.2.    TERMINATION PROCEDURES**.  After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed.  The Trustee shall retain the books, records,

documents and files that shall have been delivered to or created by the Trustee until distribution of all the Trust Assets. For purposes of this provision Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $50,000. At the Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Trust Assets; and (b) the date until which the Trustee is required by applicable law to retain such books, records, documents and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents or files relating to the Trust without giving the Reorganized Debtor and the Beneficiaries reasonable prior written notice thereof.

4.3. **TERMINATION DISTRIBUTION**. Upon termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee will deliver all funds and other investments remaining in the Trust, if any, including any investment earnings thereon, to a charity supporting survivors of childhood sexual abuse as set forth in the Confirmation Order.

4.4. **DISCHARGE, EXCULPATION AND EXONERATION**. Upon termination of the Trust and accomplishing of all activities described in this Article, the Trustee and its professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Trustee or his designated agents or representatives). The Trustee may, at the expense of the Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

**ARTICLE V**
**IMMUNITY, LIABILITY AND INDEMNIFICATION OF TRUSTEE**

5.1. **LIMITATIONS ON LIABILITY**. Neither the Trustee nor any of its duly designated agents or representatives or Professionals shall be liable for any act or omission taken or omitted to be taken by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or its designated agents or representatives. The Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys-at-law, accountants, financial advisors and agents and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee shall be under no obligation to consult with its attorneys-at-law, accountants, financial advisors or agents, and its good faith determination not to do so shall not result in the imposition of liability on the Trustee, unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

5.2. **NO RECOURSE AGAINST TRUSTEE PERSONALLY**. No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney-at-law, accountant or other Professional retained in accordance with the terms of this Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or trust agreement whatsoever executed by the Trustee in implementation of

D-7

this Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any such promise, contract, instrument, undertaking, obligation, covenant or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust will not be covered by a bond.

5.3.    **INDEMNIFICATION**.  The Trustee, using Trust Assets, shall defend, indemnify and hold harmless the Trustee, its officers, directors, agents, representatives and employees to the fullest extent that a corporation or trust organized under the laws of Minnesota is entitled to defend, indemnify and hold harmless its trustees, officers, directors, agents, representatives and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder; provided that neither the Trustee nor its officers, directors, agents, representatives or employees shall be defended, indemnified or held harmless in any way for any liability, expense, claim, damage or loss for which they are ultimately liable under Section 5.1.

5.4.    **OTHER DUTIES, OBLIGATIONS, INDEMNIFICATION.** The Trust will also assume all duties, obligations and indemnification responsibilities outlined in the Plan and Insurance Settlement Agreements.

## ARTICLE VI
## COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE AND ITS AGENTS

6.1.    **TRUSTEE COMPENSATION**.   The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in Exhibit 2.

6.2.    **COMPENSATION OF TRUSTEE'S AGENTS**.   Any Person retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered.

6.3.    **REIMBURSEMENT OF EXPENSES**.   Any and all reasonable and necessary costs and expenses incurred by the Trustee and any Person retained by the Trustee, in performing its respective duties under this Trust Agreement, will be reimbursed by the Trustee from the Trust Assets.

## ARTICLE VII
## SUCCESSOR TRUSTEES

7.1.    **VACANCY CAUSED BY TRUSTEE RESIGNATION OR REMOVAL**.

(a)    The Trustee may resign at any time upon thirty (30) days' written notice to be filed with the Bankruptcy Court.  The Trustee shall, within thirty (30)

D-8

days after such resignation takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Trustee while serving as such.

**(b)**     Any Tort Claimant may petition the Bankruptcy Court to remove the Trustee.

**(c)**     The Bankruptcy Court may remove a Trustee for cause, which cause shall include, but shall not be limited to, the factors listed in Minnesota Statute § 501C.076(b). The removal will take effect upon the date the Bankruptcy Court specifies. In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such.

**7.2.     OUTGOING TRUSTEE OBLIGATIONS.**  In the event of the resignation or removal of the Trustee, the outgoing Trustee shall:

**(a)**     Execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

**(b)**     Deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee; and

**(c)**     Otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee.

**(d)**     The resigning, removed or departed Trustee hereby irrevocably appoints the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

**7.3.     APPOINTMENT OF SUCCESSOR TRUSTEE.**  Any vacancy in the office of Trustee shall be filled by the nomination of a majority of the members of the UCC (notwithstanding dissolution of the UCC on the Effective Date), subject to the approval of the Bankruptcy Court, after notice and a hearing. If at least three (3) members of the UCC do not

D-9

participate in the nomination of a successor Trustee within thirty (30) days after the Trustee resigns or becomes unable to serve, the counsel for the majority of Tort Claimants shall designate a successor after notice to Beneficiaries and a hearing.

**7.4.    PRESERVATION OF RECORD OF CHANGES IN TRUSTEES**.  A copy of each instrument of resignation, removal, appointment and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

## ARTICLE VIII
## TRUSTEE REPORTING AND DISCHARGE

**8.1.    ANNUAL ACCOUNTINGS**.  The Trustee shall prepare, at least annually, and upon termination of the Trust, a written accounting of the administration of the Trust listing current assets (with fair market values) and detailing all transactions that occurred during the period covered by such accounting.  Each such accounting shall be filed with the Bankruptcy Court.  Copies of such accounting shall be available to Beneficiaries upon request.

**8.2.    APPROVAL OF ACCOUNTINGS AND DISCHARGE OF THE TRUSTEE**. The Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1.  Upon the entry of an order of the Bankruptcy Court approving any such accounting, the Trustee shall be discharged from all liability, with respect to all assets listed and transactions detailed in such accounting, to the Trust, any Beneficiary or any Person who or which has had or may then or thereafter have a claim against the Trust for acts or omissions in the Trustee's capacity as the Trustee or in any other capacity contemplated by this Trust Agreement or the Plan.

## ARTICLE IX
## SECTION 468B SETTLEMENT FUND

**9.1.    GENERALLY**.

(a)    In accordance with the Plan, the Trustee will take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of § 468B of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and the regulations promulgated pursuant thereto.  The Diocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1).  The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

(b)    It is further intended that the transfers to the Trust will satisfy the "all events test" and the "economic performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461- 1 (a)(2).

**9.2.    EMPLOYER IDENTIFICATION NUMBER**. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

D-10

**9.3.** **RELATION-BACK ELECTION**. If applicable, the Trustee and the Diocese shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

**9.4.** **FILING REQUIREMENTS**. The Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The Diocese or Reorganized Debtor shall file an election statement(s) satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Trust is treated as a grantor trust under Section 671 of the Tax Code and the regulations promulgated thereunder. The election statement shall be included with the Trust's first timely filed trust income tax return. The Diocese or Reorganized Debtor shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15th of the year following each calendar year in which the Diocese or Reorganized Debtor makes a transfer to the Trust.

**9.5.** **BROAD POWERS OF THE TRUSTEE**. The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the regulations promulgated pursuant thereto. Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

**ARTICLE X**
**BENEFICIARIES**

**10.1.** **NAMES AND ADDRESSES**. The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Plan. The Trustee may rely upon this Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Beneficiary to the Trustee. The Trustee may deliver distributions and notices to counsel for any Beneficiary identified in such Beneficiary's proof of claim or proper notice of a name or address change.

**10.2.** **RIGHTS OF BENEFICIARIES**. The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of such Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets. Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to such Persons under this Trust Agreement and the Plan.

**10.3.** **TAX IDENTIFICATION NUMBERS**. The Trustee may require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number

D-11

or social security number as assigned by the IRS, and such other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status).  The Trustee may condition the payment of any distribution to any Beneficiary upon receipt of such number and records or documents.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**11.1.    PLAN INCORPORATION**.  The Plan and the Confirmation Order, including the Plan's Miscellaneous Provisions, are incorporated into this Trust Agreement.

**11.2.    NOTICES**. All notices or deliveries required or permitted hereunder shall be given as directed in the Plan, to the following:

> If to the Trust or Trustee:
>
> DW Harrow & Assoc., LLC
> 1880 State Highway 309
> Kerens, Texas 75144
>
>
> If to a Beneficiary:
>
> Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented claimant, to the address for the claimant provided in the Proof of Claim.

**11.3.    WAIVER**. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

**11.4.    REIMBURSEMENT OF COSTS**. If the Trustee or the Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement thereof, the Trustee or the Trust, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

**11.5.    ENTIRETY OF TRUST AGREEMENT**. This Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter hereof.  This Trust Agreement, together with the Exhibits hereto, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed therein.

**11.6.    COUNTERPARTS**. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on such counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**11.7.    CAPTIONS**. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

**11.8.    INDEPENDENT LEGAL AND TAX COUNSEL**. All parties to this Trust Agreement have been represented by counsel and advisors (collectively referred to as "Counsel") of their own selection in this matter. Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against any party. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America.

**11.9.    APPLICABLE LAW.** This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Minnesota applicable to contracts and trust agreements made and to be performed therein, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and Treasury Regulations thereunder shall be governed by federal tax law, and all matters of federal bankruptcy law shall be governed by federal bankruptcy law.

**11.10.    TERMINATION.** This Trust Agreement shall terminate and be deemed void *ab anitio* if a Confirmation Order is not entered consistent with the Plan.

IN WITNESS WHEREOF, the Diocese and the Trustee execute this Trust Agreement as of the date set forth in the opening paragraph.

**Trustee:**

_____

By: _____

Printed Name: _____

Title: _____

**The Diocese of Duluth**

_____

By: _____

Printed Name: _____

Title: _____

D-13

**EXHIBIT 1**

**THE DIOCESE OF DULUTH
TRUST DISTRIBUTION PROTOCOLS**

## 1.  Definitions

     1.1    <u>Capitalized Terms</u>. Capitalized terms used in this Trust Distribution Protocols shall have the meanings given them in the Plan, the Trust Agreement or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Trust Distribution Protocols by reference.

## 2.  Purpose, Interpretation

     2.1    <u>Purpose</u>. This Trust Distribution Protocols is designed to provide guidance to the Tort Claims Reviewer in determining the amount of each Tort Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

     2.2    <u>General Principles</u>. As a general principle, this Trust Distribution Protocols intends to set out a procedure that provides substantially the same treatment to holders of similar Class 3 Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Tort Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 3 Claim are intended to reflect the relative values of Class 3 Claims. Likewise this Trust Distribution Protocols intends to set out a procedure that provides substantially the same treatment to holders of similar Class 4 Claims.  As to Class 4 Claims, the Tort Claims Reviewer will determine values based on the maximum amount in the Unknown Tort Claim Reserve Fund which is reserved for Unknown Tort Claims, taking into consideration all possible additional claims that could be made up to the sixth anniversary of the effective date.  The range of values set forth in the Evaluation Factors below and the discretion given to the Tort Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 4 Claim are intended to reflect the relative values of Class 4 Claims.

     2.3    <u>Sole and Exclusive Method</u>. The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 3 Claim may seek allowance and distribution of such Claim. Although the Evaluation Factors collectively comprise the methodology that must be applied in reviewing Claims, the Tort Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim. The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 4 Claim may seek allowance and distribution of such Claim. Although the Evaluation Factors collectively comprise the methodology that must be applied in reviewing Claims, the Tort Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim.

2.4     Interpretation. The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Trust Distribution Protocols.

2.5     Confidentiality and Privilege. All information that the Tort Claims Reviewer receives from any source about any Tort Claimant shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Tort Claimant (or such Claimant's counsel of record). All information the Tort Claims Reviewer receives from any Tort Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Tort Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

## 3.  Tort Claims Reviewer

3.1     Designation. Roger L. Kramer is the Tort Claims Reviewer, subject to an order of the Bankruptcy Court.  The Tort Claims Reviewer shall conduct a review of each of the Tort Claims, according to the Evaluation Factors and other provisions contained in §§ 5 and 6 below, make determinations upon which individual monetary distributions will be made subject to the Plan and Confirmation Order.

## 4.  Procedure

4.1     Allowance of a Tort Claim. A Tort Claim shall be allowed if the Tort Claims Reviewer determines the Tort Claimant proved his or her claim by a preponderance of the evidence. If necessary, the Tort Claims Reviewer can ask for additional information to make this determination. The Tort Claimant may refuse such a request at his or her own risk. If a Tort Claim is allowed, the Tort Claims Reviewer shall determine the amount of such Tort Claim by assigning such Tort Claim a value pursuant to the Evaluation Factors. The Tort Claims Reviewer may consider the credibility of the Tort Claimant and the facts alleged in support of the Claim and, in the Tort Claims Reviewer's sole discretion, reduce or deny the Tort Claim.

4.2     Supplemental Information. The Tort Claims Reviewer shall consider all of the facts and evidence presented by the Tort Claimant in the Class 3 claimant's filed proof of claim. Within fourteen (14) calendar days after confirmation of the Plan, Tort Claimants may submit supplemental information to the Tort Claims Reviewer in support of their Tort Claims.  The Tort Claims Reviewer shall have the ability to request additional information from any Tort Claimant.

4.3     Determinations by the Tort Claims Reviewer. The Tort Claims Reviewer or Trustee shall notify each Tort Claimant in writing of the estimated monetary distribution based on the points awarded under § 5 below with respect to the Tort Claimant's claim, which may be greater or smaller than the actual monetary distribution to be received based on the outcome of any reconsideration claims. The Tort Claims Reviewer's determination shall be final unless the Tort Claimant makes a timely request for the point award to be reconsidered by the Tort Claims

Reviewer in accordance with § 4.4 below. The Tort Claimant shall not have a right to any other appeal of the Tort Claims Reviewer's point award. The Tort Claims Reviewer shall make final determinations as expeditiously as possible, while ensuring a full and fair review process for all Tort Claims.

4.4     Requests for Reconsideration. The Tort Claimant may request reconsideration by delivering a written request for reconsideration to the Tort Claims Reviewer within fourteen (14) calendar days after the date of mailing of the notice of the preliminary monetary distribution provided by the Tort Claims Reviewer under § 4.3 above. Each written request must be accompanied by a check for the reconsideration fee of five hundred dollars ($500). The Tort Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Tort Claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Tort Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Tort Claims Reviewer shall have the power to change the award if cause exists. The Tort Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

4.5     Deceased Abuse Survivor.  The Tort Claims Reviewer shall review the claim of a deceased Tort Claimant without regard to the Tort Claimant's death, except that the Tort Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

4.6     Payment. After all Class 3 Claims have been evaluated pursuant to the Evaluation Factors, the Trustee shall determine the dollar value for each Tort Claim based on the Class 3 claimant's pro rata share of the total points assigned to all Class 3 claimants and the available funds for distribution after accounting for necessary holdbacks including, but not limited to, Trust operating expenses. The Trustee shall then make payment to Class 3 Claimant in accordance with the Trustee's powers and duties under Section 3.1(h) of the Trust Agreement. After all Class 4 Claims have been evaluated pursuant to the Evaluation Factors, the Reorganized Debtor shall determine the dollar value for each Tort Claim based on the Class 4 claimant's pro rata share of the total points assigned to all Class 4 claimants and the available funds in the Unknown Tort Claim Reserve Fund as determined by the Unknown Claims Representative. Claims that meet the definition of an Unknown Tort Claim pursuant to paragraph 86 (v.) of the Plan and are not otherwise excused by paragraphs 86 (i.) through (iv.), inclusive, will receive the de minimis payment of $2,500.00 as sole compensation for their claim. The Reorganized Debtor shall then make payment to Class 4 Claimants in accordance with Sections 4.4 and 6.2 of the Plan.

4.7     Undeliverable Distributions. If, after the passage of 365 days of the Effective Date, the Trustee does not have signed copies of all required releases and forms, including the Claimant's refusal to sign or returned mail due to lack of current address, the funds allocated to

the Claimant shall go back to the general corpus of the Trust and shall be available for pro rata distribution to the other Claimants.

## 5.  **Guidelines for Allocation for Abuse Survivor Claims**

5.1     <u>Evaluation Factors.</u> Each Tort Claim will be evaluated by the Tort Claims Reviewer. Each Tort Claim will be assigned points according to the following system, and the points shall determine the amount of distribution to each Tort Claimant on a pro-rata basis ("Evaluation Factors"):

   a.     **Nature of Abuse & Circumstances**. A point value ranging from 0 to 50 should be allocated for this section. Considerations should include, but are not limited to, the following factors:

   (1)     The duration and/or frequency of the abuse.

   (2)     Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk.

   (3)     Circumstances of abuse:

        a.     grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

        b.     coercion or threat or use of force or violence, stalking;

        c.     relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator; and

        d.     location of abuse, including but not limited to isolated location, Tort Claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

   b.     **Impact of the Abuse**. Overall, this category looks to how the abuse impacted the Tort Claimant. This includes how the abuse impacted the

CORE/3008165.0002/154242262.2

Tort Claimant's mental health, physical health, spiritual well-being, inter-
personal relationships, vocational capacity or success, academic capacity
or success, and whether the abuse at issue resulted in legal difficulties for
the Tort Claimant. Some of these considerations may include the below
factors, but the below list is not intended to be exhaustive. A point value
ranging from 0 to 50 should be allocated for this section.

The Tort Claims Reviewer should consider, along with any and all other
relevant factors, whether the abuse at issue manifested, or otherwise led
the claimant to experience, or engage in behaviors resulting from:

a. Mental Health Issues: This includes but is not limited to
anxiety, depression, post-traumatic stress disorder,
substance abuse, addiction, embarrassment, fear,
flashbacks, nightmares, sleep issues, sleep disturbances,
exaggerated startle response, boundary issues, self-
destructive behaviors, guilt, grief, homophobia, hostility,
humiliation, anger, isolation, hollowness, regret, shame,
isolation, sexual addiction, sexual problems, sexual identity
confusion, low self-esteem or self-image, bitterness,
suicidal ideation and suicide attempts.

b. Physical Health Issues: This includes but is not limited to
physical manifestations of emotional distress,
gastrointestinal issues, headaches, high blood pressure,
physical manifestations of anxiety, erectile dysfunction,
heart palpitations, sexually-transmitted diseases, physical
damage caused by acts of abuse, reproductive damage, self-
cutting and other self-injurious behavior.

c. Spiritual Well-being: This includes but is not limited to loss
of faith in God, loss of faith and trust in religion and
spiritual distress.

d. Interpersonal Relationships: This includes but is not limited
to problems with authority figures, hypervigilance, sexual
problems, marital difficulties, problems with intimacy, lack
of trust, isolation, betrayal, impaired relations, secrecy,
social discreditation and isolation; damage to family
relationships, and fear of children or parenting.

e. Vocational Capacity: This includes but is not limited to
under- and un-employment, difficulty with authority
figures, difficulty changing and maintaining employment,
feeling of unworthiness or guilt related to financial success.

D-18

    f.   Academic Capacity: This includes but is not limited to school behavior problems.

    g.   Legal difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.

**c.**    **Claimant Involvement**. The Tort Claims Reviewer shall consider that all Claimants have benefited from the work and cost incurred by those Claimants who have previously asserted claims against the Diocese and have participated in the legal and factual development of claims against the Diocese. A point value ranging from 0 to 15 should be allocated for this section. The Tort Claim Review should consider factors including but not limited to whether the Claimant has filed a lawsuit; whether the Claimant and/or the Claimant's family has been subject to a deposition, mediation or interview; whether the Claimant has participated on the committee representing survivors; and whether the Claimant participated in publicizing the issue of clergy sex abuse which has benefitted all claimants.

In addition to the points available in Section 5.1, the Tort Claims Reviewer may, in his discretion, further increase an award to an individual Tort Claimant based on the Tort Claimant's unique and substantial contribution to the development of legal and factual claims against the Diocese. Specifically, the Tort Claims Reviewer may award increased compensation to a Tort Claimant who has succeeded in obtaining a favorable verdict against the Diocese at trial. While the Tort Claims Reviewer has broad discretion to increase an award under this provision, in no instance may a Tort Claimant receive more than four (4) times the average monetary payment awarded to Class 3 Claimants.

**d.**    **Pending Lawsuit.** If the Tort Claimant has a pending state court lawsuit related to the abuse against a Catholic Entity, the Tort Claims Reviewer shall award the Tort Claimant an additional 30 points.

**6.   Tort Claim Provisions.**  The following provisions shall apply to all Tort Claims:

    6.1    <u>Reduction for Payments from Order.</u> If the Tort Claimant's abuser(s) belonged to a religious order, the Tort Claimant's final monetary distribution shall be reduced by thirty-three percent (33%). If the reduction result is not a whole number, the Tort Claims Reviewer should round up to the nearest whole number.

    6.2    <u>Reduction for Payments from Archdiocese Bankruptcy Case.</u> If the Tort Claimant already received a monetary distribution in relation to a claim based on clergy sexual abuse in the chapter 11 bankruptcy case filed by the Archdiocese of St. Paul and Minneapolis, the Tort

D-19

Claimant's final monetary distribution shall be reduced by sixty-six percent (66%). If the reduction result is not a whole number, the Tort Claims Reviewer should round up to the nearest whole number.

      6.3    <u>Further Reduction.</u> If a Tort Claimant is also a clergy abuser in another allowed Tort Claim, then his points will be reduced by the number of points allocated to his victim(s).

CORE/3008165.0002/154242262.2

**EXHIBIT 2**

**THE DIOCESE OF DULUTH**
**TRUSTEE COMPENSATION**


DW Harrow & Assoc., LLC will charge an average hourly rate of $385.00.

EXHIBIT E
TORT CLAIM RELEASE

## RELEASE

**TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST EXECUTE AND DELIVER THIS RELEASE.**

1. All capitalized terms in this Release are defined in the Joint Plan and have the meanings stated in the Joint Plan.

2. In consideration of the Trust's promise to make me a distribution, the amount payable to me under the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

   a. Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurer Entities with respect to the Settling Insurer Entity Policies from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Related Insurance Claims; iii) the Settling Insurer Entity Policies; and iv) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Reorganization Case.

   b. Hereby covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurer Entities in connection with any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the Tort Claims, Related Insurance Claims, the Settling Insurer Entity Policies, or the Reorganization Case; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with any Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the Tort Claims or other claims of abuse or neglect in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party shall satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement relating to the Abuse at issue in the Tort Claims; and (vi) this Release extinguishes any potential liability of any Protected Party or Settling Insurer Entity for contribution or indemnity to any Person who has been or may be held liable to me for any Tort Claim.

CORE/3008165.0002/152869229.2

3.  I have been provided with copies of the Disclosure Statement, the Joint Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release.

4.  I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as provided in this Release and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s).

5.  I intend the foregoing undertakings comply with the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).

6.  I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Diocese, the Reorganized Debtor, the Trust, any Settling Insurer Entity or any Protected Party.

7.  I consent to, and agree to be bound by, the injunctions set forth in the Joint Plan, including those injunctions contained in Articles VII and XIII for the benefit of the Settling Insurer Entities and Protected Parties.  I also approve of the Insurance Settlement Agreements referenced in and incorporated into the Joint Plan.

8.  I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

9.  I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

10. I hereby authorize the CMS, its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my Tort Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeks or obtains access to records about another person under false pretenses is punishable by a fine of up to $5,000.

11. This Release shall be binding upon my successors, heirs, assigns, agents, and representatives.

**TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF TORT CLAIMANT'S ESTATE:**

Name of Tort Claimant: _____

By: _____

Signature: _____

Dated: _____

Claim Number(s): _____

Social Security Number: _____

Date of Birth: _____

3

EXHIBIT F
UNKNOWN TORT CLAIM RELEASE

## RELEASE

**TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST EXECUTE AND DELIVER THIS RELEASE.**

1. All capitalized terms in this Release are defined in the Joint Plan and have the meanings stated in the Joint Plan.

2. In consideration of the Reorganized Debtor's promise to make me a distribution, the amount payable to me under the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

   a. Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurer Entities with respect to the Settling Insurer Entity Policies from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Related Insurance Claims; iii) the Settling Insurer Entity Policies; and iv) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Reorganization Case.

   b. Hereby covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurer Entities in connection with any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the Tort Claims, Related Insurance Claims, the Settling Insurer Entity Policies, or the Reorganization Case; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with any Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the Tort Claims or other claims of abuse or neglect in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party shall satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement relating to the Abuse at issue in the Tort Claims; and (vi) this Release extinguishes any potential liability of any Protected Party or Settling Insurer Entity for contribution or indemnity to any Person who has been or may be held liable to me for any Tort Claim.

3. I have been provided with copies of the Disclosure Statement, the Joint Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release.

4.  I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as provided in this Release and do not intend that payment by the Reorganized Debtor constitutes full compensation for the damage alleged in my Tort Claim(s).

5.  I intend the foregoing undertakings comply with the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).

6.  I understand and agree that any payment by the Reorganized Debtor to me does not constitute an admission of liability of any kind or nature by the Diocese, the Reorganized Debtor, the Trust, any Settling Insurer Entity, or any Protected Party.

7.  I consent to, and agree to be bound by, the injunctions set forth in the Joint Plan, including those injunctions contained in Articles VII and XIII for the benefit of the Settling Insurer Entities and Protected Parties.  I also approve of the Insurance Settlement Agreements referenced in and incorporated into the Joint Plan.

8.  I understand that payment from the Reorganized Debtor constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

9.  I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

10. I hereby authorize the CMS, its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Reorganized Debtor and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Reorganized Debtor and all other professionals retained by the Reorganized Debtor, and further authorize the Reorganized Debtor and other Reorganized Debtor professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my Tort Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeks or obtains access to records about another person under false pretenses is punishable by a fine of up to $5,000.

11. This Release shall be binding upon my successors, heirs, assigns, agents, and representatives.

**TO BE COMPLETED BY UNKNOWN TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF UNKNOWN TORT CLAIMANT'S ESTATE:**

Name of Unknown Tort Claimant: _____

By: _____

Signature: _____

Dated: _____

Claim Number(s): _____

Social Security Number: _____

Date of Birth: _____

EXHIBIT G
[RESERVED]

# EXHIBIT H
## LIST OF CURRENT PARISHES

**List of Parish Corporations – Diocese of Duluth**

| | |
|---|---|
| St. James' Church, Aitkin | Our Lady of Fatima Church, Garrison |
| Holy Family Church, Hillman | Our Lady of Hope Church, Aurora |
| Our Lady of the Snows Church, Big Fork | St. Michael's Church, Northome |
| St. Catherine's Church, Squaw Lake | St. Francis' Church, Brainerd |
| All Saints Church, Baxter | St. Thomas' Church, Pine Beach |
| St. Andrew's Church, Brainerd | St. Mathias' Church, Fort Ripley |
| St. Francis' Church, Carlton | St. Mary & Joseph's Church, Sawyer |
| Queen of Peace Church, Cloquet | Holy Family Church, Cloquet |
| St. Joseph's Church, Chisholm | Our Lady of Sacred Heart Church, Buhl |
| St. Mary's Church, Cook | Holy Cross Church, Orr |
| St. Martin's Church, Tower | St. Joseph's Church, Crosby |
| St. Joseph's Church, Deerwood | Immaculate Heart Church, Crosslake |
| St. Emily's Church, Emily | St. Mary's Church, Deer River |
| St. Joseph's Church, Ball Club | St. Charles' Church, Cass Lake |
| Holy Rosary Cathedral, Duluth | St. Mary Star of the Sea Church, Duluth |
| Our Lady of Mercy Church, Duluth | St. Benedict's Church, Duluth |
| St. James' Church, Duluth | St. John's Church, Duluth |
| St. Joseph's Church, Gnesen | St. Lawrence's Church, Duluth |
| Holy Family Church, Duluth | St. Joseph's Church, Duluth |
| St. Michael's Church, Duluth | St. Agnes' Church, Walker |
| Sacred Heart Church, Hackensack | St. Raphael's Church, Duluth |
| St. Rose's Church, Proctor | St. Anthony's Church, Ely |
| St. Pius' Church, Babbitt | Resurrection Church, Eveleth |
| St. Joseph's Church, Gilbert | St. Louis' Church, Floodwood |

**List of Parish Corporations – Diocese of Duluth**

| | |
|---|---|
| Immaculate Conception Church, Cromwell | St. Mary's Church, Meadowlands |
| St. John's Church, Grand Marais | Holy Rosary Church, Grand Portage |
| St. Joseph's Church, Grand Rapids | St. Augustine's Church, Cohasset |
| Blessed Sacrament Church, Hibbing | St. Patrick's Church, Hinckley |
| St. Luke's Church, Sandstone | St. Thomas' Church, International Falls |
| St. Columban's Church, Little Fork | St. Edward's Church, Longville |
| St. Paul's Church, Remer | Holy Family Church, McGregor |
| Our Lady of the Fatima Church, McGrath | Holy Angels' Church, Moose Lake |
| St. Mary's Church, Willow River | St. Isidore's Church, Sturgeon Lake |
| St. Cecilia's Church, Nashwauk | Mary Immaculate Church, Coleraine |
| Our Lady of the Lakes Church, Pequot Lakes | Immaculate Conception Church, Pine City |
| St. Joseph's Church, Beroun | Holy Spirit Church, Two Harbors |
| St. Mary's Church, Silver Bay | Holy Spirit Church, Virginia |
| Newman Catholic Campus Ministries at U.M.D., Duluth | |

EXHIBIT I
KNOWN DIOCESE ENTITY INSURANCE POLICIES

CATHOLIC MUTUAL RELIEF SOCIETY INSURANCE POLICIES

| Diocese Certificates Issued to the Diocese of Duluth Potentially Affording Coverage in Connection with Tort Claims | |
| --- | --- |
| SMP | Coverage Year(s) |
| 7071 | 1982-1985 |
| 7436 | 1985-1986 |
| 7603 | 1986-1987 |
| 7786 | 1987-1988 |
| 7786 | 1988-1989 |
| 8061 | 1989-1990 |
| 8061 | 1990-1991 |
| 8061 | 1991-1992 |
| 8450 | 1992-1993 |
| 8450 | 1993-1994 |
| 8450 | 1994-1995 |
| 8450 | 1995-1996 |
| 8450 | 1996-1997 |
| 8450 | 1997-1998 |
| 8450 | 1998-1999 |
| 8450 | 1999-2000 |
| 8450 | 2000-2001 |
| 8450 | 2001-2002 |
| 8450 | 2002-2003 |
| 8450 | 2003-2004 |
| 8450 | 2004-2005 |
| 8450 | 2005-2006 |
| 8450 | 2006-2007 |
| 8450 | 2007-2008 |
| 8450 | 2008-2009 |
| 8450 | 2009-2010 |
| 8450 | 2010-2011 |
| 8450 | 2011-2012 |
| 8450 | 2012-2013 |
| 8450 | 2013-2014 |
| 8450 | 2014-2015 |
| 8450 | 2015-2016 |
| 8450 | 2016-2017 |

| Parishes for Which a Parish Certificate or Secondary Evidence Potentially Affords Coverage in Connection with Tort Claims | |
|---|---|
| **Parish** | **Coverage Year(s)** |
| St. Rose Parish, Proctor, MN | 1980-1983 (cancelled 4/1/1982) |
| St. Margaret's Parish, Duluth, MN | 1979-1985 (cancelled 4/1/1982) |
| St. Luke's Parish and Mission, Sandstone, MN | 1976-1982 (cancelled 4/1/1982) |
| St. Joseph's Parish, Deerwood, MN | 1976-1982 (cancelled 4/1/1982) |
| St. Joseph's Parish, Ball Club, MN | 1976-1984 (cancelled 4/1/1982) |
| St. Elizabeth's Parish, Duluth, MN | 1978-1984 (cancelled 4/1/1982) |
| St. Anthony's Parish, Duluth, MN | 1978-1984 (cancelled 4/1/1982) |
| Our Lady of the Snows Parish, Big Fork, MN | 1978-1984 (cancelled 4/1/1982) |
| Mary Immaculate Parish, Coleraine, MN | 1978-1982 (cancelled 4/1/1982) |
| Holy Rosary Parish, Aurora, MN | 1978-1981 |
| Holy Family Parish, Holy Family, MN | 1966-1969, 1978-1983 (cancelled 4/1/1982) |
| Holy Cross Church, Duluth, MN | 1980-1983 (cancelled 4/1/1982) |
| Good Shepherd Parish, Duluth, MN | 1976-1985 (cancelled 4/1/1982) |
| St. Paul's Church, Warba, MN | 1976-1982 (cancelled 4/1/1982) |
| St. Michael's Church, Northhome, MN | 1966-1969; 1978-1984 (cancelled 4/1/1982) |
| St. Mary's Parish, Deer River, MN | 1966-1969; 1978-1984 (cancelled 4/1/1982) |
| St. Mary's Church, Willow River, MN | 1966-1969; 1978-1984 (cancelled 4/1/1982) |
| St. Mary's Parish, Cook, MN | 1966-1969; 1980-1983 (cancelled 4/1/1982) |
| St. Joseph's Parish, Beroun, MN | 1980-1983 (cancelled 4/1/1982) |
| St. Joseph's Parish, Crosby, MN | 1976-1985 (cancelled 4/1/1982) |
| St. John's Parish, Hill City, MN | 1980-1983 (cancelled 4/1/1982) |
| St. Isidore's Church, Sturgeon Lake, MN | 1979-1985 (cancelled 4/1/1982) |
| St. Catherine's Parish, Squaw Lake, MN | 1966-1969; 1978-1983 (canceled 4/1/1982) |
| Immaculate Heart Parish, Crosslake, MN | 1978-1984 (cancelled 4/1/1982) |
| Holy Spirit Parish, Virginia, MN | 1976-1982 (cancelled 4/1/1982) |
| Holy Rosary Parish, Grand Portage, MN | 1976-1982 (cancelled 4/1/1982) |
| Holy Family Parish, McGregor, MN | 1979-1982 (cancelled 4/1/1982) |
| Holy Family Parish, Cloquet, MN | 1976-1982 (cancelled 4/1/1982) |
| Holy Cross Church, Orr, MN | 1966-1969; 1980-1983 (cancelled 4/1/1982) |
| St. Bridget Church, Greaney, MN | 1966-1969 |
| St. Joseph's Parish, Deerwood, MN* | early 1970's |
| St. Jean's, Duluth, MN* | 1970's |
| Immaculate Conception, Nett Lake, MN* | 1960's |
| Our Lady of Fatima, Orr, MN* | 1960's |
| St. Catherine's Parish, Squaw Lake, MN* | early 1960's; early 1970's |
| St. Augustine's Church, Cohasset, MN* | 1960's and 1970's |
| St. Joseph's, Ball Club* | early 1970's |

Holy Cross Church, Orr, MN                    early 1960's

*No portion of any certificate has been found for this parish for this period and any potential for coverage is based on secondary evidence

## CHURCH MUTUAL INSURANCE POLICIES

| Parish | Policy Start Date |
|---|---|
| | |
| St. Paul's Church – Remer | November 28, 1976 |
| St. Paul's Church – Remer | November 28, 1979 |
| St. Kevin's Church – Pengilly | January 31, 1977 |
| Our Lady of Fatima – Garrison | May 23, 1971 |
| Our Lady of Fatima – Garrison | August 2, 1977 |
| Our Lady of Fatima – Garrison | August 2, 1977 |
| Immaculate Conception Church – Eveleth | December 8, 1976 |
| Resurrection Church – Eveleth | September 27, 1979 |
| St. Joseph's Church – Chisholm | May 14, 1978 |
| St. Joseph's Church – Chisholm | May 14, 1981 |
| St. Francis - Carlton | November 15, 1975 |
| St. Francis - Carlton | November 15, 1975 |
| St. Francis - Carlton | November 15, 1978 |
| St. Francis Church – Brainerd | September 17, 1977 |
| St. Francis Church – Brainerd | September 17, 1980 |
| St. Andrew's Church – Brainerd | November 15, 1976 |
| St. Andrew's Church – Brainerd | November 15, 1979 |
| Sacred Heart Church – Mountain Iron | December 10, 1976 |
| Sacred Heart Church – Mountain Iron | December 10, 1979 |
| Immaculate Conception – Hibbing | December 20, 1977 |
| Blessed Sacrament Church – Hibbing | July 1, 1976 |
| St. Leo's Church – Hibbing | January 1, 1976 |

## FIREMAN'S FUND INSURANCE POLICIES
$50,000 Per Person / $100,000 Per Occurrence

|  | Coverage Year(s) |
|---|---|
|  |  |
| Policy No. CL3-31-858 | March 1958 – March 1961 |
| Policy No. CL3-135-500 | March 1961 – March 1964 |
|  |  |
|  |  |
|  |  |

# LIBERTY MUTUAL INSURANCE POLICIES

Policies Issued to the Diocese Parties or Parish Parties Potentially Affording Coverage in Connection with the Tort Claims.

| Parish | Coverage Year(s) |
|---|---|
| **Agricultural Insurance Company:** | |
| Diocese of Duluth (CLA 770553) | 1964 - 1967 |
| Diocese of Duluth (3GA 26 24 22) | 1967 – 1970 |
| Diocese of Duluth (3GA 29 96 59) | 1970 – 1973 |
| | |
| **American Empire Insurance Company** | |
| Diocese of Duluth (4GA 12 60 79) | 1973 – 1976 |
| | |
| **Agricultural Insurance Company** | |
| St. Mary's Silver Bay (MP 37 01 17) | July 1970 – July 1973 |
| | |
| **Liberty Mutual Insurance Company** | |
| St. Christopher Church (1812545) | 1967 – 1970 |
| St. Christopher Church (1992946) | 1970 – 1973 |
| St. Christopher Church (5546611) | 1973 – 1976 |
| St. Christopher Church (3289506) | 1976 - 1979 |
| | |
| | |

## CONTINENTAL INSURANCE POLICIES

|  | Coverage Year(s) |
| --- | --- |
| **Fireman's Insurance Company of Newark, New Jersey:** |  |
| CBP 432832 | April 1973 – April 1976 |
| CBP 433069 | April 1976 – April 1979 |
| CBP 433104 | April 1979 – April 1982 |
| LX 2669250 | February 1975 – February 1978 |
| LX 2676916 | February 1978 – February 1979 |
| LX 2676922 | February 1979 – February 1980 |
| LX 2676933 | February 1980 – February 1981 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

EXHIBIT J
OFFICERS AND DIRECTORS OF REORGANIZED DEBTOR

OFFICERS OF REORGANIZED DEBTOR

President:          Bishop Paul D. Sirba
Vice President:     Rev. James B. Bissonette
Secretary:          Cathy Von Rueden
Treasurer:          Doug Hildenbrand

EXHIBIT K

**Child Protection Protocols**

1.  The Diocese shall not recommend any clergy for a position in active ministry *(i.e.,* those clergy with permission to exercise priestly ministry to the faithful) or a position that provides for access to minors, who has a pending credible or previously substantiated claim of sexual abuse of a minor against him[1] or is otherwise deemed unsuitable for ministry under circumstances that arise in whole or in part, out of accusations or risk of sexual abuse of a minor. Unsuitability determinations are made by the Bishop of Diocese of Duluth with recommendations from the Vicar General and the Diocesan Review Board. Likewise, the Diocese shall not recommend, and shall direct clergy not to recommend, any non-clergy employee for a position that provides access to minors, who has a pending credible or previously substantiated claim of sexual abuse of a minor against him or her.

2.  The Diocese shall disclose any accusation of sexual abuse of a minor to any Diocese, Catholic entity or secular employer who inquires about the existence of any accusation of sexual abuse of a minor with regard to a past or present Diocesan clergy member to the extent that communication is allowed by federal and state law. The Diocese shall also disclose the status or resolution of that claim as reflected in its records as allowed by federal and state law. This policy does not apply to ministerial assignments within the Diocese.

3.  Diocesan leadership shall meet with any survivor or his or her support person as reasonable in a supervised setting with a facilitator when appropriate, with due respect for the needs of the survivor. Meetings shall be private and may be interrupted or delayed by the facilitator if the setting becomes overly difficult.

4.  The Diocese shall publish in the *Northern Cross* four times per year for five (5) years and one time per year for an additional five (5) years thereafter a statement urging those subject to the sexual abuse of a minor to contact law enforcement to make a report of the abuse.

---

[1] A "credible claim" is one that, as determined by the Diocese, is "not implausible, and there exists a reasonable suspicion or belief supported by circumstances to justify a prudent and cautious person's belief that the allegation may be or probably is true." A "substantiated claim" is one for which, as determined by the Diocese, sufficient credible evidence exists that a reasonable person might accept as adequate to substantiate the allegation or support the conclusion that the allegation can be substantiated. The Diocese shall continue to provide information in writing to parishes and schools regarding the prevention of abuse, training to identify signs of abuse, statements that the abused are not at fault and encouraging the reporting of abuse.

CHILD PROTECTION PROTOCOLS - 1

5.  Upon request of a survivor, the Bishop, on behalf of the Diocese, shall send a personally signed letter of apology to the survivor with a credible claim of sexual abuse of a minor in the context of a Minnesota Rule of Civil Procedure 408 settlement communication.

6.  The Diocese shall continue to provide information in writing to parishes and schools regarding the prevention of abuse, training to identify signs of abuse, statements that the abused are not at fault and encouraging the reporting of abuse.

    The Diocese shall continue to provide SAFE HAVEN—IT'S UP TO YOU training or equivalent safe environment training to all new Diocese employees and agree to provide updated SAFE HAVEN—IT'S UP TO YOU training or equivalent safe environment training to all Diocese employees every five years. If significant changes are made to the Diocese's SAFE HAVEN—IT'S UP TO YOU training materials, the Diocese shall provide updated training to all Diocese employees within a reasonable time after these changes are adopted.

8.  All mandated reporters, as defined in the Minnesota Statutes, at the Diocese shall receive specific training regarding reporting obligations every five (5) years and within thirty (30) days of their retention if newly hired.

9.  The Diocese shall adopt a whistleblower policy concerning the reporting of abuse.

10. On or before 20 days after the Effective Date, the Vicar General shall make a good faith effort to obtain, from each clergy member working within the Diocese, a signed and dated written statement affirming that the clergy member (1) has not sexually abused any minor at any time, and (2) has no knowledge of any abuse of a minor by another priest of the Diocese or employee of the Diocese that has not been reported to law enforcement and the Diocese. The Vicar General shall also make a good faith effort to obtain from any visiting priest who is given open-ended faculties to minister in the Diocese or has an assignment in a parish or related Diocesan entity (this does not include clergy visiting for a single event or over a time period of less than twenty one (21) days) a signed and dated statement under this paragraph no later than thirty (30) days after assignment or open-ended faculties are given. The written statements provided under this paragraph shall not require any clergy to disclose knowledge of sexual abuse of minors obtained in the course of confession or where a person seeks religious or spiritual advice, aid, or comfort pursuant to Minn. Stat. § 595.02 or Minnesota law.

11. The Diocese shall continue its current policy prohibiting its employees and volunteers from being alone (*i.e.* out of sight of at least one other adult) with any unrelated minor while serving as an employee or volunteer of the Diocese or a Parish subject to common sense exceptions, such as emergency situations, interactions with a minor that are incidental and not extended, parents transporting their children or related individuals, and employees or volunteers transporting the children of friends and neighbors. This policy does not apply to employees and volunteers providing services in or for schools or providing

CHILD PROTECTION PROTOCOLS - 2

Catholic education. Priests are prohibited from being alone *(i.e.* out of sight of at least one other adult) with any unrelated minor except when the clergy member is hearing confession in a confessional and except for common sense exceptions, such as emergency situations and circumstances where interaction with a minor is incidental and not extended.

12. The Diocese shall continue its current policy prohibiting clergy from traveling or taking any overnight trips alone with any unrelated minor. If a clergy member travels with any unrelated minor(s), then there must be at least one other adult present and actively supervising the minor(s) at all times. The clergy members are strictly prohibited from sleeping in the same space *(e.g.,* room, bedroom, hotel room, tent, bed, etc.) with any unrelated minor.

13. The Diocese shall continue its policy that prohibits priests from having an unrelated child or children in their automobile unless supervised.

14. Public disclosure of substantiated claims of sexual abuse of minors by clergy and those facing pending credible claims that are under investigation shall be ongoing. The disclosures will be updated when a claim is determined to be substantiated, whether from the review of clergy files by outside experts or otherwise. In every such case, the Diocese will add the name of the clergy member to the disclosure section of its website. The Diocese will also disclose the names of clergy deemed unsuitable for ministry under circumstances that arise, in whole or in part, out of accusations or risk of sexual abuse of a minor. Public disclosures under this paragraph shall be made as soon as reasonably practicable but, in any event, no later than forty-five (45) days after the relevant determination. The Diocese will also share this information with the public by issuing and posting a press release on its website.

15. With regard to a substantiated claim of sexual abuse of a minor, at the conclusion of the canonical process for determination of clerical status, documents pertaining to the accusation of sexual abuse of a minor and the Diocese's response to the claim will be made accessible by the public in the manner set out in Appendix A attached hereto.

16. The Diocese shall remove photos and any visible honors (such as a plaque honoring that cleric individually or naming of a building or hall in that cleric's honor) from public display for each priest with a substantiated claim of sexual abuse of a minor. This does not prevent the Diocese from displaying photos of priests with a substantiated claim of abuse if that photo or the words accompanying it clearly indicate that the priest had a substantiated claim of sexual abuse of a minor asserted against him.

17. When the Diocese receives a report of child sexual abuse and makes a mandated report to law enforcement pursuant to Minnesota statutes, the Diocese shall not conduct an internal investigation and will not interfere in any way with law

CHILD PROTECTION PROTOCOLS - 3

enforcement until law enforcement concludes its investigation, closes its file without an investigation, or authorizes the Diocese to proceed with its investigation.

CHILD PROTECTION PROTOCOLS - 4

EXHIBIT K(1)
APPENDIX A

## CHILD PROTECTION PROTOCOLS

With regard to paragraph 15 of the CHILD PROTECTION PROTOCOLS:

1. The term "documents" referred to in paragraph 15 of the CHILD PROTECTION PROTOCOLS with regard to, "Clergy with credible claims against them concerning sexual abuse of a young person," listed on the Diocese's website shall be produced to Jeff Anderson & Associates ("JAA") within 30 days of a final order confirming the Chapter 11 Plan, subject to paragraph 2. JAA shall then make those documents public after taking appropriate actions to protect the names and identities of sexual abuse survivors and their families.

2. The Diocese shall make available to JAA copies of files maintained by the Diocese regarding claims of sexual abuse of a minor that have not been deemed by the Diocese to be substantiated. If JAA believes that any of these documents should be made public, it shall so notify the Diocese. If an agreement cannot be reached between the Diocese and JAA regarding release of the documents, Mediator Symchych shall determine whether good cause exists to publicly release the disputed documents. The mediator's determination shall be binding and final.

3. If there is a dispute about the release of documents, Mediator Symchych shall make a determination as to whether the documents should be released or the extent of the documents to be released within 30 days of receiving the parties' submissions. Each party shall have the opportunity to submit their positions. The decision of the mediator as to the release of these documents shall be binding and final.

APPENDIX A

EXHIBIT L
OTHER INSURED ENTITIES

NONE.

EXHIBIT M
LIST OF CATHOLIC ENTITIES

## LIST OF CATHOLIC ENTITIES

| Organization Name | City |
| --- | --- |
| Newman Catholic Campus Ministries at UMD | Duluth |
| St Joseph's Cemetery Association | Kettle River |
| Calvary Cemetery | Duluth |
| Human Life and Development Fund of the Diocese of Duluth | Duluth |
| Catholic Religious Education Endowment Fund of the Diocese of Duluth | Duluth |
| Seminarian Endowment Fund of the Diocese of Duluth | Duluth |
| Holy Rosary Parish Endowment Fund | Duluth |
| Stella Maris Academy | Duluth |
| St Joseph's Church and School Endowment Fund | GrandRapids |
| Hibbing Catholic Schools Endowment Fund | Hibbing |
| St John the Evangelist Tuition Assistance Fund | Duluth |
| Marquette Catholic School | Virginia |